## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

### UNDER 28 U.S.C. SECTION 2254

Prisoner's Name:                                    Jimmy Fletcher Meders

Prisoner's Number:                                 GDC 0000516816

Place of Confinement:                              Georgia Diagnostic and
                                                   Classification Prison
                                                   Jackson, Georgia 30233

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

JIMMY FLETCHER MEDERS,

|                                          |   |                                     |
|------------------------------------------|---|-------------------------------------|
| Petitioner                               | ) |                                     |
|                                          | ) | Civil Action No. 2:07-CV-00090-LGW  |
|                                          | ) | Habeas Corpus                       |
| WILLIAM TERRY, Warden, Georgia           | ) |                                     |
| Diagnostic Prison,                       | ) |                                     |
|                                          | ) |                                     |
| Respondent                               | ) |                                     |

## [RED LINED VERSION]
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY UNDER SENTENCE OF DEATH

NOW COMES the Petitioner, Jimmy Fletcher Meders, by and through undersigned counsel, and invoking this Court's jurisdiction pursuant to 28 U.S.C. § 2254, submits this Amended Petition for Writ of Habeas Corpus.  The amendments appear in an underlined form. A conformed copy of this Amended Petition is also contemporaneously filed.

Petitioner seeks this Court's protection and intercession because the Georgia state courts have violated, and unreasonably and arbitrarily refused to correct violations, of the Petitioner's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, resulting in Petitioner's

unconstitutional convictions of malice murder and sentence of death.[1]  Petitioner requests that

this Court afford him all of the protections promised by federal habeas corpus statutes, the rules

governing § 2254 cases in the United States District Courts, the Criminal Justice Act, and all

other pertinent statutes, court rules, and case law.  Finally, Petitioner seeks an Order granting an

evidentiary hearing to present the necessary evidence in support of his claims, as well as an

Order granting this petition for writ of habeas corpus.

## INTRODUCTION

Petitioner's conviction and death sentence were reversed by a state habeas corpus judge

(Bishop, J.) sitting in the Superior Court for Butts County and Petitioner Meders was granted a

new trial based upon the state habeas court's finding that Petitioner was denied his right to the

effective assistance of counsel as protected by the Sixth Amendment to the United States

Constitution.  Meders v. Schofield, Butts County Superior Court No.  93-V-188.  (Order dated

September 28, 2005) (hereafter referred to as the "Habeas Order" or "HO"). A copy of that Order

is attached to this Amended Petition as Attachment 1.  The habeas court denied Petitioner's other

requests for relief based, *inter alia*, upon claims of prosecutorial misconduct for introducing and

using perjured testimony and suppressing exculpatory evidence. Id.  The habeas court also did

not reach Petitioner's challenge to his sentence because it ordered a new trial.

The Georgia Supreme Court reversed the habeas court's grant of a new trial finding that

consideration of Petitioner's claims of ineffective assistance were procedurally barred.  Schofield

v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006). The Georgia Supreme Court also found that

Petitioner's other claims were procedurally defaulted.  Id.  Finally, the Georgia Supreme Court

did not address Petitioner's sentencing claims or remand the matter so that the sentencing claims

---

[1] Petitioner was also convicted of armed robbery and sentenced to life imprisonment
during the same trial.  Petitioner challenges his robbery conviction and life sentence as well.

could be reviewed by the habeas court despite Meders's request for remand to consider the sentencing phase of his trial.  Opening Brief on Cross Appeal at 36 and 43; Motion to Reconsider at 1, 6 and 15-17.  The Georgia Supreme Court's ruling became final on July 25, 2006, after Petitioner's motion for reconsideration was denied.

A Petition for Writ of Certiorari was denied by the United States Supreme Court. Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

As the Georgia Supreme Court found that a number of petitioner's claims were defaulted and the alleged defaults occurred during a portion of petitioner's direct appeal while he enjoyed the right to the effective assistance of counsel, petitioner filed a second state habeas petition to address the constitutional effectiveness of his counsel during the direct appeal.  Petitioner's second state habeas was filed on July 20, 2007.  Petitioner was represented by attorneys from the firm of Dykema Gossett, LLP and not by the undersigned counsel.   Petitioner's second state habeas petition was denied on December 16, 2009.  Petitioner sought a certificate of probable cause to appeal the denial of relief, which was denied by the Georgia Supreme Court on May 16, 2011. Meders v. Hall, Case No. S10E1058.  The petitioner, with counsel from Dykema Gossett, LLP then sought a writ of certiorari in the United States Supreme Court and the Court denied the petition on October 17, 2011. Meders v. Hall, 132 S.Ct. 458 (2011).

## Section 2254(d) and (e)

This Court must apply the provisions of 28 U.S.C. § 2254(d) and (e) to resolve the merits of the issues presented by Meders's Petition for Writ of Habeas Corpus if certain conditions are met.  Under 28 U.S.C. §§ 2254(d) and (e) this Court's review is constrained if the state court has addressed the merits of a federal constitutional claim for relief, has issued an opinion with respect to the merits, has adjudicated the merits, see § 2254(d); and if the merits treatment

occurred on a complete record, see 2254(e)(2),[2] with facts found in a reasonable manner, see § 2254(d)(2), and with facts found that are supported by the record, see § 2254(e)(1), then relief may not be granted on the claim in federal habeas corpus proceedings unless the state court decision was contrary to or involved an unreasonable application of federal law as established by the Supreme Court.  See § 2254(d)(1), see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527 (2003);  (Terry) Williams v. Taylor, 529 U.S. 1495, 120 S.Ct. 1495 (2000) and (Michael) Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479 (2000).

## STATEMENT OF FACTS[3]

Petitioner Meders was convicted of the malice murder and armed robbery of a Jiffy Mart convenience store clerk that occurred during the early morning hours of October 14, 1987. Petitioner, a first time offender of very limited intelligence[4] was sentenced to death after a four day trial in April 1989.  The jury submitted Jury Question 5 during its deliberations which specifically sought police reports that would have corroborated Petitioner's testimony, but which had not been introduced into evidence by the defense nor mentioned by the prosecution.  HO-34 and Jury Question 5, TT-1360, Court Ex. 1.  The prosecutor had the police reports in his trial file, HO-41 and HT-128, but did not bring the reports to the attention of the trial judge. Id.  The

---

[2] If the record from state court is materially incomplete for reasons not fairly attributable to the Petitioner, then Petitioner will be eligible to develop and present additional facts during the proceedings before this Court.  See § 2254 (e)(2) and (Michael) Williams v. Taylor, 529 U.S. 420 (2000).

[3] This introductory section provides facts relevant to all grounds and is supplemented within each ground for relief as necessary.  The record is referred to as follows.  The trial transcript is referred to as "TT."  The transcript of the remand hearing is referred to as "RT." The transcript of the habeas hearing is referred to as "HT."  The transcript of the second habeas hearing is referred to as "SHT." The remand order is referred to as "RO" and the habeas order is referred to as "HO."  The order issued with respect to the second habeas is referred to as "SHO."

[4] HT-229 and 314.  Meders also has brain damage.  HT-315.

following facts make clear the critical importance of the police reports that were withheld from the jury that convicted Petitioner and sentenced him to death.

Petitioner Meders was the only person charged with the murder or the associated robbery of the convenience store clerk even though two other men, Bill Arnold[5] and Greg Creel, admitted to being present in the convenience store at the time of the crime. HO-38.  The habeas court, after hearing three days of testimony and reviewing 52 exhibits encompassing six bound volumes, recognized that all three men were present at the time of the murder and identified the key issue at trial as having been which of the three possessed the murder weapon immediately prior to the killing because the possessor of the weapon likely committed the murder.  HO-38. Meders and Arnold each accused the other of possessing the murder weapon immediately prior to the killing.

Meders testified that he had spent the day drinking and taking drugs with Arnold and Creel.  TT-1075.  Arnold and Creel then took Meders home.  According to Meders, Arnold and Creel returned to his home later to pick him up specifically to retrieve Meders's gun that they later used to commit the murder.  TT-895-98, 1084.  According to Meders's testimony, Arnold and Creel possessed Meders's gun immediately prior to the killing and used it to shoot at two pick-up trucks owned by men with whom Arnold and Creel were feuding.  TT-897-98 and 1085-87. The second truck, owned by Robert Brown, was located near a florist on Georgia Highway 303.  TT-1086-87; see also HO-38.

The jury specifically asked whether there were police reports concerning the shooting of Brown's truck as had been described by Meders:

---

[5] Arnold was previously represented by Meders's trial counsel, John Davis, when Arnold pled guilty to burglary.  HT-52.

> Was there any reports filed on the incident of the truck, on Ga Hwy 303,
> reported between the day, after or between then and now, being shot at?

HO-34; Jury Question 5, TT-1360, Court Ex. 1.  The habeas court found:  "Jury Question 5

established the importance of Meders's testimony about the shooting at the pick-up truck near

Highway 303."  HO-38-39.[6]

The prosecutor had the police report of the Highway 303 shooting in his personal file

during the trial, realized the significance of the reports at least when the jury asked its Question

5, yet said nothing to the court or jury.  HO-41 and HT-128.  Prosecutor John Johnson kept silent

about the police reports for two years and only acknowledged the existence of the police reports

at the time of the remand hearing, after the police reports had been obtained by substitute

counsel.  HO-44-45.  The police reports were not in the files of Meders's trial lawyer, John

Davis.  HO-42. Creel was mentioned by name as a suspect in the police report of the shooting of

the truck owned by Robert Brown.  The officer who investigated the shooting of Brown's truck

"commented at the time that he took the report that the slug found was similar to the one found at

the scene of the murder."  HO-39.  This investigating officer, thus, linked the Brown truck

shooting incident directly to the Jiffy Mart killing.  There was also a time and location proximity

between the Brown truck shooting and the Jiffy Mart murder.  The Brown truck was shot at 1:30

a.m. on October 14, 1987.  Remand Hearing Exhibit D-2F (Brown report). The murder at the

Jiffy Mart occurred at approximately 2:30 a.m. on the 14th.  Remand Hearing Exhibit D-2C.

Both the Brown and Jiffy Mart incidents were in the same area of Glynn County.  Remand

---

[6] The trial court's response to this question simply instructed the jury to rely on the evidence already introduced at trial.  There was no evidence introduced at trial about the police incident reports or about related prior inconsistent statements by Creel or Arnold, or by a third witness, Randy Harris.  HO-37 n.1.

Hearing Exhibit D-5. Meders also testified to another truck shooting committed by Arnold, a bit earlier on the 14th, at 12:30 a.m.  Remand Hearing Exhibit D-2G (Bowen report).

Lead detective, Jack Boyet, recognized the significance of the Bowen and Brown reports and copied them for his file within two days of the murder.  RT-182;[7] see Remand Hearing Exhibits D-2F (Brown report) and D-2D (Bowen report).[8]

A week before trial, Creel and Arnold admitted to the prosecutor and the lead detective that they knew truck owner Bowen and that they knew, and were actively feuding with Brown, the owner of the truck near Highway 303.  HO-45.  The State never revealed this exculpatory evidence to the defense. Id.  Nor did the State reveal that approximately two months after the murder and 16 months before trial, Creel was charged with trespass and throwing a railroad tie through the window of the Brown's vehicle and a criminal arrest warrant was issued.  HT-737, Ex. P-1.  John Davis, Meders's trial lawyer, also appears never to have learned about the charges against Creel on his own.  Detective Boyet, however, knew of the railroad tie charges because he personally investigated the incident.  HO-42.

The habeas court found that:

> [t]rial counsel did not introduce any evidence to corroborate Meders's testimony that Arnold and/or Creel had possession of the murder weapon on the night of the killing.

HO-39. The police reports were not introduced and no corroborative witnesses (e.g., Brown or the investigating officers) were called to testify at trial.

---

[7] The habeas court concluded, however, that there was no evidence that the reports were in the prosecutor's file at the time he purportedly met his duty to disclose exculpatory evidence under Brady v. Maryland  by providing trial lawyer Davis with access to this prosecution file, "if indeed a review took place."  HO-42.

[8] The lead detective recalled five or six incident additional reports that documented the feud between the Creel and Brown families, but those reports were not provided to the prosecutor and were not in his file when it was reviewed by Davis, if indeed a review occurred. HT-189.

The prosecutor compounded his withholding of the police reports of the truck shootings by actively misleading the jury when he elicited false testimony from the lead detective (who also had the Brown and Bowen reports in his file) that "no evidence whatsoever" corroborated Meders's testimony that Arnold shot the pick-up trucks, TT-900, and failed to correct false testimony to the same effect offered by the detective during cross-examination.  TT-908;[9] see also HO-39.   The jury, hearing the investigator's assertion that "no evidence whatsoever" corroborated Meders's description of the truck shootings, reasonably inferred that the trucks were not, in fact, shot.  The police reports directly refuted this false conclusion.

The jury clearly sought the police reports to determine if any truck shootings had, in fact, occurred.  The absence of the reports and the lead detective's testimony that "no evidence whatsoever" corroborated Meders's testimony, coupled with the prosecutor's argument to the same effect, gave the jury misleading information and it was on this false evidence that Meders was convicted and sentenced to death.

In preparation for the hearing on the second state habeas, petitioner's counsel discovered a two paragraph handwritten note that was written on December 28, 1987 and December 29, 1987, which was two months after the crime was committed in this matter and almost a year and half before the trial.   The note was marked into evidence at the second habeas hearing as petitioner's Exhibit 5.  SHO at 87.  The note was in the handwriting of the lead investigator in the matter, then Detective Jack Boyet.  *Id.*  The note reads as follows.

> Bennett received information from same source, who said that Arnold and Creel both knew the robbery was going to happen. They did not know the clerk was

---

[9] Meders had given a statement to the lead detective five months before trial in which he described the truck shootings.  Thus, Johnson knew prior to trial that Meders would probably testify that Creel and Arnold had Meders's pistol and had used it to shoot the Brown and Bowen pick-up trucks shortly before the murder.  HO-44 citing HT-122.

going to be killed. They did not receive any money from the incident.  [SHO at 87.]

Called John Johnson, informed him of the information. We agreed to pick up Creel and Arnold and question them further. No prosecutions at this time because of a lack of corroboration other than the confidential source.

SHO at 89.

Detective Boyet's note refers to the head of detectives for the Glynn County Police Department, Wayne Bennett.  Mr. Bennett was the Glynn County Sheriff at the time of the second habeas hearing.   Sheriff Bennett testified that he received two calls from a confidential source about the crimes at issue and the note references his second call from the confidential source.  During the first call, the informant claimed that petitioner implicated himself and this assertion was included in a search warrant application for petitioner's home.  SHO at 162 .   The informant also received a reward in this matter.  SHO at 19.  Sheriff Bennett did not recall the note or the second call until the time of the second habeas hearing in 2008.  SHO at 157.  He was provided with the note by Detective Boyet a few hours before the hearing and his review of the note at that time refreshed his recollection.  SHO at 157.   Sheriff Bennett lacked any personal knowledge that the note implicating Creel and Arnold was previously disclosed to any of petitioner's prior counsel, including his trial lawyer, John Davis, or his appellate and habeas lawyers, Jenkins and Volinsky.  SHO at 158.

Creel and Arnold specifically testified at the original trial in this matter that they were completely unaware of any plans to rob the convenience store and claimed they did not even know petitioner had a gun.  TT-689, 707, 708, 725, 741-42.    They claimed that petitioner acted completely alone and they did not know that he was armed.  Id.

Further, the prosecutor elicited testimony from Sgt. Boyet that Creel and Arnold had told consistent stories about the robbery from "day one" and argued the consistency of statements as

reason for the jury to believe Arnold, Creel and Harris.  TT at 1183, 679-80 and 734-35.  This statement was demonstrably false based on review of the transcripts of the original interviews of Creel and Arnold, in which they acknowledged they knew of petitioner's gun.  Remand Hearing Exhibit D-1: HT at 924, 935 and 959.  The newly discovered note establishes that the prosecution also had a confidential informant who Sheriff Bennett considered reliable who described Creel and Arnold as knowledgeable co-conspirators.

The note and its contents were never disclosed to petitioner's trial lawyer before trial as Brady exculpatory evidence or in response to a specific motion to reveal the involvement of confidential informants under Roviaro v. United States, 353 U.S. 53 (1957).  The note was not revealed to petitioner before or during the remand hearing, in response to later Open Records Requests, or as part of the first habeas hearing.  SHO at 95, 96, 98, 103, 104, 128, 158, 186, 292-95, 356, 365, 369 and RO at 38.

The importance of the note was described at the second habeas hearing as follows:

> One is it indicates that apparently Detective Boyet was going out to pick up Creel and Arnold, which would cause me as an attorney in this situation to want to find out whether or not an interview occurred on or about December 29th and where those interview notes are because I have never seen any interview notes of an interview at that point in time. It's also indicative of what I would call a Napue violation because it contains exculpatory information and impeaching information in that my memory is, is that Creel and Arnold testified at trial that they did not have any idea that an armed robbery was about to occur. And if this is information in the possession of the prosecution, when that testimony occurs in trial they have a constitutional duty to furnish the information to the Court to correct false testimony under the case of Napue v. Illinois. It's also important impeachment information that would be used by competent counsel in examining both Creel and Arnold because it contradicts a very central issue in their case, as to their knowledge or involvement in  any alleged robbery. To just sort of put it generally, it's Brady material in spades and it would be something that I, I mean, I was very interested to see it... [I]t also raises the possibility of consideration to witnesses because it talks about a discussion that Mr. Boyet apparently had with Mr. Johnson  about whether or  not to, no prosecution at this time. So, there was a decision somewhere along the line again not to prosecute these men for this

crime, and that, to me, raises the specter of some kind of promise or consideration given to these witnesses in return for their testimony.

SHO at 372-73.

Sheriff Bennett was also asked about the prosecutor's decision to not charge Creel, Arnold or Harris.  He testified that he was unhappy with the decision and believes the three should have been charged.   SHO at 168-69 and 181-84.

The fact that petitioner was the only person charged in this matter despite evidence of a conspiracy is also a fact in mitigation that should have been presented to the jury at sentencing. Petitioner claimed that he was in a drunken stupor and was the patsy who took the blame for Arnold, Creel and Harris.  The heretofore never revealed note established specific complicity on the part of Arnold, Creel and Harris, that if not sufficient to exonerate petitioner would have served to reduce the level of conviction or mitigate against the death penalty.

## HISTORY OF PRIOR PROCEEDINGS

1.    a.    The name and location of the court that entered the judgment of conviction and sentence challenged:  Superior Court of Glynn County, Brunswick, Georgia.

b.    Criminal Docket No.  87-00763

2.    a.    The date of the judgment of conviction for malice murder and armed robbery was: April 7, 1989.

b.    The date of the judgment of sentence was:  April 7, 1989.

3.    Length of Sentence:  Petitioner Meders was sentenced to death for malice murder and received a consecutive life sentence for armed robbery.

4.    Petitioner was convicted of multiple counts.

5.    Petitioner was convicted of murder, in violation of O.C.G.A. § 16-5-1, and armed robbery, in violation of O.C.G.A. § 16-8-41.

11

6.  Petitioner pled not guilty at trial.  The trial on the issue of guilt or innocence and on the issue of sentence was had before a jury.

7.  Petitioner testified at the trial on the issue of guilt or innocence and at pretrial.

8.  Petitioner appealed his convictions and sentence of death and life imprisonment.

9.  The facts of Petitioner's appeal are as follows:

a)  Georgia Supreme Court;

b)  S89PO175.

c)  Petitioner's convictions and sentences were affirmed by the Georgia Supreme Court on February 28, 1990.  Meders v. State, 260 Ga. 49, 389 S.E.2d 320 (1990). A remand hearing was held as part of the direct appeal on March 26, 1991.[10] Relief was denied by the Glynn County Superior Court on July 10, 1991 and the Georgia Supreme Court affirmed the denial of relief on remand in a decision reported as Meders v. State, 261 Ga. 806, 411 S.E.2d 491 (1992).  This decision was also part of case number S89PO175.

d)  Grounds Raised on direct appeal:

---

[10] Meders, with the assistance of other counsel, filed a second state habeas petition in which he challenged the effective assistance of counsel provided to him on remand.  This filing was necessitated by the Georgia Supreme Court's ruling that Meders's counsel defaulted significant issues by not raising them at the remand hearing.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006). Petitioner, for example, did not raise issues concerning prosecutorial misconduct because the remand was expressly for the purposes of litigating the ineffective assistance of counsel.  See Meders I, 260 Ga at 56, 389 S.E.2d at 326 ("The question of effectiveness will likely have to be addressed at some point, and we see no reason not to do it now. We therefore grant the state's request for a remand to give defendant an opportunity to litigate this issue. If it is necessary to appoint counsel to represent the defendant on remand, the court shall do so.").  Petitioner took the Georgia Supreme Court's conclusions issued with respect to default as correct for purposes of the second state habeas proceedings only and maintained his right to challenge the legal and factual bases for those conclusions in the litigation before this Court.

i.   Denial of due process because the trial court, ignoring a bona fide doubt, failed to hold a hearing to determine if Petitioner was competent;

ii.  Denial of due process and effective assistance at trial and sentencing by the trial court's refusal to appoint a mental health expert to assist the defense;

iii. Denial of constitutional rights protected by the Georgia and United States Constitutions by the jury/venire selection process;

iv.  Denial of due process by the introduction into evidence of a summons charging cocaine sale;

v.   Denial of constitutional rights to a fair trial and a reliable sentencing by the prosecutor's misconduct in closing argument;

vi.  The trial court abused its discretion and thereby rendered the Petitioner's conviction and sentence of death unreliable and arbitrary when the court failed to hold a hearing or grant a mistrial in response to Petitioner's complaint that he only received four days notice of the trial date and was unable to procure the attendance of a witness;

vii. The introduction of gruesome photographs not relevant to matters in issue violated due process;

viii. The trial court erroneously found that Petitioner's pretrial statements were voluntarily made in violation of his constitutional rights;

ix.  The Petitioner's right to a fair and impartial grand jury was violated by the presence of three grand jurors who were biased against the Petitioner;

x.   The Unified Appeal Procedure mandated by O.C.G.A. 17-10-36, on its face and as applied, violated the Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

xi.   After remand, Petitioner challenged the orders upholding his conviction and refusing to grant him funds to retain experts in the field of jury selection, mental health and the practice of criminal law.

e)   Higher state court review was not sought because the Georgia Supreme Court is the highest state court.

f)   A Petition for Writ of Certiorari was filed in the United States Supreme Court (Docket No. 91-8283) and on October 5, 1992, the United States Supreme Court denied the Petition for Writ of Certiorari.  Meders v. Georgia, 506 U.S. 837, 117 S.Ct. 114 (1992).

10. On April 2, 1993, Meders filed a Petition for Writ of Habeas Corpus with the Superior Court of Butts County pursuant to O.C.G.A. § 9-14-41, *et seq.*

a)   Superior Court for Butts County, Georgia;

b)   Docket No.  93-V-188;

c)   Date of Filing:  April 2, 1993;

d)   Nature of the Proceeding:  Habeas Corpus;

e)   Grounds raised:

i.   Challenge to Execution Warrant-Insufficient Statutory Notice;

ii.   Challenge to Execution Warrant-Failure to Comply with Court Order;

iii.   Denial of Effective Assistance of Counsel (numerous sub-parts);

iv.   Prosecution Subornation of Perjury;

    v.   Prosecution Misconduct in Closing Argument (falsely arguing state's witnesses "told the same story since day one");

   vi.   Improper Instructions;

  vii.   Failure to Hold Competency Hearing;

 viii.   Refusal to Appoint Mental Health Expert at Trial;

   ix.   Denial of Jury/Venire Challenge;

    x.   Improper Admission/ Failure to Object to Cocaine Charge Summons;

   xi.   Misconduct in Introducing Cocaine Charge Summons;

  xii.   Prosecution Misconduct in Closing Argument (inflammatory and personal arguments at sentencing and reduction of jurors' moral responsibility);

 xiii.   Insufficient Notice of Trial Date;

 xiv.   Introduction of Gruesome Photographs;

  xv.   Involuntary Pretrial Statements;

 xvi.   Facial and as applied challenge to Unified Appeal Procedure;

 xvii.   O.C.G.A. §17-10-30 Unconstitutionally Violates Fifth, Sixth, Eighth, and Fourteenth Amendments;

xviii.   Arbitrary Application of Aggravating Circumstances;

 xix.   O.C.G.A. §17-9-3 is Unconstitutional;

  xx.   O.C.G.A. §17-10-37 is not Complied With;

 xxi.   Violation of Gregg v. Georgia;

 xxii.   Failure to Reveal the Deal;

xxiii.   Denial of Motion for Directed Verdict;

xxiv.   Denial of Motion for New Trial;

xxv.   Vagueness in Statutory Aggravating Circumstances;

xxvi.   Death Penalty is Unconstitutional;

xxvii.   Denial of Expert Assistance on Remand (mental health expert);

xxviii.   Denial of Jury Selection Expert on Remand;

xxix.   Denial of Due Process at Remand;

xxx.   Failure to Appoint Mental Health Expert on Remand to litigate Voluntariness of Pretrial Statements;

xxxi.   Denial of Expert Assistance on Remand to Litigate Effective Assistance Received at Sentencing;

xxxii.   Mental Retardation (First Amended Petition);

xxxiii.   Denial of Effective Assistance at Trial/Expanded Grounds (Second Amended Petition);

xxxiv.   Denial of Fair Hearing on Remand/Expanded Grounds (Second Amended Petition);

xxxv.   Refusal to Appoint Defense Expert for Trial/Expanded Grounds (Second Amended Petition); and

xxxvi.   Denial of Due Process/Brady v. Maryland (Second Amended Petition and further expanded in post-hearing briefings).

f)   Petitioner received an evidentiary hearing.

g)   Patula Circuit Superior Court Judge Joseph Bishop, sitting by designation in Butts County, conducted an evidentiary hearing on November 28-29, 1995 and on December 27, 1995.

h)   On September 28, 2005, the habeas court granted relief.

16

11. The State appealed to the Supreme Court of Georgia and on June 12, 2006, the Supreme Court of Georgia reversed the habeas court and denied relief.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006).  A motion to reconsider was denied on July 25, 2006. Id.  Petitioner filed a cross-appeal, which also was denied.  Id.  The State's appeal was in Docket No.  SO6A0579, the cross-appeal was Docket No.  SO6X0581.

12. Petitioner filed a Petition for Writ of Certiorari in the Supreme Court of the United States on October 24, 2006 and that Court denied the Petition for Writ of Certiorari on January 7, 2007.  Meders v. Schofield, 127 S.Ct 958 (2007).

13. On July 20, 2007, Meders filed a second Petition for Writ of Habeas Corpus with the Superior Court of Butts County pursuant to O.C.G.A. § 9-14-41, *et seq.*

    i)   Superior Court for Butts County, Georgia;

    j)   Docket No.  2007-V-751;

    k)   Date of Filing; July 20, 2007;

    l)   Nature of the Proceeding:  Habeas Corpus;

    m)   Grounds raised: Denial of Effective Assistance of Appellate Counsel (multiple sub-parts);

    n)   Petitioner received an evidentiary hearing.

    o)   Towaliga Circuit Superior Court Judge Thomas H. Wilson, sitting by designation in Butts County, conducted an evidentiary hearing on November 19-20, 2008.

    p)   On December 16, 2009, the habeas court denied relief.

14. The Petition sought a certificate of probable cause to appeal the denial of the second habeas corpus petition to the Supreme Court of Georgia and on May 16, 2011, the Supreme Court of Georgia denied the certificate and refused to consider the matter on appeal.

Meders v. Hall, Case No. S10E1058. The Georgia Supreme Court did issue a statement with its denial of a certificate of probable cause correcting a prior factual and legal error in Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006). In its 2006 decision, the Court concluded that Petitioner and his counsel were deficient in not having utilized O.C.G.A. § 24-10-130 to compel the deposition of Mr. Davis. *Id*. at 866-67. As admitted by the Court in 2011, the statute had not been enacted at the relevant time. Meders v. Hall, Case No. S10E58 at p. 1. A motion to reconsider was denied.  Id.

15. Petitioner filed a Petition for Writ of Certiorari in the Supreme Court of the United States on August 15, 2011, and that Court denied the Petition for Writ of Certiorari on October 17, 2011. Meders v. Schofield, 127 S.Ct 958 (2011).

## CLAIMS FOR RELIEF

### CLAIM ONE

<u>INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL</u>

PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND SENTENCING IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE MULTIPLE AND GRAVE FAILINGS OF TRIAL COUNSEL INCLUDING, *INTER ALIA*, THE FAILURE TO DISCOVER AND INTRODUCE OR UTILIZE POLICE INCIDENT REPORTS AND PRIOR INCONSISTENT STATEMENTS OF STATE WITNESSES WHICH WOULD HAVE CORROBORATED PETITIONER'S TESTIMONY AND IMPEACHED THE TESTIMONY OF THE STATE'S WITNESSES, THE FAILURE TO OBJECT TO INADMISSIBLE EVIDENCE OF AN UNRELATED COCAINE CHARGE AND INADMISSIBLE EVIDENCE OF FOOD STAMPS, AND THE FAILURE TO REVIEW PETITIONER'S MENTAL EVALUATION AND PRESENT AVAILABLE MITIGATING EVIDENCE IN THE SENTENCING PHASE.

16. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

17. As found by the habeas court, Petitioner was denied the effective assistance of counsel.  HO-49.   Trial counsel, John Davis, who was 71 at the time of trial, did not have an attorney sitting second chair at trial.  HO-24.  There was, at best, inconclusive evidence as to whether Davis reviewed the prosecutor's file as claimed by the prosecutor even though this was purportedly the method by which the State met its duty to provide exculpatory evidence. HO-25.  Further, and more importantly, there is no evidence that critical police reports and witness statements were in the prosecutor's file when it was reviewed, if a review occurred. HO-42-43.  Davis was unaware of a psychiatric report about Meders's competence to stand trial until after jury selection. HO-25. Davis failed to make an opening statement in the guilt/innocence phase. HO-26.  Davis failed to make an opening statement in the sentencing phase. HO-26.

18. The habeas court found, and Petitioner here asserts, that Davis's representation was ineffective in at least three areas of the trial.  First, the habeas court found that trial counsel's failure to object to the admission of a summons for a cocaine charge was:

> grave error where, as here, the unrelated charge summons was used to bolster testimony from an uncharged, unindicted party present at the scene of the crime who, in turn, could have been impeached with prior inconsistent statements discovered during pretrial investigation by a reasonably effective lawyer.

HO-34.

19. Second, the habeas court found trial counsel was ineffective in failing to object to the admission of inadmissible food stamps:

> ... this failure to object to the food stamps—just as the failure to object to the cocaine summons—also constituted grave error where, as here, the unrelated and legally received food stamps in Petitioner's wallet were clearly intended by the prosecution to cause jurors to connect the Petitioner with food stamps stolen during the scene of the crime.

HO-36.

20. Third, the habeas court extensively analyzed the failure of trial counsel to introduce police reports and to impeach the testimony of the State's key witnesses, Creel and Arnold, with their prior statements about topics related to the police reports. HO-37.   The court first noted that during guilt-innocence deliberations, the jury sent out Question 5, asking:

> Was there any reports filed on the incident of the truck, on Ga Hwy 303 reported between the day, after or between then and now, being shot at?

HO-37; TT-1061. The habeas court concluded that "at trial, possession of the murder weapon prior to the killing was a critical issue in contention." HO-38.  The habeas court found that two police reports were in the prosecutor's file at the time of trial, Remand Hearing Exhibits D-2F and D-2D, that corroborated Petitioner Meders's testimony on this point, as were transcripts of interviews of Creel and Arnold that impeached their claims of a lack of knowledge about the presence of the gun. HO-38-42. The habeas court found that the prosecutor elicited testimony from lead investigator Boyet in which Boyet informed the jury there was "no evidence whatsoever" to corroborate Petitioner's account of the truck shooting. HO-40-41.[11] The habeas court concluded that Petitioner did not receive effective assistance of counsel and was prejudiced "because, if [Davis] had indeed reviewed the State's file, the Petitioner's trial counsel failed to introduce corroborative evidence, and failed to impeach Creel and Arnold with their prior statements." HO-37.  Alternatively, Davis was ineffective for not reviewing the prosecutor's file and/or in failing to conduct sufficient investigation based upon Meders's descriptions of the truck shootings to have found the corroborative police reports on his own.

---

[11] Johnson also falsely argued to the jury in closing that Creel, Arnold and Harris should be believed because the "all told the same story all the way down the line from day one." TT-1183.  In fact, all three had told materially different "stories" soon after the killing and should have been impeached at trial.

21. The habeas court did not rule on Meders's claims regarding trial counsel Davis's failure to provide effective assistance of counsel during the sentencing phase because the court granted Petitioner's request for a new guilt/innocence trial.  Petitioner preserved those claims and asserts them here.

22. No court has ever provided Petitioner with a full and fair hearing of his sentencing claims and ruled thereon.  The habeas court did not reach this issue because it ordered a new trial.  The remand court refused to provide Petitioner, who was indigent at all relevant times, with funds to retain a mental health expert who was crucial to making the showing necessary to establish ineffectiveness and prejudice in the sentencing proceeding.

23. William Dickinson, PhD was eventually retained and testified at the habeas hearing.  Dr. Dickinson found evidence that should have been presented as mitigation at the time of sentencing including that Meders is a first offender, HT–229, that he is only within the "dull normal range of intelligence," HT–314, that he has clear brain damage, HT–315, and that he "would unlikely be able to fabricate [a complex story] and to maintain that fabrication with any degree of consistency during interviews or interrogation." HT–325.  This last finding was also highly relevant to guilt and innocence.

24. In addition, Dr. Dickinson shed light on the evaluation conducted by Dr. D'Alesandro, the state-hired competency expert.  Dr. D'Alesandro was personally unaware that Meders was facing the death penalty, yet opined that Meders was competent, that is, that Meders understood the charges against him and could participate in the proceedings. HT–400-401, 418-19, 422.  D'Alesandro also knew very little about seminal texts in his field and used outdated tests to determine Meders's intelligence.  Id.

25. Dr. Dickinson testified that he could have provided evidence to a jury that confirmed that Meders likely did not have the mental capacity to have fabricated the descriptions about the pick-up truck shootings.  HT-308-12.  Dr. Dickinson testified to Meders's history of brain injuries, his very low educational level, his exposure to toxic substances that affected his neurological functions, his long history of poly-substance abuse, and his depression.  Id. Dickinson also testified that Meders had a very good capacity to adapt to prison life and, in fact, has not been a problem while incarcerated.  HT-355.  None of this testimony was before the jury and trial court when Meders was tried, convicted and sentenced to death.[12]  As the remand court denied Meders's request for funds necessary to hire Dr. Dickinson, this evidence was also not introduced during the remand hearing.

26. All of these factors support a case for mitigation that should have been presented to the sentencing jury and would have been presented to the judge on remand had Meders been granted the funds to retain an appropriate expert.

27. These issues have been exhausted in state court.

28. Not all of these issues were raised on the original direct appeal.  The challenges that could have been raised without the appointment of experts were raised during the remand hearing and then Petitioner appealed from the remand order that denied relief.  The remand order was upheld by the Georgia Supreme Court.  Meders v. State, 261 Ga. 806, 411 S.E.2d 491 (1992).

29. Petitioner raised the remainder of these claims of ineffective assistance in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on these ineffectiveness grounds.  The habeas court did not address the

---

[12] Testimony of the type provided by Dr. Dickinson was also unavailable during efforts to determine whether Meders's pretrial statements were voluntarily made.

Petitioner's sentencing arguments because it ordered a new trial.   A copy of the habeas order

is attached to this petition <u>as Attachment 1.</u>

30. The Georgia Supreme Court reversed the order granting a new trial and denied

Petitioner's cross-appeal.   <u>Schofield v. Meders,</u> 280 Ga. 865, 632 S.E.2d 369 (2006) *cert.*

*denied sub. nom.*  <u>Meders v. Schofield,</u> 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM TWO

<u>PROSECUTOR'S USE OF PERJURED TESTIMONY</u>

THE PROSECUTOR'S INTENTIONAL INTRODUCTION OF PERJURED TESTIMONY
VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION WHEN THE PROSECUTOR KNOWINGLY INTRODUCED TESTIMONY
FROM   THE   LEAD   DETECTIVE   THAT   "NO   EVIDENCE   WHATSOEVER"
CORROBORATED PETITIONER'S TESTIMONY ABOUT THE TRUCK SHOOTINGS AND
ARGUED THAT THE STATE'S THREE KEY WITNESSES "ALL TOLD THE SAME
STORY … FROM DAY ONE" WHEN THE PROSECUTOR HAD THE CORROBORATIVE
POLICE REPORTS AND PRIOR INCONSISTENT STATEMENTS OF THE THREE KEY
WITNESSES   IN   HIS   FILE   AND   COMPOUNDED   THIS   MISCONDUCT   BY   AND
THROUGH HIS CLOSING ARGUMENT.

31. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This

claim is evidenced by the following additional factual allegations and legal conclusions.

32. The prosecution violates due process if it casts the true facts in a false light, or if

its witnesses lie.  <u>Napue v. Illinois,</u> 360 U.S. 264, 79 S. Ct. 1173 (1959); <u>Giglio v. United</u>

<u>States,</u> 405 U.S. 150, 92 S. Ct. 763 (1972);  <u>United States v. Agurs,</u> 427 U.S. 97, 103, 96 S.

Ct. 2392 (1976);  <u>Mooney v. Holohan,</u> 394 U.S. 103, 55 S. Ct. 340 (1935).  If there is a

reasonable likelihood that the jurors or the judge relied upon the state's shading of the truth, a

new trial is required.

33. The prosecutor elicited false testimony from the lead detective (who had the

Brown and Bowen reports in his file) that "no evidence whatsoever" corroborated Meders's

testimony that Arnold shot the pick-up trucks, TT-900, and failed to correct false testimony to

23

the same effect offered by the detective during cross-examination.  TT-908; see also HO-39.
The jury, hearing the investigator's assertion that no evidence corroborated Meders's
description of the truck shootings, reasonably inferred that the trucks were not, in fact, shot.
The police reports directly refuted this conclusion and Boyet's testimony was demonstrably
false.

34. The prosecutor also falsely argued in his guilt/innocence closing argument to the
jury that Creel, Arnold and a third State witness, Harris, had given consistent and truthful
descriptions to the police from the very start of the investigation and that Meders had
concocted his defense while awaiting trial.  He argued that Creel, Arnold and Harris should be
believed because they "all told the same story all the way down the line from day one."  TT-
1183; see also TT-679-80 and 734-35.

35. In fact, Creel, Arnold and Harris had all dramatically changed their stories between
the time of their first interviews and the time of their trial testimony.  All gave recorded
interviews to the police within days of the killing.[13]

36. Creel and Arnold admitted at trial that they had been drinking with Meders during
the day of the shootings, but denied having taken Meders home (where Meders testified that
his handgun was retrieved by Creel and Arnold) and denied knowing Meders had the murder
weapon at the time of the killing.  TT-689, 707, 708, 725, 741-42.  Both Creel and Arnold,
however, directly admitted in their taped statements that they took Meders home and later
picked him up.  Remand Hearing Ex. D-1; HT-924, 935 and 959.

---

[13] "There is no evidence that transcripts of the initial statements of Harris, Creel and
Arnold were in the prosecution's file when it was reviewed by defense counsel, if indeed a
review took place."  HO-42-43.

37. At trial, Creel claimed he did not know Meders was armed at the time they entered the convenience store. TT-689.  However, in the taped statement, Creel said the opposite was true. HT-951.

38. A third state witness, Randy Harris, offered testimony crucial to the State's case with respect to motive and an alleged confession. Harris also provided a tip that led the police to the murder weapon.[14]  The description of the purported confession by Meders was particularly chilling and was relied upon by the Georgia Supreme Court. Meders I, 249 Ga. at 50, 389 S.E. 2d at 321 ("After offering the other two a share of the take—which they declined—Meders left them and drove to Harris' motel room.  He woke Harris and told him he had 'just blowed a man's head off over thirty-eight dollars.'").  Harris is Arnold's first cousin. TT-736.  Meders claimed that Harris framed him because he believed Meders was having an affair with his wife.  HT-851; Habeas Ex. 7.

39. Harris, however, did not tell Detective Boyet about Meders's alleged confession to shooting the clerk in the head when Boyet first met with Harris.  HT-218-19. When specifically questioned at the outset of the investigation, Harris did not know where the clerk had been shot and, instead, asked the location of the wound in his recorded interview.  HT-87. Harris also did not mention bullets being dumped by Meders in his presence in the early statement as he did at trial.  Id.  The prosecutor conceded at the habeas hearing that Harris did not mention the head shot in his transcribed interview statement.  HT-88.

---

[14] Police searched Meders's home at the time of his arrest and did not find the murder weapon.  Two days later, Harris tipped the police that the weapon could be found under Meders's waterbed and said his information came from Meders's wife, Sherry.  TT-1148-50; HT-246.  Detective Boyet, at the habeas hearing, testified that he had no reason to believe that Meders's wife had provided the information to Harris.  HT-248.

40. The State had information from a reliable informant that was recorded in a note by Detective Boyet on December 28, 1987 and December 29, 1987 that indicated that Creel and Arnold were knowledgeable co-conspirators.   *See SHO* at 87-89.   The note was withheld from trial counsel, counsel on appeal and at the first habeas hearing and the note was not produced pursuant to Open Records Act Requests.   SHO at 158 and Exhibit 3 to Second Habeas Hearing, transcript of Boyet deposition at JRBD 0040.   In fact, Detective Boyet testified at his deposition in preparation for the second habeas hearing that he looked for a note or other documentation concerning the informant after the first habeas hearing and could not find any such documentation.   Id.

41. The trial prosecutor, John Johnson, did not reveal the existence of the confidential informant in response to a motion to reveal informants made by trial counsel even though Johnson was specifically asked by the trial judge if there were any undisclosed informants or tipsters.at hearings held on November 2, 1988 and November 4, 1988.  Id.  at JRBD 0048-49.[15]   Further, Johnson did not reveal the existence of the confidential informant despite the fact that Boyet's note was in the prosecution's case file and specifically described the information provided by the informant and the fact that Boyet discussed this information with Johnson at a time before the hearing at which Johnson failed to disclose the existence of the informant.  Id. at JRBD 049-50.

42. These issues have been exhausted in state court.

43. These issues were not raised on the original direct appeal.

_____

[15] During his colloquy with the trial judge about tipsters and informants, Johnson represented to the judge that there were not any tipsters or informants who were not listed on the State's list of trial witnesses.   Detective Boyet confirmed during his deposition that the informant described in the note and discussed with Johnson was not listed by the State as a trial witness.   Id. at JRBD 0053.

44. Petitioner raised these challenges, with the exception of the portion of the issue concerning the handwritten note of December 28-29, 1987, in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

45. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.   Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* Meders v. Schofield, 127 S.Ct. 958 (2007).

46. Issues concerning the handwritten note were raised in the second state habeas petition which was denied and the Georgia Supreme Court denied a certificate of probable cause to appeal.

CLAIM THREE

FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

THE PROSECUTION VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE TO PETITIONER'S TRIAL COUNSEL INCLUDING, *INTER ALIA*, POLICE REPORTS WHICH CORROBORATED PETITIONER'S TESTIMONY AND SOLE DEFENSE, PRIOR INCONSISTENT STATEMENTS OF KEY STATE WITNESSES AND THE ORAL STATEMENTS OF CREEL AND ARNOLD MADE TO THE PROSECUTOR AND LEAD DETECTIVE IN WHICH CREEL AND ARNOLD ADMITTED KNOWING AND FEUDING WITH THE INDIVIDUALS WHOSE TRUCKS WERE SHOT DURING THE INCIDENTS DESCRIBED IN THE POLICE REPORTS.

47. Petitioner incorporates all prior allegations of fact as if set out fully herein.   This claim is evidenced by the following factual allegations and legal conclusions.

48. The prosecution has a constitutional obligation to disclose exculpatory evidence to a criminal defendant if it is material to either guilt or to punishment.   Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963).   The duty to disclose encompasses impeachment evidence

as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375 (1985).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, see also Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555 (1995). The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item."  Kyles, 514 U.S. at 436-37.

49. The jury's submission of Jury Question 5 during its guilt/innocence deliberations establishes the materiality of the suppressed police reports of the truck shootings.  The jury, by submitting Jury Question 5, showed that it was acutely aware of the conflicting testimony about the truck shootings and responsibly sought to determine if objective evidence of the truck shootings existed.  Meders testified that the pick-up trucks were shot by Arnold on the night of the murder because Arnold and Creel were feuding with Keith Bowen and Robert Brown, the owners of the trucks.  TT-897-98 and 1085-87.  Creel "flatly denied" that the truck shootings occurred.  TT-708.  Arnold testified that "nobody in [his] crowd shot at a truck." TT-741.  Lead detective Boyet testified that "no evidence whatsoever" corroborated Meders's testimony about the truck shootings. TT-900, 908; see also HO-39.

50. In fact, as the record now clearly establishes, Meders was telling the truth about the truck shootings.  The truck shootings had occurred, there were police reports about the shootings, the owners of the trucks were available to testify, and the jury that convicted Meders and sentenced him to death was deprived of this corroborative evidence.  The State's failure to produce the police reports clearly "undermine[s] confidence in the outcome" of this

trial and sentencing and this habeas petition should be granted.  See Bagley, 473 U.S. at 682;

Kyles v. Whitley, 514 U.S. 434.

51. In addition to failing to produce the police reports, HO-42, the habeas court also

found, and Petitioner here asserts, that the prosecution failed to disclose:

q)  Evidence from Boyet, the lead detective, about the Brown and Bowen truck
shootings.  HO-31;

r)  Evidence about the feud between Creel and Brown.  HO-31, 41;

s)  Creel's pretrial admission that he knew Brown.  Id;

t)  Creel and Arnold's admissions that they knew Bowen.  HO-31, 41, 45;

u)  Evidence that the food stamps could not be linked to the robbery.  HO-31-32, 35;

v)  Evidence of a specific altercation between Creel and Brown during which Creel
threw a railroad tie through Brown's windshield that was investigated by Boyet
prior to Meders's trial.  HO-42.; and

w)  Transcripts of prior inconsistent statements by Harris, Creel and Arnold.  HO-42-
43.

x)  Petitioner also asserts the prosecution failed to produce the note written by
Detective Boyet indicating that Creel and Arnold were co-conspirators that was
marked as Exhibit 5 to the Second Habeas Hearing.

52. Prosecutor Johnson claimed that he complied with his responsibilities under Brady

to produce the police reports and transcripts of the prior statements of witnesses by providing

open file discovery to trial counsel Davis.  HO-42.  Although there may be equivocal evidence

as to whether the prosecutor ever provided Davis with access to his file, HO-25, the habeas

court completely rejected the prosecutor's claim to have provided the police reports to Davis.

The habeas court found that:

> there is no evidence that the police incident reports . . . were in the prosecutor's file at the time when it was reviewed by defense counsel, if indeed a review took place.

HO-42.

53. The habeas court similarly found, and Petitioner here asserts, that:

> [t]here is no evidence that transcripts of the initial statements of Harris, Creel and Arnold were in the prosecution's file when it was reviewed by defense counsel, if indeed a review took place.

HO-42-43.

54. The habeas court found and Petitioner here asserts that the State did not disclose its evidence confirming the Brown feud, the verbal admissions that Creel and Arnold knew Bowen or the fact that Boyet conducted a line-up in an investigation of Creel for having thrown a railroad tie through Brown's windshield.  See HO-41, 42 and 45.

55. The habeas court also found and Petitioner here asserts that his trial lawyer's file did "not include a single note, photostatic copy of a single page or any indication whatsoever that counsel for Meders at trial actually reviewed the prosecution's case file."  HO-45-46.

56. The habeas court did not rule on Meders's claims that his constitutional rights were violated at sentencing by the errors he has asserted because the habeas court found that he was entitled to a new trial on guilt/innocence.  The suppressed exculpatory evidence should also have been considered at sentencing as a mitigating circumstance.

57. Further, it was determined at the second state habeas hearing that the State had information from a reliable informant that was recorded in a note by Detective Boyet on December 28, 1987 and December 29, 1987 that indicated that Creel and Arnold were

knowledgeable co-conspirators.   *See*   SHO Exhibit 5 and SHO at 87-89.   The note was withheld from trial counsel, counsel on appeal and at the first habeas hearing.   The note was not produced pursuant to Open Records Act Requests.   SHO at 158 and Exhibit 3 to the Second Habeas Hearing.   Further, Prosecutor Johnson affirmatively misled the trial judge and the trial lawyer when he claimed there was not an undisclosed confidential informant or tipster.   Exhibit 3 to Second Habeas Hearing at 48-53.

58. The note was exculpatory and could have led to the development of other exculpatory evidence.   The note also indicates that Creel and Johnson were to be further interviewed in late December 1987 or early in 1988.   There are no notes of said interviews and this absence of documentation (or the failure to follow up the informant's tip) are also condemnatory of the police investigation and was therefore exculpatory.

59. The exculpatory aspects of the handwritten note and the references to the prosecution's decision not to charge co-conspirators are relevant to both the guilt/innocence phase of the trial and in mitigation of sentencing.

60. These issues have been exhausted in state court.

61. These issues were not raised on the original direct appeal.

62. Petitioner raised these challenges in his first state habeas petition filed on April 2, 1993, in subsequent amendments, and in Petitioner's Post-Hearing Memorandum dated June 27, 1997 at 10-14 and 21-39.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

63. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.   Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*   Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

64. Issues concerning the handwritten note were raised in the second state habeas petition, which was denied, and the Georgia Supreme Court denied a certificate of probable cause to appeal.

CLAIM FOUR

INTRODUCTION OF INADMISSIBLE FOOD STAMPS

THE PROSECUTION'S INTRODUCTION OF FOOD STAMPS FOUND IN PETITIONER'S POSSESSION AT THE TIME OF HIS ARREST TO LINK PETITIONER TO THE ROBBERY VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE PROSECUTOR'S TRIAL FILE INCLUDED A NOTE FROM THE LEAD DETECTIVE THAT ADVISED THE PROSECUTOR THAT THE FOOD STAMPS COULD NOT BE LINKED TO THE ROBBERY AND PETITIONER WAS A LEGAL RECIPIENT OF FOOD STAMPS.

65. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

66. The habeas court found that defense counsel failed to provide constitutionally effective assistance of counsel because counsel failed to object to the introduction of food stamps seized from Meders.  HO-35.  Petitioner contends that the improper introduction of the food stamps also constitutes prosecutorial misconduct that undermines confidence in the outcome of this matter.  See Donnelly v. DeChristoforo, 416 U.S. 637 (1974).

67. The prosecutor offered the food stamps as evidence despite the existence of a note from the lead detective later found in the prosecutor's personal trial file, "***Unable to trace any food coupons to store.***" Id. (emphasis in habeas order).  Further, the prosecutor argued to the jury that Meders's possession of these food stamps when arrested was evidence of guilt, TT-1204, and repeated this false assertion to justify the jury's imposition of a sentence of death. TT-1316.  As well, the Georgia Supreme Court relied on this false evidence in upholding

Meders's conviction and sentence. <u>Meders I</u>, 260 Ga. at 50, 389 S.E.2d at 321 ("Seventeen food stamps were found in the pocket of his coat.").

68. The prosecutor's misconduct concerning the food stamps violated Petitioner's due process rights.

69. These issues have been exhausted in state court.

70. These issues were not raised on the original direct appeal.

71. Petitioner raised these challenges in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

72. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.   <u>Schofield v. Meders,</u> 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* <u>Meders v.</u> Schofield, 549 U.S. 1126,127 S.Ct. 958 (2007).

CLAIM FIVE

<u>INTRODUCTION OF INADMISSIBLE COCAINE TRAFFICKING CHARGE</u>

THE PROSECUTOR'S INTRODUCTION OF AN UNADJUDICATED SUMMONS FOR COCAINE TRAFFICKING TO SUPPORT THE STATE'S THEORY OF MOTIVE VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT WAS INADMISSIBLE IN PETITIONER'S CAPITAL TRIAL.

73. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

74. The trial prosecutor was very experienced and was pitted against a 71 year old defense counsel who tried the case without a second chair.  HO-24.  The habeas court found, and the Petitioner here asserts, that "[t]he State introduced at trial a charging document in

33

which Meders was charged with the sale of cocaine."  HO-33; see also Trial Ex. 37-42.[16]  The

citation was intentionally introduced into evidence by the prosecutor to support his proof of

motive (i.e., that Meders committed the robbery to pay off a drug debt.) HO-33.   The

introduction of the citation undermined the fairness of Meders's trial and sentencing.  HO-32.

Indeed, the State conceded at oral argument on direct appeal that the charge could not have

been properly admitted over objection because the prosecutor had not complied with the

notice requirements of Uniform Superior Court Rule 31.3.  The untried charge also was not

admissible as it was not proof of anything, Sides v. State, 213 Ga. 482, 99 S.E.2d 884 (1957),

and the state violated Petitioner's due process rights by introducing the charge.  See Donnelly

v. DeChristoforo, 416 U.S. 637 (1974).   The State's misconduct created a reasonable

probability that the outcome of Meders's trial was changed and that confidence in the

outcome is undermined.  Id.

75. This issue has been exhausted in state court.  This issue was raised on the original

direct appeal, but the Georgia Supreme Court denied relief because trial counsel had not

objected to the introduction of the summons.  360 Ga. at 54, 389 S.E.2d at 324 ("Absent any

objection by the defendant the court did not err by admitting the contents of the defendant's

wallet in evidence.")   Meders then raised trial counsel's failure to object as part of his

ineffective assistance claim.

76. Petitioner raised this challenge in his first state habeas petition filed on April 2,

1993 in case number 93-V-188.   The habeas petition was granted, in part, based on this

ground.   A copy of the habeas order is attached to this petition.

---

[16] State's Exhibit 37, the contents of Meders's wallet, also included business cards from
two attorneys, Jeffrey R. Berry and Samuel G. Oliver, and the business card of Det. G.J.
McMichael of the Glynn County Police Department.  The Berry business card appears to have
rate quotes for "Bond Hearing 200, Plea 300, Jury 600" and notes "Received-200.00."

77. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*  Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM SIX

PROSECUTOR'S FALSE VOUCHING FOR STATE'S WITNESSES

THE PROSECUTOR IMPERMISSIBLY AND FALSELY VOUCHED FOR THE STATE'S WITNESSES AND THEREBY VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY, *INTER ALIA*, FALSELY ARGUING THAT THE THREE KEY WITNESSES "ALL TOLD THE SAME STORY … FROM DAY ONE" WHEN THE PROSECUTOR'S TRIAL FILE CONTAINED PRIOR INCONSISTENT STATEMENTS OF THE WITNESSES AND BY ARGUING THAT "NO EVIDENCE WHATSOEVER" CORROBORATED MEDERS'S TESTIMONY ABOUT THE TRUCK SHOOTINGS WHEN THE PROSECUTOR HAD THE POLICE REPORTS OF THE TRUCK SHOOTINGS IN HIS FILE AT THE TIME OF TRIAL.

78. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

79. A prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872 (1974). Improper argument by a prosecutor reaches the level of fundamental unfairness if it is "so egregious as to create a reasonable probability that the outcome was changed." Brooks v. Kemp, 762 F.2d 1368, 1403 (11th Cir. 1985)(en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325 (1986), reinstated, 809 F.2d 700 (11th Cir.(en banc), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240 (1987). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984).

80. Petitioner Meders testified that Arnold and Creel took him home and returned to pick him up specifically to retrieve his gun that they later used to the commit murder.  TT-895-98, 1084.

81. Meders testified that immediately prior to the killing, Arnold and Creel possessed Meders's gun and used it to shoot at two pick-up trucks owned by men with whom Arnold and Creel were feuding.  TT-897-98, 1085-87.  The second truck, owned by Robert Brown, was located near a florist on Georgia Highway 303.  TT-1086-87; see also HO-38 and Remand Hearing Exhibit D-5.

82. The jury specifically asked whether there were police reports concerning the shooting of Brown's truck:

> Was there any reports filed on the incident of the truck, on Ga Hwy 303, reported between the day, after or between then and now, being shot at?

HO-34; Jury Question 5, TT-1360, Court Ex. 1.  The habeas court found, and Petitioner here asserts, that "Jury Question 5 established the importance of Meders's testimony about the shooting at the pick-up truck near Highway 303."  HO-38-39.[17]

83. The prosecutor misled the jury in his closing argument on this important point of who possessed the murder weapon immediately prior to the killing.  The prosecutor argued in his closing to the jury that Creel, Arnold and a third State witness, Harris, had given consistent and truthful descriptions to the police from the very start of the investigation and that Meders had concocted his defense while awaiting trial.  He argued that Creel, Arnold and Harris should be believed because they "all told the same story all the way down the line from day one."  TT-1183; see also TT-679-80, 734-35.

---

[17] The trial court's response to these questions at trial simply instructed the jury to rely on the evidence already introduced at trial.  There was no evidence at trial introduced about the police incident reports or the prior statements of Harris, Creel or Arnold.  HO-37 n.1.

84. In fact, Creel, Arnold and Harris had all dramatically changed their stories from the time of their first interviews until the time of their trial testimony.  All gave recorded interviews to the police within days of the killing.[18]  Creel and Arnold admitted at trial that they had been drinking with Meders during the day of the shootings, but denied having taken him home (where Meders claimed his handgun was later retrieved when Creel and Arnold returned to his house) and denied knowing Meders had the murder weapon.  TT-689, 707, 708, 725, 741-42.  Both, however, had directly admitted in their taped statements that they took Meders home and later picked him up.  Remand Hearing Ex. D-1; HT-924, 935 and 959.

85. At trial, Creel claimed he did not know Meders was armed at the time they entered the convenience store.  TT-689. However, in the taped statement, Creel admitted the opposite was true.  HT-951.

86. Randy Harris offered testimony critical to the State's case with respect to motive and an alleged confession. Harris also provided a tip that led the police to the murder weapon.[19] The description of the purported confession by Meders was particularly chilling and was relied upon by the Georgia Supreme Court. Meders I, 249 Ga. at 50, 389 S.E. 2d at 321 ("After offering the other two a share of the take—which they declined—Meders left

---

[18] "There is no evidence that transcripts of the initial statements of Harris, Creel and Arnold were in the prosecution's file when it was reviewed by defense counsel, if indeed a review took place."  HO-42-43.

[19] Police searched Meders's home at the time of his arrest and did not find the murder weapon.  Two days later, Harris tipped the police that the weapon could be found under Meders's waterbed and said his information came from Meders's wife, Sherry.  TT-1148-50 and HT-246.  Boyet, at the habeas hearing, testified that he had no reason to believe that Meders's wife had provided the information to Harris.  HT-248.

them and drove to Harris' motel room.  He woke Harris and told him he had 'just blowed a man's head off over thirty-eight dollars.'").[20]

87. Harris, however, did not tell the detectives about Meders's confession to shooting the clerk in the head when first asked. HT-218-19. To the contrary, when specifically questioned at the outset of the investigation, Harris did not know where the clerk had been shot and, instead, asked the location of the wound.  HT-87-90.  Harris also did not mention bullets being dumped by Meders in his presence in the early statement as he did at trial.  Id.[21]

88. The argument that the State's witnesses had "all told the same story all the way down the line from day one," TT-1183; see also TT-679-80 and 734-35, was clearly and demonstrably false and the prosecutor, by making this improper argument, violated Petitioner Meders's constitutional rights.

89. The prosecutor similarly violated Meders's constitutional rights when he claimed that "no evidence whatsoever" corroborated Meders's descriptions of the truck shootings. See Claim Two, supra.

90. "The prosecutor violated the fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States ex. rel Shaw v. De Robertis, 755 F.2d 1279 (7th Cir. 1985), citing United States v. Fearns, 501 F.2d 486, 489 (7th Cir. 1974). Cumulatively, this "series of remarks, in the context of [the] trial, rendered the entire trial unfair." Davis v. Zant, 36 F.3d 1538, 1546 (11th Cir. 1994) (granting relief where misconduct consisted of intentional misrepresentation both highly misleading to the jury and prejudicial to the petitioner). "[I]mproper suggestions, insinuations, and especially, assertions of personal

---

[20] Harris is Arnold's first cousin.  TT-736.  Meders claimed that Harris framed him because he believed Meders was having an affair with his wife.  HT-851, Ex. 7.

[21] Prosecutor Johnson conceded this point, that Harris did not mention the head shot in his transcribed statement, at the habeas hearing   HT-88.

knowledge, are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 296 U.S. 629 (1935).

91. Further, the State had information from a reliable informant that was recorded in a note by Detective Boyet on December 28, 1987 and December 29, 1987 that indicated that Creel and Arnold were knowledgeable co-conspirators.   See  SHO at 87-89 .   The note was withheld from trial counsel, counsel on appeal and at the first habeas hearing.  The note was not produced pursuant to Open Records Act Requests.    See SHO at 87 and Exhibit 3 to Second Habeas Hearing.

92. The trial prosecutor, John Johnson, withheld any evidence of the existence of the confidential informant in response to a motion to reveal informants made by trial counsel and affirmatively advised the trial judge and trial counsel that there were no undisclosed informants or tipsters.  Exhibit 3 to Second Habeas Hearing at 48-53.

93. The note contains further evidence supporting the claim that the prosecutor knowingly misled the jury when he falsely vouched for the honesty of the State's witnesses, Creel, Arnold and Harris.

94. This issue has been exhausted in state court.

95. This issue was not raised on the original direct appeal.

96. Petitioner raised this challenge in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

97. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM SEVEN

IMPROPER CLOSING ARGUMENT AT SENTENCING

PETITIONER WAS DENIED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL AND RELIABLE SENTENCING DETERMINATION BY THE PROSECUTOR'S CLOSING ARGUMENT DURING THE SENTENCING PHASE WHICH, *INTER ALIA*, PLAYED TO THE PASSIONS, FEARS AND RELIGIOUS BELIEFS OF THE JURY, MISSTATED THE EVIDENCE, EXPRESSED HIS PERSONAL OPINION IN AN INFLAMMATORY MANNER, MISSTATED THE LAW CONCERNING BURDEN OF PROOF, ENCOURAGED THE JURY TO IGNORE PROPER AREAS OF MITIGATION, DENIGRATED PETITIONER'S PROCEDURAL RIGHTS, AND IMPROPERLY DIMINISHED THE JURY'S MORAL RESPONSIBILITY IN IMPOSING THE DEATH PENALTY BY ARGUING THE AGGRAVATING FACTORS TO JUSTIFY THE DEATH SENTENCE HAD BEEN FULLY PROVEN IN THE PROCESS OF FINDING PETITIONER GUILTY.

98. Petitioner incorporates all prior allegations of fact as if set out fully herein. This claim is evidenced by the following factual allegations and legal conclusions.

99. Petitioner's rights to due process and a fair and reliable sentencing proceeding were violated by the improper and prejudicial argument of the prosecutor in his opening statement and closing argument during the sentencing phase of Petitioner's trial, in contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States constitution.

100. The prosecutor improperly played to religious themes that undermined the jury's responsibility to choose between life and death for Jimmy Meders when he argued to the jury:

> Certain laws have been constant, for five-six-seven thousand years they have been constant, and there is one law against murder. The penalty for that has also been constant for that same seven thousand years. The penalty for taking someone's life, for murdering that person, has a long time ago been to take that defendant out beyond the gates of the city and stone him to death, take his life, punish him.

TT-1309; see also TT-1315 ("eye for an eye and a tooth for a tooth").

101. The prosecutor continued his effort to diminish the jury's responsibility when he further argued:

I submit to you this, ladies and gentlemen, that you have already in this case found the defendant beyond a reasonable doubt to have committed a statutory aggravating circumstance.   In order to find him guilty of murder and armed robbery you had to find him guilty beyond a reasonable doubt of those two offenses, and so, you have already made that decision, and when you go back into that jury room and consider this case again from the sentencing standpoint, you can again come to that same conclusion….

TT-1315-16.

102. The prosecutor improperly commented on Petitioner's due process rights, claiming he afforded none to the victim:

[The victim], his life had a value.  Don Anderson had a right to live, and that was a valuable right to Don Anderson that was taken away from him without the benefit of all of this that we have gone through for the last five days.  It was taken away in an instant on October 14, 1987, by Jimmy Fletcher Meders.  He didn't have due process.  He didn't have a judge to sit up there and decide which way decisions were going to be made under the law.  He didn't have a defense attorney.  He didn't have a prosecutor.  Jimmy Fletcher Meders did all of that on his own for his own reasons that day.

TT-1314.

103. The prosecutor argued that Petitioner had to be sentenced to death to avoid his killing again.  TT-1317 ("You didn't put much value on that life, and we are going to stop you right here, right today from ever doing it again to anybody else, and we are going to punish you today for what you did.")[22]

104. These arguments were improper not only for their directive that jurors had an obligation to give death as the "conscience of the community," <u>Rideau v. Louisiana</u>, 373 U.S. 723, 83 S. Ct. 1417 (1963); <u>Irvin v. Dowd</u>, 366 U.S. 717, 81 S. Ct. 1639 (1961), but also because the arguments lessened jurors' responsibility for sending Petitioner Meders to death. <u>Caldwell v. Mississippi,</u> 472 U.S. 320, 105 S.Ct. 2633 (1985).

---

[22] Trial counsel did not object to any of the prosecutor's improper argument.

105. Taken as a whole, the improper arguments rendered Mr. Meders's sentencing phase fundamentally unfair.  Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985) (*en banc*); Donnelly v. DeChristoforo, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872 (1974); Romine v. Head, 253 F.3d 1349 (11th Cir. 2001).  There is a reasonable probability that the arguments led the jury to a death sentence.

106. These issues have been exhausted in state court.

107. A portion of these issues was raised on the original direct appeal and the court ruled on the merits despite trial counsel's failure to object.  See Meders I, 260 Ga. at 54, 389 S.E.2d at 324 ("The defendant did not object at trial to the prosecutor's closing argument and, having reviewed the complaints he now makes on appeal, we conclude the prosecutor's arguments did not result in the death sentence being imposed under the influence of passion, prejudice, or other arbitrary factor….").

108. Petitioner raised this issue and the claim that counsel was ineffective in failing to object in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

109. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*  Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM EIGHT

GLYNN COUNTY JURY SYSTEM IS UNCONSTITUTIONAL

PETITIONER WAS DENIED HIS RIGHT TO EQUAL PROTECTION IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE PROCEDURE USED TO SELECT GRAND AND TRAVERSE JURY ARRAYS IN GLYNN COUNTY TO FORCE RACIAL REPRESENTATIVENESS BY

DELIBERATELY AND SYSTEMATICALLY REMOVING ALL WHITE JURORS ONCE THE ARRAY REACHED A PREDETERMINED PERCENTAGE OF WHITE JURORS.

110. Petitioner incorporates all prior allegations of fact as if set out fully herein. This claim is evidenced by the following factual allegations and legal conclusions.

111. Prior to trial, Petitioner's trial attorney filed a "Motion to Quash the Indictment." The trial court conducted an evidentiary hearing on this motion on March 9, 1989. At that hearing, the evidence showed that a new plan for the selection of jurors in Glynn County was adopted by the Superior Court Judges on November 11, 1981. Defendant's Hearing Exhibit 1; Transcript of proceedings March 9, 1989 at 17-18, 108 (hereinafter "JCH-" followed by the relevant page number). The testimony showed that in 1986, Glynn County purchased a new computer system manufactured by Unisys. JCH-7-8. At the time the new system was installed, the installation included a software change so that a racial criterion was employed. This software modification forced a representation on each array that was a specific percentage white and a specific percentage African-American. Lynn Douglas, the individual in the Glynn County Clerk's Office who helped monitor the new system, testified that once the new system was in place, the computer operator would specify the number of jurors needed for the array and the computer would calculate the number of each race to reflect the proportion of that race in the grand or petit jury list as a whole. JCH-72-74; see also testimony of Glynn County Systems Analyst Darwin Ikard. JCH-36-37. In order to do this, the computer program would monitor the selection process as to each array. Once that selection process reached the percentage of whites in the grand or traverse jury lists as a whole, if a white juror were randomly selected by the program for inclusion in the array, the program would automatically reject that white juror and return him or her to the grand or traverse jury list, and continue with that procedure until an African-American juror was selected, who

would be accepted and placed on the array. JCH-72-73; 37. Additionally, the computer program would treat all persons who listed their race as "other" (i.e., not white or African-American) as if they were African-American when it was employing this systematic procedure to force a racial balance in the jury arrays. JCH-74-75.

112. The mandate of the Fifth Amendment that "race discrimination be eliminated from all official acts and proceedings of the [federal government] is most compelling in the judicial system." Powers v. Ohio, 499 U.S. 400, 415, 111 S.Ct. 1364 (1991). The traditional test for an equal protection violation is the three-part test set out by the Supreme Court in Castenada v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272 (1977). However, as recognized by the Sixth Circuit in United States v. Ovalle, 136 F.3d 1092, 1104 (6th 1998), "if there is no doubt that racial factors were the primary reason for excluding potential jurors, there would be no need to utilize the traditional three-prong approach; a court could simply look to the direct evidence of exclusion based on race."

113. Ovalle involved a jury procedure designed to force racial representativeness that is indistinguishable from the procedure used by Glynn County at the time of Meders's indictment and jury trial. In Ovalle, the judges for the United States District Court for Eastern District of Michigan had approved a new Jury Selection Plan in 1992. The Plan included the following "subtraction" method of balancing to ensure proportional representation of different cognizable groups in the community, which provided that:

> [t]he qualified jury wheel shall be composed of persons who represent a fair cross-section of the area of each place of holding court as set forth in Section III of this Plan. To this end, if the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentage of the population of each group in the area of

each place of holding court, according to the most recently published national census report.

136 F.3d at 1095.

114. Analyzing this procedure under the equal protection clause of the Fifth

Amendment, the court concluded that:

> [W]hen race is the predominant factor in excluding certain individuals from the jury wheel there must be a compelling governmental interest for such action and the means chosen must be narrowly tailored to meet that interest.

Id. at 1105. Applying this standard to the jury selection procedure before it, the court concluded:

> The implementation of the jury selection plan is clearly not race neutral. Individuals were eliminated from consideration for jury service on the basis of their race. Any non-African-American had a chance of being eliminated from the jury wheel solely based on race…. Excluding non-African-Americans in this manner discriminates against potential jurors solely because of their racial status.

Id. While finding that the government has a compelling interest in ensuring that jury pools represent a fair cross section of the community, id. at 1105-06, the court went on to conclude that the Jury Plan was not narrowly tailored to meet this end, based on its finding that one in five white or "other" jurors eliminated from the qualified jury wheel to ensure racial representativeness did not have "the same opportunity to serve as did the African-American members of the wheel who were protected from elimination" and its additional finding that "the plan does not even attempt to assure that Hispanics or any other cognizable group except African-Americans are appropriately represented on the jury wheel." Id. at 1106. The court goes on to conclude:

> The problem is the removal of persons from the jury wheel solely on the basis of race. Rather than affirmatively removing otherwise qualified jurors because of their racial status, alternative methods of broadening membership in the jury pool could have been utilized. The Eastern District of Michigan could have chosen to supplement the voters' list and drivers' list to diversify the pool of potential jurors. Such measures can establish a jury pool that represents a fair

> cross section of the community without unconstitutionally discriminating against individuals by eliminating them from the jury wheel on the basis of their racial status.

Id.

115. That is precisely what happened in the jury selection procedures employed by Glynn County.  Whenever the percentage of white jurors reached the percentage of white jurors on either the grand jury list or the traverse jury list while a particular jury array was being selected for either purpose, the computer software would automatically reject any white jurors that were selected, thereby eliminating them from jury service solely on the basis of their racial status.  The only apparent difference in the procedures used in Ovalle from those used in Glynn County was that the former treated all non-African-Americans as whites, while Glynn County treated all jurors identified as "other" as if they were African-American.

116. Because the Glynn County jury selection procedure explicitly and purposefully eliminated jurors solely on the basis of their racial status, even assuming that the goal of ensuring racial representativeness was a compelling state interest, the procedure employed by Glynn County was not narrowly tailored to meet this end.  As a consequence, the grand jury array from which the grand jury which indicted Petitioner Meders was selected and the traverse jury array from which the petit jury which convicted Meders was selected were chosen by a procedure which violated his right to equal protection as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

117. These issues have been exhausted in state court.

118. These issues were raised in part on the original direct appeal and Petitioner sought funds to retain a necessary expert so he could litigate this claim on remand, but the request was denied.

119. Petitioner raised the remaining portion of these challenges in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

120. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.   Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* Meders v. Schofield, , 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM NINE

PROSECUTOR'S FAILURE TO REVEAL DEALS WITH WITNESSES

THE PROSECUTOR'S FAILURE TO REVEAL DEALS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BECAUSE THOSE DEALS INCLUDED, *INTER ALIA*, DEALS WITH THE STATE'S TWO EYEWITNESSES TO THE KILLING WHERE BOTH MEN ADMITTED BEING PRESENT WHEN THE ROBBERY AND KILLING OCCURRED BUT WERE NOT PROSECUTED IN RETURN FOR THEIR TESTIMONY AGAINST PETITIONER.  A THIRD STATE WITNESS WAS GRANTED A DEAL WITH RESPECT TO HIS ASSAULT OF PETITIONER'S BROTHER.

121. Petitioner incorporates all prior allegations of fact and conclusions of law as if set out fully herein.   This claim is evidenced by the following factual allegations and legal conclusions.

122. The State has a constitutional duty to reveal plea agreements with its witnesses and a failure to do so violates a defendant's constitutional rights.  Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972).

123. Here, though admittedly present at the time of the killing, Creel and Arnold were never prosecuted for anything, presumably pursuant to deals made in return for their testimony.   The failure to reveal these deals violated Petitioner's constitutional rights.

124. Stacy Meders, Petitioner's brother, was assaulted by Randy Harris, a key state witness, on January 5, 1988.  HT-156-57.   The charge was pending against Harris at the time

of Petitioner's trial.  According to Stacy Meders, the prosecutor, John Johnson, appeared in court at the time of Harris's trial, spoke to the judge in chambers and Harris, a multiple offender, was sentenced to 150 hours of community service and a $50.00 fine.  See HT-273-74.  Johnson testified at the habeas hearing but could not recollect interceding on Harris's behalf.  HT-162-63.

125. Creel and Arnold, and Creel's mother, were all charged with felonies stemming from an aggravated assault that occurred on July 23, 1988, about nine months before Creel and Arnold testified at Meders's trial.  Habeas Exhibit 34.  All charges against Creel and Arnold were dismissed on May 23, 1991, two years after the Meders's trial.  HT-135.  Creel's mother was purportedly placed in a diversion program conditioned on her paying restitution.  Although restitution was not paid, she suffered no consequence.  HT 581 and 593-94.

126. Further, the State had information from a reliable informant that was recorded in a note by Detective Boyet on December 28, 1987 and December 29, 1987 that indicated that Creel and Arnold were knowledgeable co-conspirators which was withheld from petitioner.  *See*  SHO at 87-89.   The trial prosecutor, John Johnson, affirmatively misled the trial judge and the trial counsel when he claimed there were no undisclosed tipsters or informants.  Exhibit 3 to Second Habeas Hearing at 48-53.

127. The note also revealed that the lead detective, Jack Boyet, discussed with John Johnson, the prosecutor, the potential prosecution of Creel and Arnold.   Sheriff Bennett strongly supported their prosecution and that of Randy Harris in connection with the armed robbery and murder.

128. This issue has been exhausted in state court.

129. This issue was not raised on the original direct appeal.

130. Petitioner raised this challenge in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

131. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.   Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*   Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM TEN

INTRODUCTION OF PETITIONER'S STATEMENTS

PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE IMPROPER INTRODUCTION OF IN CUSTODY STATEMENTS MADE BY PETITIONER BECAUSE THERE WAS NO SHOWING THAT PETITIONER KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHT TO REMAIN SILENT OR RIGHT TO COUNSEL.

132. Petitioner incorporates all prior allegations of fact as if set out fully herein.   This claim is evidenced by the following factual allegations and legal conclusions.

133. Petitioner's constitutional rights were violated by the introduction at trial of involuntary statements made while Petitioner was in custody in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.   Petitioner also gave a statement while represented by counsel without waiving his Sixth Amendment right to counsel.

134. Numerous officers encountered Petitioner Meders at his home on the morning after the killing.   The officers were armed and an Agent Harrell read Petitioner his Miranda rights.   TT-840-41.   Meders was then interrogated by police while in custody.   Meders gave a statement that was introduced against him at trial.   Meders was questioned further at the police station and provided additional statements which were introduced against him at trial.

49

During the times of his interrogations, Meders was within the "dull normal range of intelligence," HT–314, and had clear brain damage.  HT–315.  Any statements made by Petitioner Meders, therefore, were involuntary, unknowing and unintelligently given, and each was tainted fruit of the statement which proceeded it.  Any alleged waivers of rights by Meders during the period of these interrogations were invalid because of Meders's mental state.[23]  <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602 (1966); <u>Jurek v. Estelle</u>, 593 F.2d 672 (5th Cir. 1979).

135. While incarcerated awaiting trial and represented by counsel, Petitioner Meders contacted Detective Boyet and gave a statement to him on November 14, 1988.  The statement was introduced at trial.  TT-857-59.  Meders's counsel did not know that his client was being interviewed by Boyet.  Boyet did not obtain a specific waiver of Meders's right to counsel. <u>Id</u>.

136. Meders attempted suicide while in custody on November 11, 1988 and had been placed on Elavil shortly before he spoke with Boyet.  HT-302.   According to Dr. Dickinson, the newly started treatment with Elavil, "would likely cause a person to be somewhat impulsive, to act without sufficient deliberation.  Add that to someone [being] suicidal and not caring. . . it is quite likely the two interacting [affected Meders's] judgment."  HT-307.[24]  Meders's statement of November 11, 1988 was involuntary and his waiver of his constitutional rights to remain silent and to counsel were not knowingly and voluntarily made.

---

[23] Many people with mental retardation surrender critical rights because they cannot understand what it means to have a right, much less what it means to waive it.  <u>See</u> James W. Ellis & Rugh A. Luckasson, <u>Mentally Retarded Criminal Defendants</u>, 53 Geo. Wash. L. Rev. 414, 448 (1985).   <u>See also</u> S. Simpson, <u>Confessions and the Mentally Retarded Capital Defendant:  Cheating to Lose</u>, 6 Capital Defense Digest 30 (1984).

[24] Davis did not introduce any evidence on this point in an effort to suppress Meders's pretrial statements.  Meders was denied funds at the time of the remand hearing and, therefore, could not introduce this evidence.

137. This issue has been exhausted in state court.

138. This issue was raised in part on the original direct appeal and on remand.

139. Petitioner raised the remaining portion of this challenge in his first state habeas petition filed on April 2, 1993 in case number 93-V-188.   The habeas petition was granted on other grounds.   A copy of the habeas order is attached to this petition.

140. The Georgia Supreme Court reversed the order granting a new trial and denied Petitioner's cross-appeal.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*  Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM ELEVEN

FAILURE TO CONDUCT COMPETENCY HEARING

THE TRIAL COURT'S FAILURE TO CONDUCT A COMPETENCY HEARING VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT HAD ORDERED A COMPETENCY EVALUATION BECAUSE PRIOR TO TRIAL PETITIONER HAD SUFFERED A NERVOUS BREAKDOWN, ATTEMPTED SUICIDE, AND HAD DIFFICULTY ASSISTING TRIAL COUNSEL, YET THE COURT DID NOT HOLD A HEARING ON PETITIONER'S COMPETENCY.

141. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

142. Competency is a constitutional requirement.  Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788 (1960).  The requirement that a defendant be competent at his trial is so basic that it may not be waived.  Adams v. Wainwright, 764 F. 2d 1356, 1359 (11th Cir 1985) citing Zapata v. Estelle, 588 F.2d 1017, 1021 (5th Cir. 1979); Nathaniel v. Estelle, 493 F. 2d 794, 798 (5th Cir. 1974); and Bruce v. Estelle, 483 F.2d 1031, 1037 (5th Cir. 1973).  "The [United States Supreme Court] held in Pate that . . . when evidence was presented indicating incompetency during the trial, there was a duty on the trial judge to inquire into the insussue of competency and hold a hearing on the issue."  Baker v. State, 250 Ga. 187, 297 SE 2d 9, 12

(1982).   Also, "[t]he constitutional guarantees require the trial court to inquire into competency, even where state procedures for raising competency are not followed, if evidence of incompetence comes to the court's attention."  <u>Id</u>. at 13.

143. Evidence introduced during a hearing held on March 1, 1989 concerning Meders's nervous breakdown and suicide attempt on November 11, 1988 and his difficulty understanding the proceedings resulted in an order that Meders be evaluated for competence. Hearing of March 1, 1989 at 19-24, 32.  Meders testified that he did "not really" understand what was going on in the courtroom at the time of the hearing.  <u>Id</u>. at 23.  His ability to distinguish right from wrong at the time of the March 1, 1989 hearing was incomplete and dependent upon the circumstances presented.  <u>Id</u>. at 24.   Finally, Meders testified about having hallucinations, "a little."  <u>Id</u>.

144. Trial lawyer Davis, however, had not received a copy of the evaluation report and did not know whether Meders was competent at the time the trial began.  The habeas court found, and Petitioner here asserts, that:

> After the jury was chosen, placed under sequestration and transported to the hotel prior to the beginning of the trial the next morning, Judge Tuten inquired as to whether there were any additional pending motions to be heard. Trial Tr at 624.  Mr. Davis responded:. . .  "there was a motion to have a psychiatrist appointed and . . .I haven't heard anything further from it . . ." Trial Transcript at 625.   Both Judge Tuten and Prosecutor John Johnson were aware that a psychiatrist had been appointed, had rendered a report and John Johnson offered to "run off" a copy of the report for Mr.Davis.  Trial Transcript at 625.
> Having been ignorant of the report's existence, **and on the eve of his client's death penalty trial beginning at 9:30 the next morning**, Mr. Davis then stated:   "Well, I would just like to ask Mr. Johnson, it would serve, serve my purpose to just, if he would state in his place, does the copy state, or does the report rather, state that the defendant is compis mentis, that he is, that is able to stand trial."  Trial Transcript at 626.

HO-25 (emphasis in Habeas Order).

145. The foregoing is the sum total of the trial court's analysis of Meders's ability to understand the proceedings against him and fully participate in his death penalty trial. Putting aside the doubtful validity of any waiver of a competency hearing, none was sought and none provided by Petitioner Meders. The trial court, having found sufficient cause to order a competency evaluation, utterly failed to meet its responsibility to make a judicial determination of Meders's competence consistent with <u>Pate</u>. Instead, the trial court simply relied upon the paper report of a state psychiatrist, who was not even identified in the record of this matter.

146. This issue has been exhausted in state court.

147. This issue was raised on the original direct appeal and preserved as part of the habeas proceeding.

CLAIM TWELVE

<u>REFUSAL TO APPOINT MENTAL HEALTH EXPERT AT TRIAL</u>

THE TRIAL COURT'S REFUSAL TO APPOINT A MENTAL HEALTH EXPERT TO ASSIST THE DEFENSE AT TRIAL VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS IN LIGHT OF PETITIONER'S MENTAL CONDITION, LIMITED INTELLIGENCE, HISTORY OF DRUG AND ALCOHOL ABUSE, INTOXICATION ON THE NIGHT OF THE CRIME, AND NERVOUS BREAKDOWN, ATTEMPTED SUICIDE AND INABILITY TO ASSIST COUNSEL PRIOR TO TRIAL, ALL OF WHICH WERE RELEVANT TO PETITIONER'S COMPETENCY AND TO MITIGATION OF SENTENCE.

148. Petitioner incorporates all prior allegations of fact and conclusions of law as if set out fully herein. This claim is evidenced by the following factual allegations and legal conclusions.

149. Meders's trial counsel made a request for a psychiatrist to obtain a diagnosis of Meders's psychiatric condition. Hearing of March 1, 1989 at 26. Presumably, if a private psychiatrist had been appointed, or funds allotted therefor, a competent psychiatrist would

have found evidence and reached conclusions similar to the evidence found and conclusions reached by Dr. Dickinson.   Dr. Dickinson's testimony would have been relevant to the admissibility of Petitioner's statements, the question of guilt and innocence and the sentence imposed.

150. Specifically, Dickinson testified at the habeas hearing that Meders is a first offender, HT–229, that he is only within the "dull normal range of intelligence," HT–314, and that he clearly has brain damage. HT–315.  Meders has a history of brain injuries, has a very low educational level, has been exposed to toxic substances that affected his neurological functions, has a long history of poly-substance abuse, and suffers from depression. HT-308-12.  All of this information is relevant to sentencing and would have also been relevant to guilt/innocence as Dr. Dickinson concluded that Meders "would unlikely be able to fabricate [a complex story] and to maintain that fabrication with any degree of consistency during interviews or interrogation," HT–325.   Given that Meders was consistent during his interrogation by Sgt. Boyet, his interview by the state's mental health experts and during his testimony at trial, Dr. Dickinson's conclusions lend credibility to Meders's trial testimony. Dr. Dickinson's testimony was also relevant to determining the voluntariness of Meders's statements to the police.

151. As an indigent defendant, Petitioner Meders was entitled to services other than counsel and his constitutional rights were violated by the trial court's refusal to appoint a private psychiatrist.  See Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985).

152. This issue has been exhausted in state court.

153. This issue was raised on the original direct appeal and preserved at the habeas proceeding.

CLAIM THIRTEEN

IMPROPER JURY INSTRUCTION

THE TRIAL COURT'S IMPROPER JURY INSTRUCTION VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY ERRONEOUSLY INSTRUCTING THE JURY THEY MUST DISREGARD THE ENTIRE TESTIMONY OF ANY WITNESS WHO HAD BEEN IMPEACHED AT A TRIAL AT WHICH PETITIONER WAS THE ONLY WITNESS WHOSE TESTIMONY HAD BEEN IMPEACHED.

154. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

155. The trial court instructed the jury that it if a witness has been impeached, it is the jury's "duty to disregard that testimony entirely unless such testimony in corroborated by circumstances or by other unimpeached evidence." TT-1228 and 1252.  No state witness was impeached by the defense.

156. The court's instruction unconstitutionally amounted to a comment on the evidence and improperly shifted the burden of proof to the defense.  The instruction should have been the subject of objection, but was not.   Nonetheless, the instruction violated Petitioner's constitutional rights.

157. This issue has been exhausted in state court.

158. This issue was raised at the habeas proceeding which was granted on other grounds.

CLAIM FOURTEEN

DENIAL OF EXPERTS AT REMAND

PETITIONER'S CASE WAS REMANDED TO THE TRIAL COURT FOR A HEARING ON THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.  THE REMAND WAS PART OF THE DIRECT APPEAL AND PETITIONER WAS, THUS, ENTITLED TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN THE REMAND PROCEEDINGS.  PETITIONER, WHO WAS INDIGENT, SOUGHT FUNDS AT THE TIME OF REMAND TO RETAIN EXPERTS AND THOSE REQUESTS FOR FUNDS WERE DENIED WITHOUT EXPLANATION AND

IN VIOLATION OF PETITIONER'S RIGHT TO COUNSEL AS PROTECTED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

159. Petitioner incorporates all prior allegations of fact and conclusions of law as if set out fully herein.   This claim is evidenced by the following factual allegations and legal conclusions.

160. Meders was entitled to the effective assistance of counsel on his first appeal, which was an appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830 (1985).   The remand hearing in this matter occurred as part of the first appeal.   The Georgia Supreme Court, in fact, retained jurisdiction to review Meder's sentence on appeal until after the remand hearing was completed.   Meders I, 260 Ga. at 55; 389 S.E. 2d at 325.   Counsel was also appointed for the remand proceeding.   Id.

161. Petitioner Meders made a request for funds for expert assistance as part of his litigation of the remand issue which was a part of the direct appeal.  A request for expert funds must be granted where the defendant has shown that there exists a reasonable probability that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial, or in this matter, direct appeal.  See Moore v. Kemp, 809 F.2d 702 (11 Cir. 1987), cert. denied 481 U.S. 1054, 107 S.Ct. 2192 (1987); see also Ake v. Oklahoma. 470 U.S. 68, 105 S.Ct. 1087 (1985).   The remand court's denial of funds for experts violated Petitioner's right to a fair proceeding.   See Panetti v. Quarterman, 551 U.S. 930, 950, 127 S.Ct. 2842 (2007).

162. On remand, Petitioner Meders was prepared to challenge the effective assistance of counsel he received before and during trial through the introduction of expert testimony. Petitioner moved for funds and submitted detailed affidavits and made offers of proof to justify the retention of Dr. Dickinson, a forensic psychologist, who later testified at the habeas

hearing and provided evidence relevant to pretrial issues concerning suppression and competence, trial issues and sentencing issues.  Petitioner was prevented from challenging trial counsel Davis's failure to obtain the services of a forensic psychologist assigned to the defense by the remand court's refusal to make funds available to this indigent Defendant in violation of his constitutional rights.

163. Petitioner also moved for funds and submitted detailed affidavits and made offers of proof to justify the retention of Helen Ridley, PhD., a political scientist ready to offer expert testimony concerning the unconstitutional method by which the grand and petit juries were selected in this matter.  The right of defendant to a grand jury and a trial jury chosen by a jury selection system which represents a fair cross-section of the community is a fundamental Sixth and Fourteenth Amendment right.  Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 (1975);  Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, (1979).  Potential venire members must also not be excluded based on their race in violation of equal protection rights.  United States v. Ovalle, 136 F. 3d 1092, 1107 (6th Cir. 1998).  See Claim Eight, *supra*.  Petitioner was prevented from challenging Davis's failure to obtain the services of a jury formation expert like Dr. Ridley by the remand court's refusal to make funds available to this indigent defendant in violation of his constitutional rights.

164. Finally, Petitioner moved for funds and submitted detailed affidavits and made offers of proof to justify the retention of John Ossick, Esq., an experienced criminal defense lawyer ready to offer expert testimony concerning the ways in which Davis provided ineffective assistance to Petitioner Meders at trial.  Meders was prevented from challenging Davis's failures to provide competent legal assistance by the remand court's refusal to make funds available to this indigent defendant in violation of his constitutional rights.  The need

for Mr. Ossick's testimony was made more acute by the unavailability of Meders's trial lawyer at the time of the remand hearing.

165. This issue has been exhausted in state court.

166. This issue was raised on the direct appeal from the remand order and preserved at the habeas proceeding.

CLAIM FIFTEEN

CONSTITUTIONALITY OF O.C.G.A. § 17-10-30

THE CAPITAL SENTENCING PROVISIONS IN GEORGIA LAW, O.C.G.A. § 17-10-30, VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THEY UNREASONABLY FAIL TO DEFINE MITIGATING CIRCUMSTANCES, ALLOW AGGRAVATING CIRCUMSTANCES TO BE APPLIED ARBITRARILY, AND AUTOMATICALLY DEATH-QUALIFY DEFENDANTS WHO ARE CONVICTED OF CERTAIN OFFENSES.

167. Petitioner incorporates all prior allegations of fact and conclusions of law as if set out fully herein.

168. As referenced *supra* in Claim Seven, Petitioner was automatically eligible for the death penalty simply by his conviction for malice murder and armed robbery as proof of the elements of these crime automatically also provide statutory aggravating circumstances under the Georgia statute. The jury was not required to make any further findings to justify Petitioner's death sentence thus avoiding the constitutionally required guided consideration of the propriety of a sentence of death. In effect, O.C.G.A. § 17-10-30 undermines the purpose and need for a bifurcated trial for defendants convicted of malice murder and a robbery offense in violation of the United States Constitution. The statute also does not define for the jury's benefit mitigating circumstances and allows for the arbitrary application of aggravating circumstances.

169. This issue has been exhausted in state court.

170.   This issue was not raised on the original direct appeal.

171.   This issue was raised in the initial habeas proceeding which was granted on other grounds and subsequently reversed by the Georgia Supreme Court.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) cert. denied sub. nom.  Meders v. Schofield, 549 U.S. 1126,127 S.Ct. 958 (2007).

CLAIM SIXTEEN

FLAWED PROPORTIONALITY REVIEW

THE DEATH PENALTY IN GEORGIA VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE GEORGIA SUPREME COURT DOES NOT CONDUCT AND PUBLISH A COMPREHENSIBLE PROPORTIONALITY REVIEW OF EVERY DEATH SENTENCE WHICH CONSIDERS THE CIRCUMSTANCES OF THE CRIME AND THE CHARACTERISTICS OF THE CONVICTED DEFENDANT, BUT INSTEAD MERELY PUBLISHES A STRING CITATION OF DECISIONS, MOST OF WHICH ARE DISSIMILAR TO THE CASE AT HAND, FOLLOWED BY A GENERIC STATEMENT THAT THE COURT HAS FOUND THE DEATH SENTENCE IMPOSED "IS NEITHER EXCESSIVE NOR DISPROPORTIONATE TO SENTENCES IMPOSED IN SIMILAR CASES, CONSIDERING BOTH THE CRIME AND THE DEFENDANT."

172. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

173.  The Georgia Supreme Court's proportionality review of Meders's sentence consisted of a string cite of cases that presented facts and circumstances mostly unrelated to the circumstances of Petitioner's crime or Petitioner's personal characteristics.  See Meders II, 261 Ga. at 807, 411 S.E.2d at 492.  In a capital punishment system dependent upon proportionality review to justify its constitutionality, this opaque, minimalist approach to proportionality review violated Petitioner's constitutional rights and did not serve the proper interests of the people of the state of Georgia.

174. In support of its affirmation of Meders's sentence, the Georgia Supreme Court listed twenty-eight cases in the Appendix to its opinion and declared that "[t]he similar cases listed in the Appendix support the imposition of a death sentence in this case." Id.  In almost half the listed cases, the defendant was charged with multiple murders perpetrated during the commission of at least one (usually more than one) capital felony, committed under particularly chilling and gruesome circumstances.  Frazier v. State, 362 S.E.2d 351(1987) (two counts murder, one count armed robbery; defendant beat two elderly persons to death during the commission of a burglary; two months prior to the crime defendant had also burglarized the home of an elderly person and beaten the occupant unconscious); Ford v. State, 360 S.E.2d 258 (1987) (two counts murder, one count armed robbery, one count burglary, one count felony possession of a firearm; after weeks of planning, defendant robbed grocery store where his former lover worked and shot both his former lover and her 11-year old daughter in the head before making off with the money); Romine v. State, 350 S.E.2d 446 (1986) (two counts murder; one count armed robbery; after days of planning, defendant entered his parents' home, shot both at point blank range and stole money and other items out of his mother's purse); Finney v. State, 320 S.E.2d 147 (1984) (two counts murder; two counts kidnapping; defendant and co-defendant kidnapped two elderly women, raped the first woman and brought both to a remote area where they beat them both to death); Putman v. State, 308 S.E.2d 145 (1983) (two counts murder; defendant pulled up to a highway rest stop, shot a married couple at point blank range in the presence of their two children and another relative; it was proven at trial that the defendant had perpetrated a nearly identical crime at another rest stop and this was part of a continuous course of conduct closely connected in time, place and manner of commission); Mincey v. State, 304 S.E.2d 332 (1983) (two counts murder; one count aggravated battery; one count armed robbery; defendant shot two

adults, one as she ran away from him, during the commission of a robbery and intended to shoot three kids who were present but circumstances prevented it); Wilson v. State, 300 S.E. 2d 640 (two counts murder; one count armed robbery); Rivers v. State, 298 S.E.2d 10 (1982) (two counts murder, two counts armed robbery, two counts kidnapping; defendants entered the home of the elderly parents of their friends, marched the couple into a cornfield shot them execution style, and robbed them); Peek v. State, 238 S.E.2d 12 (1977) (two counts murder; one count kidnapping; defendant bludgeoned his brother to death and murdered the only witness to the crime); Birt v. State, 225 S.E. 2d 28 (1976) (two counts murder; two counts armed robbery; defendant tortured the wife of an elderly farm owner in the husband's presence, then shot them both and robbed them); Mitchell v. State, 223 S.E.2d 703 (1976) (two counts murder; one count armed robbery; defendant shot a woman and her 14-year old son after herding them into a cooler at the local grocery store, and attempted to kill two other young boys but failed because he ran out of bullets); Gregg v. State, 210 S.E.2d 659 (1974) (two counts murder; two counts armed robbery; defendant/hitchhiker murdered driver and passenger in car that picked him up; both victims were shot at a distance and then again, execution style).

175. In an additional eleven cases, the defendants were charged with one count of murder, one count of armed robbery and an additional aggravating factor unrelated to the robbery charge—meaning the aggravating circumstance involved at least one or more additional capital felonies (not simply that the crime was committed for pecuniary gain, as in the Meders case), the crime was found to be outrageously wanton and vile, or the defendant was shown to have a criminal history.  Miller v. State, 380 S.E.2d 690 (1989) (one count murder; one count kidnapping; two counts robbery; defendant forced murder victim off the road and shot him in the back as he ran from them, then kidnapped another victim, entered that victim's home with his

key, tied up his roommate, stole from the home, and dumped the victim, still alive, on the side of the road and urinated on him); Lee v. State, 365 S.E.2d 99 (1988) (one count murder; one count robbery; defendant had six prior theft offenses and two first degree forgery offenses); Ingram v. State, 323 S.E.2d 801 (1984) (one count murder; one count aggravated assault (attempted murder); two counts armed robbery; entered the home of victims and demanded money and the use of phone; marched husband and wife out back, tied them to chairs and gagged them; shot them both in the head; the wife survived and identified the assailant); Spivey v. State, 319 S.E.2d 420 (1984) (one count murder; two counts aggravated assault; three counts robbery; one count kidnapping); Jones v. State, 293 S.E.2d 10 (1982) (one count murder; one count armed robbery; murder was found to be "outrageously and wantonly vile" as aggravating factor; murder victim had been tortured and beaten prior to death); Solomon v. State, 277 S.E.2d 1 (1981) (one count murder; one count armed robbery; as aggravating circumstance murder was found to be "outrageously vile, horrible or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim."); Dick v. State, 273 S.E.2d 124 (1980) (one count murder; one count armed robbery; defendant had prior conviction for statutory rape); Jones v. State, 256 S.E.2d 907 (1979) (one count murder; one count armed robbery; as aggravating circumstance it was found that the defendant had "knowingly created a great risk of death to more than one person in a public place by means of a weapon . . . which would normally be hazardous to the lives of more than one person"); Amadeo v. State, 255 S.E.2d 718 (1979) (one count murder; one count armed robbery; pattern and practice evidence showed that defendant committed an identical crime in another state shortly before the commission of crime); Corn v. State, 240 S.E.2d 694 (1977) (one count murder; one count armed robbery; the offense of armed robbery was "outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind");

Dobbs v. State, 224 S.E.2d 3 (1976) (one count murder; two counts armed robbery; two counts aggravated assault).

176. In two of the cases listed in the Appendix, although the statutory aggravating circumstances found by the jury were the same as those found in the present case, additional factors relevant to the defendant's character and to the heinous nature of the crime placed the crimes committed in a qualitatively different, more egregious category than the crime allegedly committed by Meders.  Berryhill v. State, 291 S.E.2d 685 (1982) (one count murder; one count burglary; after breaking into a private home, defendant murdered husband by shooting him five time in front of wife and child, then suddenly ran from the house); Goodwin v. State, 223 S.E. 2d 3 (1976) (one count murder; one count armed robbery; defendant lured the victim, a supposed friend, into the woods and demanded he turn over his car; when victim refused, defendant stabbed him eighteen times to death).

177. The remaining three of the twenty-eight cases listed approximate the crimes charged in this case as well as the aggravating circumstances found by the jury, but these are aberrations in the general pattern.  See Roberts v. State, 319 S.E.2d 420 (1984) (one count murder; one court armed robbery; defendant entered private home and shot the woman occupant in the back as she was fleeing the scene); Pulliam v. State, 224 S.E.2d 8 (1976) (one count murder; one count armed robbery, defendant shot cab driver at point blank range and stole small amount of money); Moore v. State, 213 S.E.2d 829 (1975) (one count murder; one count burglary; defendant broke into private residence and shot occupant before robbing him; the defendant was fired upon first by the homeowner and shot in the leg and then fired back, killing the owner.).  Note that *each of these three opinions were issued between twenty-three and thirty years ago*, suggesting that

standards have changed, and such crimes, if tried today, would not be placed in that separate plane of crimes for which the death penalty is warranted and constitutionally permissible.

178. This issue has been exhausted in state court.

189. This issue was not raised on the original direct appeal.

180. This issue was raised in the initial habeas proceeding which was granted on other grounds and subsequently reversed by the Georgia Supreme Court.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM SEVENTEEN

CRUEL AND INHUMAN ADMINISTRATION OF DEATH PENALTY

THE DEATH PENALTY IN GEORGIA VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT IS ADMINISTERED IN A CRUEL AND INHUMAN MANNER.

181. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

182. The death penalty in Georgia is administered in an unnecessarily cruel and unusual fashion and, thus, violates the Eighth Amendment to the United States Constitution.

183. This issue has been exhausted in state court.

184. This issue was not raised on the original direct appeal.

185. This issue was raised in the initial habeas proceeding which was granted on other grounds and subsequently reversed by the Georgia Supreme Court.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.* Meders v. Schofield,  549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM EIGHTEEN

DENIAL OF FULL AND FAIR HEARING ON REMAND

PETITIONER WAS DENIED A FULL AND FAIR HEARING ON REMAND TO THE TRIAL COURT IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE TRIAL COURT'S REFUSAL TO CONTINUE THE HEARING TO OBTAIN THE TESTIMONY OF PETITIONER'S TRIAL COUNSEL WHO WAS HOSPITALIZED, THE TRIAL COURT'S DENIAL OF FUNDS FOR EXPERTS, AND THE DENIAL OF FAIR ACCESS TO DISCOVERY PRIOR TO THE HEARING.

186. Petitioner incorporates all prior allegations of fact as if set out fully herein.  This claim is evidenced by the following factual allegations and legal conclusions.

187. Trial counsel Davis was hospitalized shortly before the remand hearing and Petitioner moved for a continuance to obtain his presence at the hearing.   The remand court denied the motion without explanation and Petitioner was thus deprived of Davis's testimony. Trial counsel Davis later died before the state habeas petition was filed in this matter.

188. As Petitioner Meders had the burden of proving Davis's ineffectiveness at the remand hearing, which was part of the direct appeal, Meders had a due process right to access the testimony of trial counsel Davis and a right to have his then current remand counsel perform effectively.   These rights were violated by the remand court's refusal to grant a brief continuance.  See  Panetti v. Quarterman, 551 U.S.930, 950, 127 S.Ct. 2842 (2007) and Evitts v. Lucey, 469 US 387 (1985).

189. Further, the State had information from a reliable informant that was recorded in a note by Detective Boyet on December 28, 1987 and December 29, 1987 that indicated that Creel and Arnold were knowledgeable co-conspirators which was withheld from petitioner..   See SHO at 87-89.   The trial prosecutor, John Johnson, affirmatively misled the trial judge and trial

counsel when he claimed that an undisclosed tipster or informant did not exist.  Exhibit 3 to Second Habeas Hearing at 48-53.

190.  The note was relevant to petitioner's proof of his trial lawyer's ineffective assistance which was the sole and only matter litigated at the remand hearing.

191. This issue has been exhausted in state court.

192. This issue was raised on the direct appeal after the remand hearing.

193. This issue was also raised in the initial habeas proceeding which was granted on other grounds and subsequently reversed by the Georgia Supreme Court.  Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006) *cert. denied sub. nom.*  Meders v. Schofield, 549 U.S. 1126, 127 S.Ct. 958 (2007).

CLAIM NINETEEN

**[This claim has been withdrawn by Petitioner.]**

**PRAYERS FOR RELIEF**

WHEREFORE, Petitioner respectfully prays that this Court:

A.   Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

B.   Conduct a hearing at which proof may be offered concerning the allegations of this petition and, in particular, conduct an evidentiary hearing about the ineffective assistance of counsel offered to petitioner at sentencing because no court has ruled upon his claims that he was denied the effective assistance of counsel to develop a full mitigation case for the jury's consideration despite petitioner having placed this issue squarely before the first habeas court and the Georgia Supreme Court;

C.   Permit Petitioner, who is indigent, to proceed *in forma pauperis*;

D.   Grant Petitioner, who is indigent, sufficient funds to secure the expert testimony necessary to prove the facts as alleged in this petition and appoint the below signed as counsel for Petitioner as they have represented him since 1990 and are fully familiar with his case;

E.     Allow discovery, pursuant to Rule 6, Rules Governing Section 2254 Cases in the United States District Court;

F.     Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in this petition;

G.     Allow Petitioner to amend this petition after the assistance of experts and discovery;

H.     Allow Petitioner a period of sixty (60) days, which period shall commence after the completion of any hearing this Court shall determine to conduct, in which to brief the issues of law raised by this petition; and

I.     Such other relief as this Court may deem just and appropriate.


DATED, this 15 day of January 2012.


                                        Respectfully submitted,



                                        /s/ *Andru H. Volinsky*
                                        ANDRU H. VOLINSKY
                                        Bernstein Shur
                                        P.O. Box 1120
                                        Manchester, NH 03105-1120
                                        (603) 623-8700



                                        /s/ *James K. Jenkins*
                                        JAMES K. JENKINS,
                                        Maloy Jenkins Parker
                                        75 Fourteenth Street, NW
                                        25th Floor
                                        Atlanta, GA 30309
                                        (404) 875-2700

                                        Counsel for Petitioner Jimmy Fletcher Meders

**CERTIFCATE OF SERVICE**

I hereby certify that I duly served a copy of the foregoing "Amended Petition for Writ of Habeas Corpus (Red Lined Version)" by filing same with the Clerk of Court using the Courts CM/ECF, which will serve all counsel of record.

*James K. Jenkins*