# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JIMMY FLETCHER MEDERS,

    Petitioner,

    vs.

BRUCE CHATMAN, Warden, Georgia
Diagnostic Prison,

    Respondent.

CV 207-90

## ORDER

Presently before the Court is Petitioner's Amended Petition for Writ of Habeas Corpus.  Dkt. Nos. 34; 35.  In October of 1987, Petitioner spent the afternoon drinking with his boss, Randy Harris, and two acquaintances, Bill Arnold and Greg Creel. The group left Harris behind while they continued to drink into the night and early morning of October 14, 1987.  At approximately 2:30 in the morning, the trio stopped at a convenience store where Don Anderson was working as a cashier. As Creel was heating a sausage biscuit in the microwave, Petitioner shot Anderson in the chest and head.  Petitioner took $38.00 and some food stamps.  The money and food stamps were found on Petitioner's person, and the murder weapon was stashed

AO 72A
(Rev. 8/82)

under Petitioner's waterbed.  A jury of Petitioner's peers
convicted him for Anderson's slaying and sentenced him to death.
Upon due consideration, his petition for relief from this
conviction and sentence is **DENIED.**

## I. Procedural Background

### A. Jury Trial and Sentencing

The lengthy and complicated history of this case dates back
27 years.  Petitioner, Jimmy Fletcher Meders, was indicted in
the Superior Court of Glynn County, Georgia on December 16,
1987, for the aforementioned murder and armed robbery.  Dkt. No.
12-2, Ex. 1, at 3-5.  Petitioner was also indicted for the
offenses of possession of a firearm during the commission of a
felony, burglary, and felony murder.  Id.

At trial, Meders was represented by Glynn County Public
Defender John W. Davis.  E.g., id. at 35.  Davis was an
experienced member of the State Bar of Georgia.  Dkt. No. 12-
204, Ex. 65, at 23-24.  Prior to his defense work, he had served
as a solicitor general, superior court judge, and United States
congressman.  Id.

On April 7, 1989, following a four-day jury trial,
Petitioner was convicted of malice murder and armed robbery.
Dkt. No. 12-2, Ex. 1, at 86.  Following the sentencing phase of
trial, the jury found the existence of two statutory aggravating
circumstances: (1) that the offense of murder was committed

while Petitioner was engaged in the commission of armed robbery and (2) that Petitioner committed the offense of murder for himself or another for the purpose of receiving money or any other thing of monetary value. Dkt. Nos. 2-4, Ex. 1, at 87; 12-51, Ex. 16, at 4; 12-52, Ex. 16, at 17. Petitioner received the death sentence for the offense of malice murder and a consecutive life sentence for the offense of armed robbery. Dkt. No. 12-2, Ex. 1, at 88-91. On June 8, 1989, Petitioner's motion for new trial was denied. Id. at 97.

B. Direct Appeal Proceedings

1. First Stage

Petitioner appealed his convictions and death sentence to the Supreme Court of Georgia. Initially, Davis also represented Meders on appeal, although Meders's current counsel eventually substituted for Davis and filed an additional brief as part of the direct appeal. Dkt. No. 12-67, Ex. 22, at 1. On February 28, 1990, the Supreme Court of Georgia ruled on various enumerations of error and affirmed Meders's convictions, Meders v. State, 260 Ga. 49 (1990) [hereinafter Meders I], but remanded Petitioner's case to the trial court for a hearing on the issue of whether Petitioner received effective assistance of trial counsel. Dkt. No. 12-75, Ex. 27. The court delayed consideration of the proportionality of Meders's death sentence until after the remand hearing.

AO 72A
(Rev. 8/82)

## 2. Remand Proceedings

### a. The Process

On March 26, 1991, a hearing was conducted in the trial court on whether Davis rendered effective assistance of counsel. Dkt. Nos. 12-78 to -107, Exs. 30-32. At the remand hearing, Petitioner was represented by new counsel. Because the remand hearing occurred as part of the direct appeal, Meders claims that he was not entitled to access records under the Georgia Open Records Act. Dkt. No. 48, at 2.

During the remand hearing, extensive documentary evidence was presented, which included: the complete file of the District Attorney; the complete file of Davis; and documents from the Glynn County Police Department. Dkt. Nos. 12-78 to -107, Exs. 30-32. Meders sought funds to retain experts to assist him in the fields of psychology, criminal law, and jury composition, and appended affidavits from proposed experts describing their expertise and likely forms of assistance. Dkt. Nos. 47-13, Ex. 13; 47-14, Ex. 14. The remand court denied all requests for funds without written explanation. Dkt. No. 47-17, Ex. 17. The remand court refused to consider the affidavits and only allowed them to be made part of the record for appellate purposes. Dkt. No. 12-84, Ex. 30, at 244-247.

Davis was hospitalized immediately before the remand hearing to undergo a partial amputation of his leg. Meders

sought a continuance. Dkt. Nos. 47-16, Ex. 16; 47-17, Ex. 17.

Meders was unable to call Davis, who later died before the state

habeas hearing, as a witness. Dkt. No. 12-204, Ex. 65, at 5.

b. The Decision

On July 10, 1991, following the hearing, the remand court

entered a nine-page order finding that Petitioner had failed to

establish ineffective assistance of counsel under Strickland v.

Washington, 466 U.S. 668 (1984). Dkt. No. 12-108, Ex. 33, at 2,

9. The remand court found that Petitioner's "most persuasive

argument" as to ineffective assistance of counsel was his claim

that trial counsel failed "to produce independent evidence

tending to corroborate testimony of the defendant which was

inconsistent with the testimony of the State's key witnesses and

the failure to use prior inconsistent statements of such key

witnesses for impeachment purposes." Id. at 7. Petitioner,

however, failed to show prejudice:

> While attacking the credibility of the State's
> key witnesses in the manner suggested by
> defendant may well have been an effective and
> proper course of action, the fact remains that
> there is overwhelming evidence supporting the
> conviction of the defendant and tending to
> undermine his own credibility. Therefore, after
> carefully considering the defendant's contentions
> and the record, the Court finds that the
> defendant has not carried his burden of showing
> that there exists a reasonable probability that
> but for trial counsel's alleged deficiencies the
> result of the trial would have been different.

Id. at 9.

3. Direct Appeal of Remand Proceedings

On appeal following the remand, the Supreme Court of Georgia affirmed the remand court's denial of relief and completed its proportionality review of the death sentence. Meders v. State, 261 Ga. 806 (1992) [hereinafter Meders II]; Dkt. No. 12-113, Ex. 37. The Supreme Court of Georgia specifically affirmed the trial court's denial of relief as to Petitioner's claim of ineffective assistance of trial counsel by finding that "[t]he trial court's nine-page order persuasively demonstrates that Meders has failed to overcome the 'strong presumption' that Meders' trial counsel performed effectively. Ferrell v. State, 261 Ga. 115(3), 401 S.E.2d 741 (1991)." Meders II, 261 Ga. at 807(2).

The Supreme Court of Georgia also rejected, on its merits, the contention made by Petitioner that he was improperly denied expert assistance during the remand proceeding:

> Meders argues the trial court should have appointed to assist him at the remand hearing a mental health expert, a jury composition expert, and a criminal defense attorney to testify as an expert witness on the issue of ineffectiveness. Meders was represented by two attorneys in the remand proceedings. He was not entitled to the appointment of a third attorney to testify as an expert witness about how properly to try a death penalty case. Nor was expert assistance necessary to determine whether or not the jury lists fairly represented the population of Glynn County. See Spivey v. State, 253 Ga. 187(7a), 319 S.E.2d 420 (1984). Finally, it was not an abuse of discretion to deny Meders' motion for

AO 72A
(Rev. 8/82)

independent psychological assistance. <u>See</u>
<u>Christenson v. State</u>, 261 Ga. 80(2), 402 S.E.2d
41 (1991).

<u>Meders II</u>, 261 Ga. at 806-807(1).

Thereafter, Petitioner filed a petition for a writ of

certiorari in the Supreme Court of the United States, which was

denied on October 5, 1992. <u>Meders v. Georgia</u>, 506 U.S. 837

(1992); Dkt. Nos. 12-115 to -116, Ex. 38; 12-119, Ex. 41.

C. <u>First State Habeas Corpus Petition</u>

1. Superior Court Proceedings

On April 2, 1993, Petitioner filed a state habeas corpus

petition in the Superior Court of Butts County, Georgia. Dkt.

No. 12-122, Ex. 44. In his original petition, Meders again

alleged ineffective assistance of trial counsel. <u>Id.</u> at 8-10.

On August 30, 1995, Meders amended his petition and alleged

additional claims of ineffective assistance of trial counsel,

ultimately submitting 35 grounds for relief. Dkt. No. 12-127,

Ex. 48. Evidentiary hearings were conducted in November and

December 1995. Dkt. No. 12-131 to -198, Exs. 52-61.

On September 22, 2005, the state court granted Meders's

petition in part by finding that Meders had established that

trial counsel rendered ineffective assistance of counsel. Dkt.

No. 12-204 to -205, Ex. 65. The State appealed the granting of

the new trial, Dkt. No. 12-206, Ex. 66, and Meders cross-

AO 72A
(Rev. 8/82)

appealed certain portions of the habeas order that denied relief, Dkt. No. 12-207, Ex. 67.

2. On Appeal

The Supreme Court of Georgia reversed the habeas corpus court's order and reinstated Petitioner's convictions and sentences. Schofield v. Meders, 280 Ga. 865 (2006) [hereinafter Meders III]; Ex. 12-219, Ex. 74. The court found that claims of ineffective assistance "were procedurally barred because actually litigated and [the habeas court] incorrectly found cause and prejudice to excuse petitioner's procedural default in failing to raise permutations of those claims on direct appeal." Meders III, 280 Ga. at 865(1). The court also denied Meders's cross appeal by finding, inter alia, that claims concerning prosecutorial misconduct should have been raised during the petitioner's direct appeal proceedings. Id. at 868(2). Thereafter, Petitioner filed a petition for writ of certiorari in the Supreme Court of the United States, which was denied on January 8, 2007. Meders v. Schofield, 549 U.S. 1126 (2007); Dkt. No. 12-226, Ex. 79.

D. Filing of Federal Habeas Corpus Petition

On July 24, 2007, Petitioner filed his federal petition for writ of habeas corpus. Dkt. No. 1. On September 19, 2007, the Court issued a stay in the federal habeas corpus proceeding and directed Petitioner to return to the state courts to exhaust his

AO 72A
(Rev. 8/82)

claims of ineffective assistance of appellate counsel. Dkt. No. 9.

### E. Second State Habeas Corpus Petition

In July 2007, Petitioner filed a successive state habeas corpus petition in the Superior Court of Butts County, Georgia, and an amended petition on September 25, 2008. Dkt. Nos. 12-227, Ex. 80; 37-4, Ex. 86. An evidentiary hearing was conducted in this matter on November 19-20, 2008. Dkt. Nos. 37-9 to -10, Ex. 91. Relief was denied by order dated December 16, 2009. Dkt. No. 42-6, Ex. 135.

On March 19, 2010, Petitioner filed, in the Supreme Court of Georgia, an application for a certificate of probable cause to appeal from the denial of habeas relief. Dkt. No. 42-11 to -12, Ex. 139. On May 16, 2011, the Supreme Court of Georgia denied this application. Dkt. No. 42-14, Ex. 141. In doing so, the court addressed its prior ruling that faulted Meders for not deposing Davis; it acknowledged that the relevant deposition statute had not been enacted prior to trial counsel's death. Id. Thereafter, Petitioner filed a petition for writ of certiorari in the Supreme Court of the United States, which was denied on October 17, 2011. Meders v. Hall, 132 S. Ct. 458 (2011); Dkt. Nos. 42-15 to -20, Exs. 142-145.

F. <u>Return to Federal Court</u>

On November 22, 2011, Petitioner notified the Court about the denial of his petition for certiorari. Dkt. No. 31. On January 15, 2012, he filed an amended petition for writ of habeas corpus. Dkt. Nos. 34; 35.

## II. **Evidentiary Background**

As already stated, Petitioner's convictions were for the murder and robbery of a Jiffy Mart convenience store clerk, Don Anderson, which occurred during the early morning hours of October 14, 1987. Although two other men, Bill Arnold and Greg Creel, admitted to being present at the time of the crime, only Meders was charged. Dkt. No. 12-204, Ex. 65, at 38.

Arnold and Creel became crucial witnesses for the state at trial. Their testimony conflicts with Meders's version of events, and Meders's claims are heavily based on his trial counsel's failure to effectively cross-examine these witnesses with pertinent evidence, along with trial counsel's failure to exclude allegedly improper and prejudicial evidence.

A. <u>Police Reports and Crucial Witness Testimony</u>

1. Evidence at Trial

a. Meders's Testimony

Meders testified at trial that he had spent the day and evening of October 13 drinking and taking drugs with Arnold and Creel. Dkt. No. 12-45, Ex. 15, at 1075. In a statement given

in November 1988, and in his testimony at trial, Meders said that Arnold and Creel took him home during the evening and then later returned to retrieve Meders's gun. Dkt. Nos. 12-40, Ex. 13, at 897-98; 12-45, Ex. 15, at 1084-85.

Meders testified that Arnold and Creel encouraged him to shoot a young man, Keith Bowen, with whom Arnold and Creel were feuding. Dkt. No. 12-45, Ex. 15, at 1085. Meders claims that he refused and that Arnold then used Meders's gun to shoot at Bowen's parked truck. Id. at 1086. Further, according to Meders, Arnold used Meders's gun to shoot at a pick-up truck owned by another person with whom Arnold and Creel had an ongoing feud, Robert Brown. Dkt. Nos. 12-40, Ex. 13, at 897-98; 12-45, Ex. 15, 1086-87.

b. Creel's and Arnolds's Testimony

Creel and Arnold denied Meders's narrative. Creel admitted that he had been drinking with Meders during the day of the shooting, but denied taking him home and denied knowing Meders had the murder weapon. Dkt. No. 12-34, Ex. 12, at 689, 707. Arnold offered similar trial testimony, denying taking Meders home and denying knowledge of the gun. Dkt. No. 12-35, Ex. 12, at 725, 741-42.

At trial, Davis cross-examined Creel about his alleged involvement in the drive-by shootings:

> Q. [Davis] Now, as a matter of fact, did not
> Jimmy Meders pull that gun out while you were
> riding around, after you had got him from his
> house, and didn't you shoot at a couple of
> trucks?
>
> A. [Creel] No, sir.

Dkt. No. 12-34, Ex. 12, at 708. Arnold's testimony was the
same. See Dkt. No. 12-35, Ex. 12, at 741-42 ("Q. [Davis] Do,
don't you, do you remember shooting at a truck? A. [Arnold] No,
sir, we didn't.").

### c. Detective Boyet's Testimony

The lead detective in the case, Detective Jack Boyet, was
asked preemptively by the prosecutor at trial if he found any
evidence to corroborate testimony that Creel, Arnold, or another
key witness, Randy Harris, possessed the gun at some point or
that Arnold shot the victim. Boyet testified there was none.
Dkt. No. 12-40, Ex. 13, at 900. Davis followed up on this point
with Boyet on cross-examination:

> Q. [Davis] And you stated that [Arnold and Creel]
> denied shooting at a truck?
>
> A. [Boyet] Yes, sir.
>
> Q. And did you have any reason to, to doubt that
> they were telling you the truth?
>
> A. **The only thing I had to indicate that they did
> do it was, is Jimmy Meders saying that they did.**
>
> Q. So you have no other reason?
>
> A. **There, there is no other evidence to indicate
> that they did.** There, there are no witnesses

AO 72A
(Rev. 8/82)

that saw it other than the, the three who were
allegedly in the [vehicle] and I have no proof
that they did do it.

Dkt. No. 12-204, Ex. 65, at 40-41 (citing Dkt. No. 12-40, Ex.
13, at 908) (emphasis supplied in habeas order).[1]

### d. Harris's Testimony

Randy Harris was Arnold's first cousin. Dkt. No. 12-35,

Ex. 12, at 736. Harris's testimony was also crucial for the

state's case in regard to motive and an alleged confession by

Meders. Harris testified that Meders confessed to the crime

shortly after it occurred, claiming Meders said he had just shot

someone in the head for $38.00.[2] Dkt. No. 12-33, Ex. 12, at 664.

According to Harris, Meders made the confession as Meders dumped

the spent bullets from the murder weapon onto a bed where Harris

had been sleeping with an underage woman, Sondra Ruggles.[3] Id.

at 663-64.

Meders claimed that Harris was providing false information

against him because Harris suspected that Meders was having an

affair with Harris's wife. See Dkt. No. 12-154, Ex. 55, at 851.

---

[1] A week before trial, Creel and Arnold also admitted to Johnson and Boyet
that they knew Bowen and that they were feuding with Brown. Dkt. Nos. 12-82,
Ex. 30, at 187-88; 12-138, Ex. 52, at 234, 236-37.
[2] When specifically questioned at the outset of the investigation, Harris was
unable to say where the clerk had been shot and, in fact, asked an
investigator about the location of the gunshot wound. Dkt. No. 12-134, Ex.
52, at 87.
[3] Petitioner asserts that the Supreme Court of Georgia relied on Harris's
testimony in its factual summary, as did the remand court. Dkt. No. 48, at 9
(citing Meders I, 260 Ga. at 50; Dkt. No. 12-108, Ex. 33, at 3).

AO 72A
(Rev. 8/82)

### e. Prosecutor's Alleged Vouching

Petitioner claims that the trial prosecutor falsely vouched for the veracity of the state's key witnesses. The prosecutor, John Johnson, argued that Creel, Arnold, and Harris had given consistent and truthful descriptions to the police from the very start of the investigation and that Meders had concocted his defense while awaiting trial. Verbatim, Johnson argued:

> You look at [the witnesses'] personal credibility
> . . . and you also look at how their testimony
> here in Court reflects what they said on October
> 14th, 1987, because that is an important part of
> credibility. Have they stuck with their story,
> have they told the same thing all the way down
> the line, and if you just decided credibility
> based on that, if, if that is all you look at,
> then Randy Harris, Bill Arnold, Greg Creel, the
> police officers all told the same story all the
> way down the line from day one.

Dkt. No. 12-48, Ex. 15, at 1183.

### f. Jury Question

During their deliberations, the jury submitted a question labeled "Jury Question 5":

> Was there any reports [sic.] filed on the
> incident of the truck, on Ga Hwy 303, reported
> between the day, after or between then and now,
> being shot at?

Dkt. No. 12-53, Ex. 17, at 1360. No police reports were introduced into evidence about the two truck shootings and the jury was told simply to rely on the evidence introduced during

AO 72A
(Rev. 8/82)

trial. Dkt. No. 12-50, Ex. 16, at 1261. The truck owners did
not testify at trial.

### 2. Evidence at Remand

#### a. Police Reports

On remand, police reports of the Brown and Bowen shootings
were found in the lead detective's file on the Jiffy Mart
killing. Dkt. No. 12-82, Ex. 30, at 181-83. Detective Boyet
testified at remand that he recognized the significance of the
Bowen and Brown reports and copied them for his file at the
outset of his investigation of the murder. See id. The report
of the shooting of Robert Brown's pickup truck showed that the
shooting had occurred near Highway 303 "about an hour before the
murder," and it mentioned Greg Creel by name as a suspect.[4] Dkt.
No. 12-204, Ex. 65, at 39. The officer who investigated the
Brown truck shooting also saw its potential relationship to the
Jiffy Mart murder, "comment[ing] at the time he took the report
that the slug found was similar to the one found at the scene of
the murder." Id.

The prosecutor had the reports of the shootings in his case
file at the time of trial. Id. at 41. When the jury submitted
Question 5, Johnson realized that the jury was concerned about a
report of a truck shooting on Highway 303, but did not believe
he had any duty to advise the court of the existence of the

---

[4] The victim suspected that Creel or another individual was involved in the
shooting. The other police reports did not identify Creel as a suspect.

AO 72A
(Rev. 8/82)

police incident reports in his file and, therefore, stood mute. See Dkt. No. 12-205, Ex. 65, at 44.

### b. Contradictory Statements

At the remand hearing, Meders pointed to statements made by Creel and Arnold that he claims contradicted their trial testimony, although his trial counsel failed to present them to the jury. For example, on October 15, 1987, the day after the shooting, Creel said:

> And I think we come back when we got the car.
> No, we carried that idiot home. Well, Bill
> carried him home. Anyway, [Jimmy] ended up going
> home. . . . And then Bill said lets go get him.
> So, we went and got him.

Dkt. No. 12-156, Ex. 55, at 935.

Further, in a taped statement made prior to trial, Arnold told police officers:

> Ok, well I picked [Meders] up at his house and we
> was all riding around, we'd been riding around
> drinking all day, and he'd went home, so we went
> by and picked him up, then we just went riding
> around drinking, you know. . . . [I]t was day,
> daylight see, we'd been riding around all day
> long and Jimmy went home for a while and then we
> rode around and picked him up.

Id. at 959.

AO 72A
(Rev. 8/82)

B. Evidence Related to Food Stamps and Drug Citation

1. Food Stamps

During trial, trial counsel did not object to the introduction of food stamps purportedly taken during the robbery that were found on Meders at the time of his arrest. Meders now emphasizes that he was a lawful recipient of food stamps and that the stamps found on him could not be tied to the crime. Dkt. No. 12-204, Ex. 65, at 35-36. Indeed, the prosecutor's file contained a note to this effect from Detective Boyet. See id. at 35 ("Unable to trace any food coupons to store."). Despite this, Johnson argued to the jury that Meders's possession of the food stamps was evidence of his guilt, Dkt. No. 12-48, Ex. 15, at 1204, and reason to sentence Meders to death, Dkt. No. 12-51, Ex. 16, at 1316.

2. Citation for Possession of Cocaine

As found by the state habeas court, "[t]he State introduced at trial a charging document in which Meders was charged with the sale of cocaine." Dkt. No. 12-204, Ex. 65, at 33; see also Doc. 12-58, Ex. 17. The cocaine charge supported Harris's testimony about Meders's motive for the killing—that is, to pay off a drug debt. Dkt. Nos. 12-33, Ex. 12, at 666; 12-204, Ex. 65, at 33. Meders denied that he was indebted to a drug dealer. Dkt. Nos. 12-46, Ex. 15, at 1101; 12-204, Ex. 65, at 33. The Supreme Court of Georgia refused to consider on direct appeal

AO 72A
(Rev. 8/82)

the introduction of the uncharged misconduct described in the cocaine citation (or any other contents of Petitioner's wallet) because Davis failed to object to its admission. Meders I, 260 Ga. at 54(3).

### C. Potentially Mitigating Evidence

At the sentencing phase of trial, although trial counsel introduced character evidence from six individuals in mitigation of penalty, he introduced no psychological evidence. Dkt. No. 12-51, Ex. 16, at 1293-1307. In fact, he presented no other evidence. Counsel on remand moved for funds to retain a psychologist, but this request was denied by the remand court. Dkt. No. 47-17, Ex. 17. Meders claims that he could not produce evidence of his organic brain damage or other psychological problems until after remand because he was denied necessary funds to hire an expert and discover necessary facts during the remand proceeding.

On remand, Dr. William Dickinson, whom Meders was able to retain with post-conviction funds provided by the Georgia Resource Center, testified as an expert in psychology. Dkt. No. 12-141, Ex. 53. Dr. Dickinson's neuropsychological evaluation found that Petitioner had a history of multiple head injuries beginning in childhood; evidence of brain damage; an IQ of 84 with individual results in the borderline mentally retarded

AO 72A
(Rev. 8/82)

range; a history of depression and poly-substance abuse; and impairment by alcohol and drugs at the time of the offense.  Id.

Further, the remand hearing revealed a police interview of an individual, Mason Jacobs, which was found in the prosecutor's file at the time of the remand hearing.  Dkt. No. 12-88, Ex. 31, at 25-32.  Jacobs had a master's degree in psychology, worked for 10-12 years with patients in drug treatment, and had been assigned to Petitioner's unit in the National Guard.  Id. Jacobs ran into Meders on Sunday night, October 11, 1987, and described Meders as behaving erratically and under the influence of drugs.  Id.  Jacobs told the officers that he had never seen Meders lose his temper during the year they were in the National Guard together and that he did not believe that Meders would hurt anyone absent the influence of drugs.  Id.  Trial counsel did not call Jacobs as a witness or use his interview transcript to mitigate the sentence of death.

**III. Legal Standard**

A. Pleading a Petition

Because Petitioner filed his federal habeas corpus petition in 2007, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), provides the standard of review.

Because "federal habeas review exists only to review errors of constitutional dimension," a habeas corpus petition must meet

the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." McFarland v. Scott, 512 U.S. 849, 856, 861 (1994). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" Mayle v. Felix, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the United States District Courts [hereinafter § 2254 Rules]). Accordingly, general references to the transcripts, case records, and briefs on appeal fail to comply with Rule 2(c). See, e.g., Phillips v. Dormire, No. 4:04CV1483TCM, 2006 WL 744387, at *1 (E.D. Mo. Mar. 20, 2006) (citing Adams v. Armontrout, 897 F.2d 332, 333 (8th Cir. 1990)); Grant v. Georgia, 358 F.2d 742, 742 (5th Cir. 1966) (per curiam) ("The application fails to allege any facts upon which the trial court could find a deprivation of a constitutional right, or any other basis for collateral attack. Mere conclusionary allegations will not suffice." (citation omitted)).

The burden of proof is on the habeas petitioner "to establish his right to habeas relief[,] and he must prove all facts necessary to show a constitutional violation." Blankenship v. Hall, 542 F.3d 1253, 1270 (11th Cir. 2008); see also Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) ("If there has been no evidentiary hearing in state court on an issue raised on habeas corpus, one is required if the petitioner

alleges facts which, if true, would entitle him to relief."); Hill v. Linahan, 697 F.2d 1032, 1036 (11th Cir. 1983) (per curiam) ("The burden of proof in a habeas proceeding is always on the petitioner."). "A habeas petitioner must present a claim in clear and simple language such that the district court may not misunderstand it." Dupree v. Warden, 715 F.3d 1295, 1299 (11th Cir. 2013). And, he must state specific, particularized facts that consist of sufficient detail to enable the court to determine, from the face of the petition, whether the petition merits further habeas corpus review. See Mayle, 545 U.S. at 655 ("Notice pleading is not sufficient [in habeas proceedings], for the petition is expected to state facts that point to a real possibility of constitutional error." (quoting Advisory Committee Note to Rule 4 of § 2254 Rules) (brackets and internal quotation marks omitted)). Therefore, the mere assertion of a ground for relief, without more factual detail, does not satisfy a petitioner's burden of proof or the requirements of 28 U.S.C. § 2254 and Rule 2(c) of § 2254 Rules. See Benjamin v. Sec'y for Dep't of Corr., 151 F. App'x 869, 873-74 (11th Cir. 2005) (per curiam) (noting that "the Supreme Court has required . . . that petitioners must (1) include all grounds on which they sought relief, and (2) allege facts in support of each ground asserted"); Smith v. Wainwright, 777 F.2d 609, 616 (11th Cir. 1985) (stating that "a habeas corpus petitioner must allege

specific errors in his counsel's performance to support a claim for ineffective assistance of counsel").

B. Doctrine of Procedural Default

1. Procedural Default Generally

"The doctrine of procedural default dictates that a state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." Ward v. Hall, 592 F.3d 1144, 1156 (11th Cir. 2010) (brackets and internal quotation marks omitted). "However, a state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon 'adequate and independent' state grounds." Id.

An "adequate and independent" state court decision is one that "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Lee v. Kemna, 534 U.S. 362, 374-75 (2002) (emphasis omitted). Whether a state procedural rule is "adequate and independent" as to have a preclusive effect on federal review of a claim "is itself a federal question." Id.

A state procedural rule is independent of the federal question when it "rest[s] solidly on state law grounds [that are] not . . . 'intertwined with an interpretation of federal law.'" Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)

(quoting Card v. Dugger, 911 F.2d 1494, 1516 (11th Cir. 1990)).

Ordinarily, a state procedural rule is "adequate" if it is both "firmly established and regularly followed." Kemna, 534 U.S. at 376. This does not mean that the procedural rule must be rigidly applied in every instance or that occasional failure to do so eliminates its "adequacy." Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion." Judd, 250 F.3d at 1313; see also Card, 911 F.2d at 1517 ("[A] state court's procedural rule must be faithfully and regularly applied and must not be manifestly unfair in its treatment of a petitioner's federal constitutional claim." (citations omitted)).

The Eleventh Circuit has established a three-part test to enable federal courts to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision. Ward, 592 F.3d at 1156. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." Id. "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." Id. at 1156-57. "Third, the state procedural rule must be adequate, i.e., firmly established

and regularly followed and not applied in an arbitrary or unprecedented fashion." Id. at 1157 (internal quotation marks omitted). The Eleventh Circuit qualified the first prong of the test with the following observation from the Supreme Court:

> The problem we face arises, of course, because many formulary orders are not meant to convey anything as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appears to rest primarily upon federal law, we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place." Similarly where . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

Id. at 1156 n.5 (emphasis in original) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Thus, "[w]hen the last state court rendering judgment affirms without explanation, [a federal court will] presume that it rests on the reasons given in the last reasoned decision." Mason v. Allen, 605 F.3d 1114, 1118 n.2 (11th Cir. 2010) (per curiam).

AO 72A
(Rev. 8/82)

Absent reason for contrary treatment, a state court's clear finding of procedural default under the state court's own rules is afforded an amount of flexibility.

> A state court need not fear reaching the merits of a federal claim in an alternative holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.

Bailey v. Nagle, 172 F.3d 1299, 1305 (11th Cir. 1999) (per curiam) (brackets and emphasis omitted) (quoting Harris v. Reed, 489 U.S. 255, 264 n.10 (1989)); see also Alderman v. Zant, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (stating that, as to a state court's finding that the petitioner's claims were procedurally barred as successive and that the claims lacked merit based on the evidence, "[t]his ruling in the alternative [did] not have the effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred").

2. Exceptions to Procedural Default

There are two situations in which an otherwise adequate and independent state ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in the state courts: (1) where the prisoner had good cause for not following the state procedural rule and was

prejudiced by not having done so; and (2) where failure to consider a prisoner's claim will result in a "fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-50 (1991); Jones v. Campbell, 436 F.3d 1285, 1304 (11th Cir. 2006).

### a. Cause and Prejudice

The "cause and prejudice" standard is framed in the conjunctive. Thus, a petitioner must affirmatively prove both cause and prejudice. Cf. Ward, 592 F.3d at 1157 ("It is well established that if the petitioner fails to show cause, [the court] need not proceed to the issue of prejudice.").

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." Id. (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). Objective factors that constitute cause include "interference by officials" that makes compliance with the state's procedural rule impracticable and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." Zeigler v. Crosby, 345 F.3d 1300, 1305 (11th Cir. 2003) (per curiam) (quoting Carrier, 477 U.S. at 488). In addition, "ineffective assistance [of counsel] adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." Edwards v.

Carpenter, 529 U.S. 446, 451 (2000). However, attorney error short of ineffective assistance of counsel does not constitute cause and will not excuse a procedural default. McCleskey v. Zant, 499 U.S. 467, 493-94 (1991). Further, "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." Reed v. Ross, 468 U.S. 1, 16 (1984).

If cause is established, a habeas petitioner must also prove "actual prejudice from the alleged constitutional violation." Ward, 592 F.3d at 1157. "To establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1180 (11th Cir. 2010). Such a showing must go beyond proof "that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982); see also Ward, 592 F.3d at 1157 ("[T]o show prejudice, a petitioner must demonstrate that the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." (internal quotation marks omitted)).

AO 72A
(Rev. 8/82)

### b. Fundamental Miscarriage of Justice

"[I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim." Id. In a "rare," "extraordinary,"[5] and "narrow class of cases,"[6] a federal court may consider a procedurally defaulted claim in the absence of a showing of cause and prejudice for the procedural default if either (1) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," Smith v. Murray, 477 U.S. 527, 537-38 (1986) (quoting Carrier, 477 U.S. at 496), or (2) the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty," Schlup v. Delo, 513 U.S. 298, 323 (1995) (quoting Sawyer v. Whitley, 505 U.S. 333, 336 (1992)).

---

[5] See Schlup v. Delo, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, [the Supreme] Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." (emphasis added)).

[6] Zant, 499 U.S. at 494 ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice." (emphasis added)).

AO 72A
(Rev. 8/82)

C. Reasonableness of a Determination on the Merits

If there is a state determination of a claim on its merits, then the Court will not disturb it unless it "[A] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or [B] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sochor v. Sec'y Dep't of Corr., 685 F.3d 1016, 1027 (11th Cir. 2012) (quoting 28 U.S.C. § 2254(d)) (internal quotation marks omitted). This is a highly deferential standard for evaluating state-court rulings that demands the federal habeas court to give the state ruling the benefit of the doubt. Id. (citation omitted).

1. Unreasonable Application of Clearly Established Law

"A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id. (citation and internal quotation marks omitted). This involves a two-stage inquiry: first, a determination on what arguments supported the decision or, if none were stated, could have supported the decision, and second, "whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." Id. (brackets omitted). In other words, a court may "issue a writ of habeas corpus only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with precedents' of the Supreme Court of the United States." Id. at 1028 (ellipsis omitted) (quoting Harrington v. Richter, 131 S. Ct. 770, 786 (2011)).

### 2. Unreasonable Determination of Facts

The second inquiry under § 2254(d) is different from whether a state court erred in applying the law. Id. Instead, the focus is on the state court's findings of facts, which are presumed correct unless there is clear and convincing evidence rebutting the presumption. Id. (citing 28 U.S.C. § 2254(e)(1)). Thus, the standard of review is even more deferential than under a clearly erroneous standard of review. Id.

## IV. Discussion

### A. Claim 1: Ineffective Assistance of Trial Counsel

Claim 1 asserts ineffective assistance of counsel (IAC) during both the guilt and sentencing phases of trial. Dkt. No. 35 ¶¶ 16-30.

### 1. Strickland Standard

Claim 1 is brought under Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, a petitioner must show (1) counsel's performance was deficient and (2) that deficiency prejudiced his defense. Id. at 687. Counsel's performance is deficient when it falls "below an objective standard of reasonableness," Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000) (en banc), which means that it is "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690. Further, "the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." Chandler, 218 F.3d at 1313 (quoting Burger v. Kemp, 483 U.S. 776, 794 (1987)) (internal quotation marks omitted).

Courts conduct a highly deferential review of counsel's performance and "'indulge the strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (brackets omitted) (quoting Strickland, 466 U.S. at 689-90). To establish prejudice, there must be "a reasonable probability that, but for counsel's [deficient performance], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S.

AO 72A
(Rev. 8/82)

at 694. "A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002) (per curiam). A petitioner must "affirmatively prove prejudice." Strickland, 466 U.S. at 693.

## 2. Sentencing Phase

As to the sentencing phase of Petitioner's trial, Meders posits various arguments that allegedly establish a claim for IAC, including: trial counsel's alleged failure to read a competency report that revealed adverse impairment by alcohol at the time of the offense; failing to state to the jury that Meders, if convicted, would be a first-time offender; not revealing Petitioner's drug use and military service; and allegedly not conducting any investigation of evidence in mitigation of sentence.[7] See Dkt. No. 48, at 24-25, 31.

### a. Procedural Default Analysis

The progress of the litigation regarding Meders's claim is somewhat unique and deserves a thorough discussion. Despite Petitioner's argument that the Court should review his sentencing IAC claim de novo, id. at 19, the Court relies upon the state court's explicit finding of procedural default.

---

[7] Petitioner clarifies that this claim is distinct from his stand-alone claims concerning the remand court's denial of funds for a mental health expert. Dkt. No. 56, at 2 n.2.

AO 72A
(Rev. 8/82)

During direct appeal, and in the course of an argument based on insufficient notice of the trial impeding Meders's effort to procure witnesses, Petitioner expressly noted that he "does not raise or waive a claim of ineffective assistance of counsel." Dkt. No. 12-68, Ex. 22, at 57 n.28. Meders also argued that he was deprived of effective assistance by not having the benefit of a private psychiatric expert. Dkt. No. 12-67, Ex. 22, at 18. There was no argument based on deficient performance absent a consideration of there being no privately obtained expert. However, the state successfully argued that IAC was injected into the direct appeal and was relevant to other claims. Dkt. No. 12-73, Ex. 25, at 3-8. Therefore, Meders I remanded the case for resolution of any IAC claims.

The only remand filing that can be interpreted as raising such a claim was in a Motion to Provide Funds for Expert Assistance. Dkt. No. 56, at 5 (citing Dkt. No. 47-13, Ex. 13). The remand court denied this motion without explanation. Dkt. No. 47-17, Ex. 17. In regard to the remand hearing, the only portions related to such a claim were cursory and cannot be taken as a fair presentment of the claim. See Dkt. No. 12-84, Ex. 30, at 244-45 (offering Dr. Dickinson's affidavit as an offer of proof after the expert could not be retained), 275-76 (stating that Meders's intoxication was important mitigation testimony that should have been submitted), 277 (stating that

33

"[t]his is not a case where we're only fighting about the penalty," in the context of a discussion only about guilt-phase IAC). Then, in denying Petitioner's IAC claims, the remand court discussed only claims relating to trial counsel's guilt-phase performance. Dkt. No. 12-210, Ex. 68, at 8-16. There was no mention of ineffective assistance of counsel based on sentencing.

Meders listed as an enumeration of error on appeal that "[t]he Defendant was denied the effective assistance of counsel at sentencing and was prejudiced thereby." Dkt. No. 47-22, Ex. 22. He also claimed that he was not waiving any right to raise a sentencing IAC claim.[8] See Dkt. No. 12-110, Ex. 34, at 35-36. In the context of an argument contesting the denial of expert funds, Meders discussed how various facts could have mitigated his sentence. See id. at 45-46. However, this discussion concluded that "as to the narrow question presented in this review, the trial court's refusal to provide any funds for a mental health expert deprived Defendant's current counsel of any meaningful opportunity to demonstrate the prejudicial effect of his trial counsel's failing in this area." Id. at 46. The Supreme Court of Georgia did not address a sentencing IAC claim

---

[8] The Court finds no basis to conclude that such a declaration can take precedence over state procedural rules and the Supreme Court of Georgia's directive to address any IAC claims on remand. See Meders I, 260 Ga. at 55(10) ("We therefore grant the state's request for a remand to give defendant an opportunity to litigate this issue [of trial counsel's effectiveness].").

in its affirmance of the remand court's order. Meders II, 261 Ga. at 807(2).

In Meders's state habeas petition, he raised various IAC claims, including that counsel failed to properly object to items of improper evidence offered in aggregation at the penalty phase (Claim 3(m)), that counsel failed to conduct an adequate pretrial investigation to uncover evidence in mitigation (Claim 3(n)), that counsel failed to object properly to misleading and improper arguments made by the prosecution at the penalty stage (Claim 3(o)), and that counsel failed to object to portions of the charge that failed to adequately define mitigating circumstances (Claim 3(p)). Dkt. No. 12-122, Ex. 44, at 9-10. At a hearing before the state habeas court, the judge inquired about whether a sentencing IAC claim could be brought and expressed reservations about hearing an issue already directed for resolution during the remand proceeding. See Dkt. Nos. 12-24 and -25, Ex. 46. In a post-trial memorandum of law, Petitioner raised a single claim that he was denied the right to effective assistance of counsel by Davis's failure to pursue, obtain, and use evidence against Arnold, Creel, and Harris. Dkt. No. 12-200, Ex. 62, at 77. In his proposed findings of fact and conclusions of law and in regard to his IAC claims, Meders focused on the denial of funds to retain experts as

AO 72A
(Rev. 8/82)

prejudicing him during the sentencing phase. Dkt. No. 47-68, Ex. 68, at 26-28.

While the state habeas court granted relief on Petitioner's guilt-phase claim, it denied the aforementioned IAC claims as procedurally defaulted. Dkt. No. 12-204, Ex. 65, at 28. In a cross-appeal, although Meders contested the finding of procedural default on 11 claims, he did not appeal the finding of procedural default on his sentencing IAC claims. Dkt. No. 12-211, Ex. 69, at 37-41; see also Dkt. No. 47-78, Ex. 78, at 83, 95 (discussing potentially mitigating factors, but in the context of other claims).

In reversing the grant of relief by the state habeas court, the Supreme Court of Georgia found that (A) the lower court improperly considered IAC claims procedurally barred as actually litigated and (B) incorrectly found cause and prejudice to overcome procedural default for certain claims; it did not specifically address any sentencing IAC claim. Meders III, 280 Ga. at 865-66(1). Although the last state court rendering judgment did not clearly and expressly state that it was relying on state procedural rules to resolve the claim, the Supreme Court of Georgia did not disturb the habeas court's finding of procedural default. Therefore, the state habeas court order, as the last reasoned opinion on the claim, leads the Court to

AO 72A
(Rev. 8/82)

presume that the Supreme Court of Georgia did not disregard that bar. _Ward_, 592 F.3d at 1156 n.5.

Pursuant to the three-part test established in _Judd v. Haley_, 250 F.3d 1308, 1313 (11th Cir. 2001), the state habeas court relied exclusively on state procedural rules in finding default—that is, it was not intertwined with an interpretation of federal law. _See_ Dkt. No. 12-204, Ex. 65, at 13-14 (citing _Black v. Hardin_, 255 Ga. 239 (1985); _Valenzuela v. Newsome_, 253 Ga. 793 (1985); O.C.G.A. § 9-14-48(d)). Indeed, Georgia's procedural default rules—including the procedural default doctrine under O.C.G.A. § 9-14-48(d)—are firmly and regularly applied and have been given deference by the Eleventh Circuit. _E.g._, _Ward_, 592 F.3d at 1176. Although Meders contends that he raised a sentencing IAC claim, he apparently made actually bringing and arguing the claim contingent upon receiving funds on remand. The Court finds no basis in this strategy as preserving an IAC claim when there was a ripe opportunity to bring it. Therefore, Meders's sentencing IAC claim is procedurally defaulted.

### b. Exceptions-to-Default Analysis

Petitioner argues that cause exists for the procedural default on this claim because he was precluded from presenting expert testimony about his psychological condition. Dkt. No. 56, at 24. Further, prejudice is shown, according to

AO 72A
(Rev. 8/82)

Petitioner, by there being no demonstration of mitigating evidence that may have prevented imposition of the death penalty.  Id.

### i. Cause

Petitioner's argument is without merit.  The state habeas court held that Petitioner's sentencing IAC claim was procedurally defaulted for timeliness—a determination not appealed by Petitioner, and not disturbed by the Supreme Court of Georgia.  Although Petitioner argues that cause is established by the denial of funds to utilize an expert at the remand proceeding, the Court finds no basis in his argument. Certainly, it is possible that retaining an expert could have uncovered credible criticisms of the pre-trial psychological evaluation.  However, given that the focus would be on the adequacy of trial counsel's investigation given what was known to counsel and the insignificant findings of the state psychologist in regard to Meders's mental health, see infra Part IV.A.2.b.ii, an ex post reexamination would be of little use. Further, Meders's focus on mental factors mitigating sentence leaves unexplained why a sentencing IAC claim based on other purported mitigating factors could not have been brought sooner. Therefore, no cause is shown.

AO 72A
(Rev. 8/82)

## ii. Prejudice

As to prejudice, Petitioner's claim likewise fails. Prejudice is determined by "whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1241 (11th Cir. 2010) (ellipsis omitted). To judge the adequacy of counsel's investigation of potentially mitigating circumstances, the Court considers trial counsel's perspective at the time the investigative decisions are made and gives "a heavy measure of deference to counsel's judgments." Ford v. Hall, 546 F.3d 1326, 1333 (11th Cir. 2008) (quoting Rompilla v. Beard, 545 U.S. 374, 381 (2005)). "The court should focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of petitioner's background was itself reasonable." Id. at 1333-34 (emphasis, brackets, and internal quotation marks omitted) (quoting Wiggins v. Smith, 539 U.S. 510, 523 (2003)). Not only should the Court consider the evidence known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Id. at 1334.

The record fails to show prejudice. Much of the evidence that Petitioner argues should have been given at sentencing would have been cumulative of evidence introduced at trial.

39

See, e.g., Dkt. No. 12-45, Ex. 15, at 1066 (testimony that Meders was in the National Guard since 1980), 1074 (testimony that Meders had been drinking all day and smoking marijuana). Counsel is not required to call additional witnesses to present such cumulative evidence. Ford, 546 F.3d at 1338. Further, as to Meders's substance abuse, "a showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing." Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999). This may be even more so where future dangerousness can be inferred from an individual's alcoholism increasing the risk of relapse into the purportedly mitigating state during the murder. As to trial counsel's diligence in investigating and using Meders's psychological state as mitigating evidence, Meders's argument is likewise not compelling. Trial counsel, at the time, knew that Meders was under psychological stress from his incarceration, familial difficulties, and the prospect of a death sentence. He responded reasonably by requesting an evaluation, which was granted. The evaluation revealed nothing that would have constituted a significant mitigating factor. See Dkt. No. 12-98, Ex. 32, at 32-34 (expounding the findings of Meders's psychological evaluation). Although trial counsel questioned the status of the psychological evaluation and was unaware that the results had already been communicated, he was provided a

AO 72A
(Rev. 8/82)

copy of the findings just prior to trial. See Dkt. No. 12-32, Ex. 12, at 625. There is nothing to suggest that he did not read this evaluation, nor would he have acted unreasonably to end his investigation based on the evaluation's findings. Indeed, given trial counsel's decades of experience, "[t]he presumption that counsel's performance is reasonable is 'even stronger.'" Reed, 593 F.3d at 1244. (quoting Chandler, 218 F.3d at 1316 n.18).

The alleged mitigating factors would have only barely altered Meders's sentencing profile. This is not a case presenting facts that would have been significant to mitigating a defendant's moral culpability. See, e.g., Porter v. McCollum, 558 U.S. 30, 41 (2009) (per curiam) (stating that only evidence related to a crime of passion was presented and nothing about the defendant's battlefield heroism during the Korean War, struggles to regain normality after the war, childhood history of physical abuse, and brain abnormality and limited education). Counterbalancing the weak mitigating factors proposed by Meders was a shocking crime in which a store clerk was murdered in the middle of the night and without warning by a stranger—all for so little gain, a handful of cash and food stamps. Facing such facts, Davis reasonably emphasized residual doubt in mitigation, which the Eleventh Circuit has countenanced as an effective strategy. See Dkt. No. 12-51, Ex. 16, at 1319-1321 (arguing

AO 72A
(Rev. 8/82)

residual doubt in mitigation of sentence); Ward, 592 F.3d 1170 ("We previously have catalogued those cases in our circuit in which we have noted the effectiveness of the residual doubt defense.").

At the very least, any prejudice suffered would be insufficient to entitle Meders to relief or to overcome the procedural default. Therefore, Claim 1, as it pertains to trial counsel's allegedly ineffective assistance of counsel at sentencing, is procedurally defaulted.

### 3. Guilt Phase

Petitioner asserts an IAC claim based on six alleged failings at the trial's guilt phase:

> (1) failing to use police incident reports found in the prosecutor's open file and failing to develop testimony of the shootings near Highway 303 that corroborated Meders's trial testimony and impeached the testimony of the State's key witnesses; (2) failing to respond to the trial judge when the deliberating jury sent out a note asking about the existence of such reports; (3) failing to utilize prior inconsistent recorded statements of the State's three eyewitnesses found in the prosecutor's open file; (4) failing to object to the admission of an unadjudicated citation for cocaine sales; (5) failing to object to the admission and use of food stamps based upon a note in the prosecutor's open file that the food stamps could not be linked to the robbery; and (6) trial counsel's failure to make an opening statement.

Dkt. No. 48, at 38. Respondent contends that allegations (2) and (6) were not raised in a state proceeding and therefore are

unexhausted, while the other claims were decided on the merits and therefore deserve deference under § 2254(d). See Dkt. No. 49, at 79-80. Petitioner did not reply to this assertion of failure to exhaust. After reviewing the record, the Court is unable to find a fair presentment of these two claims. Therefore, those bases for Petitioner's Strickland claim—failure to respond to the jury note and failure to make an opening statement—are unexhausted and will not be considered.

### a. Applicability of § 2254(d)

Respondent contends that the remaining four issues deserve deference under § 2254(d). Although most of these issues are indisputably exhausted, some of the underlying issues warrant closer review. Where the state court did not address a given prong under Strickland, the Court's review is de novo rather than under § 2254(d)'s deferential standard. Rompilla, 545 U.S. at 390; Johnson v. Sec'y, DOC, 643 F.3d 907, 930 (11th Cir. 2011). The remand court's order addressed and denied the merits of five alleged deficiencies: not suppressing evidence seized in Meders's left pocket; not objecting to the admission of the contents of Meders's wallet as the product of an illegal search; not objecting to a cocaine citation as impermissible character evidence; not suppressing evidence seized from a warrantless search of the vehicle used at the murder; and failing to use prior inconsistent statements made by key witnesses. Dkt. No.

AO 72A
(Rev. 8/82)

12-108, Ex. 33, at 3-9. In affirming this order, the Supreme

Court of Georgia held, "The trial court's nine-page order

persuasively demonstrates that Meders has failed to overcome the

'strong presumption' that Meders' trial counsel performed

effectively. Ferrell v. State, 261 Ga. 115(3), 401 S.E.2d 741

(1991)." Meders II, 261 Ga. at 807(2). Indeed, as to some of

these claims, only Strickland's prejudice prong was addressed.

See Dkt. No. 12-108, Ex. 33, at 4 (finding overwhelming evidence

even if ammunition and food stamps from a pocket were improperly

seized), 6 (finding admission of a cocaine citation not to be

sufficiently prejudicial given the other references to drugs in

the record), 7 (finding admission of items and a food stamp as

insufficiently prejudicial given that other food stamps were in

evidence), 10 (finding that failure to impeach state witnesses

with police reports did not create the requisite prejudice to

amount to IAC). Only one alleged deficiency garnered a

conclusion on whether trial counsel's performance was deficient.

See id. at 5 (finding no deficiency in failing to suppress the

contents of the wallet given that such a suppression argument

lacked merit).

### b. Deficiency of Counsel's Performance

#### i. *Parties' Arguments*

Petitioner attacks trial counsel's performance on various fronts. He questions whether trial counsel ever reviewed the prosecution's case file, whether trial counsel understood the significant relevance of police reports and prior inconsistent statements, and whether trial counsel used reasonable efforts to defend a client facing death row. See Dkt. No. 48, at 40-43. Petitioner finds impalpable the possibility that trial counsel reviewed the records, understood their significance, and chose not to use them. See id. at 43. Likewise, Petitioner asserts that trial counsel's performance was constitutionally deficient for not objecting to the admission of a cocaine citation and food stamps, which Petitioner alleges were inadmissible.[9] Id. at 43-44. According to Petitioner, this background, along with not even asking Meders about his legal receipt of food stamps, "demonstrates precisely how unengaged [trial counsel] was with the defense of his client in [a] capital trial." Id. at 45.

Respondent does not contest whether trial counsel's performance was deficient. Instead, his focus is whether Meders

---

[9] Without addressing whether the cocaine citation or food stamps were actually inadmissible, the state habeas court concluded that given the context of a capital case, "a reasonably effective lawyer would have, at a minimum, **vigorously,** objected to the admission into evidence and submission to jurors of a criminal charge summons for an unrelated crime" or of the food stamps, when intended to connect Meders to the crime scene. Dkt. No. 12-204, Ex. 65, at 33-36 (emphasis in original).

AO 72A
(Rev. 8/82)

was prejudiced, which is the sole _Strickland_ prong decided on the merits by the state court. See Dkt. No. 49, at 79. Given that the state court did not decide whether trial counsel's performance was deficient, the Court addresses the issue _de novo_.[10] _Ferrell v. Hall_, 640 F.3d 1199, 1224 (11th Cir. 2011) (stating that the court should afford _de novo_ review to a prong that a state court never reached).

### ii. Finding of Deficiency

After reviewing the evidence provided in the extensive record, the Court concludes that trial counsel's assistance was deficient for most of the claims. Dkt. No. 12-204, Ex. 65, at 24. Notably, Respondent has proffered no argument on this issue and apparently concedes the deficiency of trial counsel's performance. Only in regard to the food stamps[11] does the Court find that trial counsel's performance was not deficient.

The prosecution maintained an open-access policy with Davis for review of its file. Although the prosecutor testified that Davis visited his office once to review the file, he could not recall how long Davis was there. Dkt. No. 12-133, Ex. 52, at 73. Davis asked for no copies of anything in the file; if he wanted to note anything from the file, Davis would have taken

---

[10] As to the cocaine citation, the remand court decided Davis's effectiveness only in terms of not objecting to the wallet's contents based on them being the fruit of an illegal search. Dkt. No. 12-108, Ex. 33, at 5.
[11] Although the parties contest whether this claim was exhausted, the Supreme Court of Georgia treated it as raised and decided on remand. _Meders III_, 280 Ga. at 866 n.1. Therefore, the Court treats this claim as exhausted.

AO 72A
(Rev. 8/82)

his own notes. Id. at 74-75. The state habeas court, after comparing the prosecution's file and Davis's file, found that Davis's file did not include a single note, copy, or any indication that Davis actually reviewed the prosecution's file. Dkt. No. 12-204, Ex. 65, at 24. Nevertheless, the court was unable to conclusively determine whether or to what extent Davis reviewed the prosecutor's case file. Id. at 24-25. At the very least, however, Davis never introduced or referenced the police reports and inconsistent statements of key witnesses—evidence that was located in the prosecution's file.

Failure to introduce evidence corroborative of Meders's strategy of defense and that would have impeached the credibility of the state's key witnesses was deficient and in no way could be seen as a strategic choice. The reports would have corroborated at least the existence of drive-by shootings, thereby lending some support to Meders's narrative of the night's events. The reports not only supported the existence of the shootings, but also cast at least some shadow of doubt on Creel's testimony of not being involved in a shooting. Indeed, the victim named Creel as a suspect. The same goes with the prior inconsistent statements by Harris, Creel, and Arnold. For example, although Creel admitted to knowing that Meders had a gun before the murder occurred, he denied any such knowledge at trial. At the very least, the Court can fathom no reason for

<u>not</u> introducing the reports and inconsistent statements for impeachment.

As to the cocaine citation, counsel's performance was also deficient. He either (A) did not realize it was in Meders's wallet and would be admitted or (B) realized it was there but did not understand that the law could plausibly favor an objection on its inadmissibility.[12] Both options reflect a lack of reasonable diligence. The Court sees no reasonable strategy in not attempting to object to the citation's admission.

As to the food stamps, the Court finds no basis in finding that they would have been excluded had an objection been made. They were certainly relevant as possibly embodying the fruits of the murder, despite law enforcement's inability to definitively connect the food stamps seized with the food stamps taken from the store. See <u>Mansfield v. Sec'y, Dep't of Corr.</u>, 679 F.3d 1301, 1311-12 (11th Cir. 2012) (crediting consideration of food stamps despite the evidence not establishing "with certainty" that the food stamps found by police belonged to the murder victim).

---

[12] Georgia law provides that an unadjudicated charge is not evidence of guilt and that introduction of such evidence is prejudicial: "[T]he fact that a defendant is also under indictment for one or more other crimes than the one for which he is on trial would tend to impress upon the jury that he is more likely to be guilty in the case under consideration and thus to effectively deprive him of the right to enter upon his trial with the presumption of innocence in his favor." <u>Sides v. State</u>, 213 Ga. 482, 485 (1957).

AO 72A
(Rev. 8/82)

c. Prejudice to Meders

Petitioner argues that prejudice exists because there was a reasonable probability of a different verdict had the police reports and inconsistent statements been introduced and had there been an objection to the allegedly improper evidence. Dkt. No. 48, at 46. For reasons discussed below, the Court disagrees and cannot find that the state court's determination was unreasonable under § 2254(d).

i. Arguments About Remand Hearing's Fairness

Before addressing the alleged prejudice, Petitioner argues that the Court's analysis should be framed by the allegedly deficient process at the remand hearing. Dkt. No. 48, at 46. By ignoring Meders's objections against remanding the case to assess IAC claims, which were explicitly not being raised in the appeal brief, the Supreme Court of Georgia, Meders contends, forced him to litigate the issue with restrictive funding and without the benefit of the Georgia Open Records Act. Id. at 47-48. Meders argues that he was further handicapped by the remand court's denial of a continuance to enable Davis to testify and the limited access to the prosecution's file until the state habeas proceeding. Id. at 48-49. Given these alleged defects, Petitioner argues that the state court's decision was necessarily arbitrary and unreasonable under § 2254(d).

AO 72A
(Rev. 8/82)

Respondent, on the other hand, contends that remanding the issue of IAC was necessary or else the claim would have been forever found defaulted. Dkt. No. 49, at 81-82 (citing Williams v. Turpin, 87 F.3d 1204, 1210 (11th Cir. 1996); Lewis v. State, 291 Ga. 273, 282 (2012)). Moreover, Respondent argues that Georgia's requirement of raising IAC as soon as practicable should not bear on whether the state court's determination deserves deference. Id. at 83-84. As to Petitioner's argument about restricted funds, Respondent claims that it is not based on any federal constitutional law and therefore does not alter the standard of review. Id. at 84.

Contrary to Petitioner's argument, the remand process does not alter the Court's analysis. Although the Court agrees with Petitioner that there is no basis in finding that an IAC claim would have been forever defaulted if it had not been addressed on direct review, there was no error in using this process. The Supreme Court of Georgia's preference to address such a claim as soon as possible does not appear to be arbitrarily enforced. See, e.g., Franks v. State, 278 Ga. 246, 263 (2004) (reviewing various IAC claims raised during a motion for new trial); Fults v. State, 274 Ga. 82, 86-87(6) (2001) (addressing an IAC claim decided during remand). Further, although it may be unfortunate that trial counsel died before being able to testify on his own effectiveness, it is speculative whether a later resolution of

Petitioner's IAC claims would have actually had the benefit of such testimony—or that such testimony would have been for Petitioner's benefit. As to Petitioner's claims that he was encumbered on remand by limited access to the prosecution's documents, at the time, the parties found a compromise that apparently resolved remand counsel's issue. See Dkt. No. 12-78, Ex. 30, at 9, 15. Indeed, the Court has no knowledge of the records to which Petitioner is referring. Finally, as discussed in other sections, the Court does not find that the denial of funds deprived Petitioner of a fair and full opportunity to assert his claims.

## ii. Remand Court's Analysis

Meders argues that the remand court unreasonably applied Strickland because it did not consider the police reports and impeaching statements, while it did consider the food stamps and cocaine citation. Dkt. No. 48, at 51. He also criticizes the remand order's "shear paucity" of discussion and "truncated" prejudice inquiry, and concludes that the Court should not countenance the remand court's conclusory finding of no prejudice based on the purportedly "overwhelming" evidence. Id.

Respondent shows that it is the state court's conclusion and adjudication of a claim's merits that deserve deference, not necessarily the number of words utilized in reaching the conclusion. See Dkt. No. 49, at 90 (citing Harrington, 131 S.

AO 72A
(Rev. 8/82)

Ct. at 784; Williams v. Allen, 598 F.3d 778, 797 (11th Cir.

2010); Sargent v. Sec'y, Fla. Dep't of Corr., 480 F. App'x 523,

527 (11th Cir. 2012) (per curiam)).

Indeed, in denying that Meders's was prejudiced by any

deficient performance, the remand court said that there was

"overwhelming evidence supporting the conviction of the

defendant and tending to undermine his own credibility." Dkt.

No. 12-108, Ex. 33, at 9. Therefore, after purportedly

"carefully considering the defendant's contentions and the

record," the remand court found "that the defendant has not

carried his burden of showing that there exists a reasonable

probability that but for trial counsel's alleged deficiencies

the result of the trial would have been different." Id.

Although the court did not specify in that paragraph what

specific evidence it was relying on, the remand court had

provided a "backdrop to the consideration of the 'prejudice'

prong" under Strickland. Id. at 2. The evidence included:

- that the gun from which the fatal bullets were fired was
  owned by Meders and found under his mattress two days after
  the shooting;

- that all of the convenience store's bait money was found on
  Meders or at his house;

- that Meders had told Harris that Meders "blew a man's head
  off for $38.00";

- that Meders was the only one denying knowledge the next day of the shooting or being at the store;

- that Meders waited until a year after the shooting to come up with the narrative of events offered by him at trial; and

- that Meders failed to include the murder weapon in a disclosure of the firearms he owned.

Id. at 2-3. Petitioner criticizes the remand court's analysis based on these facts as unduly giving them too much credence in light of new evidence, while simultaneously not sufficiently crediting the non-proffered evidence at issue and the fact that the jury specifically asked about whether there were reports of any drive-by shooting.

### iii. Reasonableness of Remand Ruling

After carefully considering the merits of Petitioner's claim, the Court finds that there is at least a possibility that fair-minded jurists could disagree about whether the state court's decision conflicts with precedents of the Supreme Court of the United States. As an initial matter, the Court recognizes the inference of prejudice based on Jury Question 5 and the critical battle for credibility during the trial. In essence, although there was agreement by all witnesses to certain facts, some facts were disputed and could only be resolved by assessing the witnesses' credibility. For example,

AO 72A
(Rev. 8/82)

at trial, Creel denied knowing that Meders had a gun on the night of the murder, but admitted within days after the murder to seeing a firearm beforehand. Similarly, although both Creel and Arnold denied picking Meders up from his house, they earlier had admitted to picking him up. And, although the police reports did not clearly implicate Creel and Arnold in the shootings, their existence as proof of shootings hours before the murder would have cast some doubt on Creel's and Arnold's testimony that they were not involved, although the police reports themselves included speculative information and details incongruous with Meders's narrative. See Dkt. No. 12-87, Ex. 31, at 8 (noting that two individuals were seen in the shooting vehicle, not three). All these factual nuances were not determinative of Meders's guilt, but these minute battles could have informed the jury's decision on the ultimate dispute between the witnesses actually present to the murder: whether Arnold or Meders shot the store clerk. It seems possible that the jury discussed the witnesses' credibility and whether parts of Meders's story could be substantiated.

Nevertheless, the state court's determination was not an unreasonable application of Strickland. The record reveals the significantly incriminating nature of the evidence. It was never disputed that Meders owned the firearm that killed Anderson, that he grabbed money from the cash register, that he

AO 72A
(Rev. 8/82)

was the sole person found with the fruits of the armed robbery, that the firearm was found hidden under Meders's waterbed, and that Meders was the only witness who initially denied being at the convenience store or involved with the murder. Crediting Meders story would require a fanciful belief to the following:

- that Meders gifted his firearm to Arnold after the murder;

- that someone breached Meders's home while no one was there and placed the firearm under Meders's bed after Meders was arrested;

- that Arnold committed the murder without asking for or receiving anything in return;

- that multiple individuals conspired to blame Meders, even Harris, who was not at the convenience store; and

- that Meders denied knowledge of the murder based on Harris's advice, despite simultaneously believing that Harris was trying exact revenge for an alleged affair between Meders and Harris's wife.

The jury would have had to believe this while simultaneously downplaying the serious deficiencies in Meders's own credibility, as he admitted to lying to police officers the day after the murder. Indeed, testimony even revealed that Meders lied to a police officer the night of the murder about lying to

AO 72A
(Rev. 8/82)

his wife.[13]  Moreover, trial counsel attempted to impeach Creel's

and Arnold's testimony with that of other witnesses, meaning

that trial counsel made some choice on how to best challenge

Creel and Arnold's narrative.  The police reports and

inconsistent statements may have cast some doubt on Arnold's and

Harris's testimony, but not nearly to the degree that could have

resuscitated Meders's own credibility.  At the very least, the

state court's finding of prejudice was not an unreasonable

application of Strickland.

Likewise, to the degree that the cocaine citation and food

stamps were deficiently handled, the admissions do not lend

support to the conclusion that there was a probable likelihood

of a different outcome but for the evidence.  The cocaine

citation was never referenced during trial, while drug use was

referenced throughout.  Although Petitioner claims that the

prejudice is significant because it was an offense for

trafficking, which buttressed Harris's testimony that Meders

owed $2,000 to a cocaine dealer in Florida, his own drug use

(rather than distribution) could have also underlay the

referenced debt.  In other words, Meders's drug use was not in

---

[13] Meders had just gotten home after 3:00 a.m. when a police officer
questioned Meders on Meders's property.  The officer had seen Meders speeding
and with a broken light on his vehicle.  When questioned by the officer,
Meders appeared nervous and told the officer that he was worried about his
wife knowing that he had received a beeper message from his girlfriend and
was returning from meeting up with her.  Meders admitted later that this
story was false.

AO 72A
(Rev. 8/82)

dispute, and his alleged debt was not a critical fact for the determination of guilt. At the very least, as with the police reports and inconsistent statements, the state court determination of no prejudice was a reasonable application of Strickland. Therefore, Claim 1 is without merit.

B. Claim 2: Prosecutor's Use of Perjured Testimony

Claim 2 asserts that the prosecutor knowingly solicited perjured testimony from the lead detective and key witnesses and argued falsely based on that testimony. Dkt. No. 35 ¶¶ 31-46. The testimony concerned corroboration of Meders's truck-shooting story, and the argument allegedly entailed vouching for the consistency of key witnesses. Id. Although Petitioner acknowledges that this claim was found to be procedurally defaulted, he believes that he can show cause and prejudice to overcome the default. Dkt. Nos. 48, at 57-59; 49, at 111.

1. Supreme Court of Georgia's Procedural-Default Ruling

As to this claim, the Supreme Court of Georgia stated the following:

> Petitioner argues that the habeas court erred by denying his claim regarding the State's use of allegedly-false testimony by a detective and a portion of the prosecutor's argument to the jury. The habeas court found that petitioner had failed to demonstrate that the testimony in question was actually false. Given the vagueness of the facts upon which the detective testified at trial and the varying interpretations one might place on his testimony, we do not find the habeas court's finding of fact to be clearly erroneous. We

further note that this claim should have been
found procedurally defaulted because it was not
raised during petitioner's direct appeal
proceedings. Upon finding the claim to be
procedurally defaulted, the habeas court should
then have inquired into whether petitioner had
shown cause and prejudice to overcome that bar.
See OCGA § 9-14-48(d); Turpin v. Todd, supra, 268
Ga. at 824(2), 493 S.E.2d 900(a). The habeas
court's findings of fact concerning the merits of
the claim are identical to the inquiry regarding
possible prejudice under the cause and prejudice
test; therefore, considering the habeas court's
findings and our own review of the trial record,
we conclude that no prejudice has been shown and
that the claim, therefore, remains defaulted.

Meders III, 280 Ga. at 868-69(2). Thus, this claim is

procedurally defaulted unless the cause-and-prejudice exception

applies.

## 2. Cause Analysis

In none of the filings prior to remand did Petitioner make

a claim for prosecutorial misconduct. See Dkt. Nos. 12-63, Ex.

19; 12-64, Ex. 19; 12-67, Ex. 22; 12-68, Ex. 22.; 12-74, Ex. 26.

Although he asserted prosecutorial misconduct on direct appeal,

it was not for the factual bases underlying Claim 2. See Dkt.

No. 12-68, Ex. 22, at 43-52. However, Petitioner asks the Court

to focus on the remand proceeding and argues that Respondent

should be judicially estopped from making his present argument

on cause because the remand court would not consider

Petitioner's claim for prosecutorial misconduct. Dkt. No. 56,

at 80-83 (citing Dkt. Nos. 42-2, Ex. 131, at 69-70; 42-6, Ex.

AO 72A
(Rev. 8/82)

135, at 73-74; 12-83, Ex. 30, at 204; New Hampshire v. Maine, 532 U.S. 742 (2001)).

Petitioner's focus on the remand hearing as the appropriate venue to assert his claim, and the denial of that opportunity, is misplaced. In remanding the case, the Supreme Court of Georgia explicitly limited the rest of direct review to IAC and sentence review. See Meders I, 260 Ga. at 55(10) ("The question of effectiveness will likely have to be addressed at some point, and we see no reason not to do it now. We therefore grant the state's request for a remand to give defendant an opportunity to litigate this issue. . . . After the conclusion of the proceedings on remand, the case shall be returned to this court for review of the proceedings on remand and for the sentence review . . . ."). Petitioner attempts to divert the Court's focus to the remand proceeding, but the Supreme Court of Georgia explicitly held that the procedural default arose from failing to raise the claim on direct appeal.

To cure this failure, Petitioner alleges that his new counsel could not bring the claim on direct appeal because they lacked access to the records supporting the claim's factual basis until after Meders I and the initial stage of direct review was complete. See Dkt. Nos. 48, at 58-59; 58, at 81-82. However, Petitioner cites nothing—in the record or in law—to support the conclusion that his new attorneys were deprived of

any meaningful opportunity to garner the factual predicates for the claim and raise them for resolution in Meders I. As a result, Petitioner's current counsel is implicated, and he waives IAC as a basis for cause to bring this claim.

### 3. Prejudice Analysis

For the same reasons stated supra Part IV.A.3.c.iii, there is no reasonable probability that the result of the proceeding would have been different but for the alleged error. The amount of evidence against Petitioner was overwhelming. Therefore, because Petitioner cannot establish both cause and prejudice, Claim 2 remains procedurally defaulted.

### C. Claim 3: Failure to Disclose Exculpatory Evidence

Claim 3 asserts that the prosecution failed to disclose exculpatory evidence at trial, including police reports, prior inconsistent statements of key state witnesses, and oral statements of Creel and Arnold admitting to having a feud with the owners of the targeted trucks. Dkt. No. 35 ¶¶ 47-64. Underlying this claim are several pieces of evidence. E.g., id. ¶ 51. Although the parties agree that this claim was found to be procedurally defaulted,[14] Petitioner argues that there is

---

[14] As to Meders's Brady claim, the Supreme Court of Georgia said, in full, the following:

> Petitioner argues that the habeas court erred by failing to grant relief based on his claim of evidence suppression. See Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). The Warden argues that the majority of the matters addressed in this claim were waived

AO 72A
(Rev. 8/82)

by petitioner's failure to raise them properly in the
habeas court and that, in any case, the claim is
procedurally defaulted because it could have been but was
not raised on direct appeal. Pretermitting the Warden's
argument regarding waiver, we conclude that petitioner
cannot satisfy the cause and prejudice test and, therefore,
that his claim remains defaulted.

To succeed in an evidence suppression claim,
petitioner was required to show the following:

> (1) the State possessed evidence favorable to the
> defendant; (2) the defendant did not possess the
> favorable evidence and could not obtain it himself
> with any reasonable diligence; (3) the State
> suppressed the favorable evidence; and (4) had the
> evidence been disclosed to the defense, a reasonable
> probability exists that the outcome of the trial
> would have been different. [Cits.]

Schofield v. Palmer, supra, 279 Ga. at 852(2), 621 S.E.2d
726. The burden of proving these elements rested on
petitioner. See Watkins v. State, 276 Ga. 578(4), 581
S.E.2d 23 (2003).

Most of the allegedly-suppressed evidence in issue
consisted of items that the prosecutor, both on remand and
at the habeas hearing, asserted had been contained in the
district attorney's file made available to trial counsel.
See Adams v. State, 271 Ga. 485, 487(3), 521 S.E.2d 575
(1999) (noting prosecutor's open file policy satisfies
State's duty to disclose exculpatory materials). Although
the habeas court found there was no evidence to corroborate
the prosecutor's statements regarding what materials were
contained in his file and how available he made the file to
trial counsel, the habeas court also made no finding of
fact that the prosecutor's testimony was false.
Furthermore, our review of the trial record tends to
confirm the prosecutor's testimony, given trial counsel's
statement during a pre-trial hearing in which he
specifically informed the trial court that he was satisfied
to date with his review of the State's file. Thus, we
conclude that petitioner has failed to show that the
prosecutor's entire file was not made available to trial
counsel.

Portions of petitioner's evidence suppression claim
concern matters not included in the prosecutor's file,
including the allegation that the prosecutor assisted one
of the State's witnesses in certain criminal matters both
before and after petitioner's crimes and additional
information related to other shooting incidents. Our
review supports the habeas court's finding that petitioner
failed to show prejudice as a result of the alleged
suppression of these items sufficient to demonstrate a
reasonable probability of a different outcome in either
phase of petitioner's trial. Schofield v. Palmer, supra,
279 Ga. at 852(2), 621 S.E.2d 726.

AO 72A
(Rev. 8/82)

cause and prejudice to overcome the default. See Dkt. Nos. 48,
at 66-67; 49, at 122.

To establish a Brady[15] violation, Petitioner must show:

> (1) that the Government possessed evidence
> favorable to the defense, (2) that the defendant
> did not possess the evidence and could not obtain
> it with any reasonable diligence, (3) that the
> prosecution suppressed the evidence, and (4) that
> a reasonable probability exists that the outcome
> of the proceeding would have been different had
> the evidence been disclosed to the defense.

Moon v. Head, 285 F.3d 1301, 1308 (11th Cir. 2002) (brackets

omitted) (quoting Spivey v. Head, 207 F.3d 1263, 1283 (11th Cir.

2000)). "A 'reasonable probability' is a probability sufficient

to undermine confidence in the outcome." United States v.

Bagley, 473 U.S. 667, 682 (1985). Indeed, the prejudice inquiry

to overcome a procedural default is similar to the Brady claim's

underlying materiality inquiry. Hallford v. Culliver, 459 F.3d

1193, 1200 (11th Cir. 2006) (per curiam). A Brady violation

"turns on the cumulative effect of all such evidence suppressed

by the government, and . . . the prosecutor remains responsible

for gauging that effect regardless of any failure by the police

to bring favorable evidence to the prosecutor's attention."

Kyles v. Whitley, 514 U.S. 419, 421 (1995).

---

> Therefore, pretermitting the Warden's waiver
> arguments, petitioner's claim fails because his evidence
> suppression claim concerns only materials either not shown
> to have been suppressed or not sufficiently prejudicial to
> warrant relief.

Meders III, 280 Ga. at 869-70(4).

[15] Brady v. Maryland, 373 U.S. 83 (1963).

AO 72A
(Rev. 8/82)

Petitioner injects the following as underlying his claim:

- evidence about the existence of a feud between the Creel and Brown families, Dkt. No. 12-204, Ex. 65, at 31 (citing Dkt. No. 12-82, Ex. 30, at 188);

- evidence that Creel admitted to knowing the Brown family, id. (citing Dkt. 12-82, Ex. 30, at 187);

- evidence that Creel and Arnold knew Keith Bowen, Dkt. No. 12-205, Ex. 65, at 45 (citing Dkt. No. 12-138, Ex. 52, at 236-37); and

- evidence of Creel, approximately 2 months after the murder and 16 months before trial, being charged for trespass and throwing a railroad tie through the window of Brown's vehicle, id. at 42 (citing Dkt. Nos. 12-150, Ex. 55, at 727; 12-151, Ex. 55, at 737).[16]

Dkt. No. 48, at 68.

Although the state possessed evidence marginally favorable to the defense, Petitioner's Brady claim would fail, and there would be no prejudice. Meders could have discovered this evidence with reasonable diligence. Creel's arrest record would be public record, and the other evidence could have been found by interviewing Creel or Arnold. Further, given that there is

---

[16] Petitioner also claims that, if the Court finds that reports of drive-by shootings, transcripts of witness statements, and investigation notes were not in the prosecutor's file at the time of trial, then these pieces of evidence also underlie a Brady claim. Dkt. No. 48, at 68 n.37. The Court finds, however, that the evidence suggests that the reports were in the file and therefore cannot underlie a Brady claim.

no reason to believe anything but the prosecution's testimony that the police reports were in its file, that the file was freely available to Meders, and that the reports evidenced a feud between the Browns and Creels, there is no basis in finding that evidence of the feud was suppressed. The other evidence also has attenuated materiality and very well may have been excluded on the basis of jury confusion and avoiding a "trial within a trial." Lastly, as stated supra Part IV.A.3.c.iii, the evidence against Petitioner was overwhelming, and the purported Brady evidence would have been insufficiently material to overcome it. These failures mean that Petitioner cannot overcome the procedural default on this claim.

D. Claim 4: False Argument Based on Food Stamps

Claim 4 asserts error via prosecutorial misconduct in introducing food stamps as evidence and referencing them in closing argument, despite a note from the lead detective that said, "Unable to trace any food coupons to store." Dkt. Nos. 35 ¶¶ 65–72; 12–89, Ex. 31, at 17–19; 12–137, Ex. 52, at 221. The prosecution used the food stamps, which were found in Meders's jacket pocket, as evidence connecting Meders to and providing the motive for the robbery. Dkt. No. 48, at 72 (citing Dkt. Nos. 12–48, Ex. 15, at 1204; 12–51, Ex. 16, at 1316–17). Although Petitioner admits that the claim was found procedurally

defaulted because there was no objection asserted at trial,[17] he argues that there is cause and prejudice to overcome the default. Id. at 71-73.

### 1. Cause

Petitioner argues that cause exists because trial counsel was ineffective and the note's existence was not revealed until the remand proceedings. Id. at 71-72. The default clearly arose from trial counsel's conduct. Meders I, 260 Ga. at 54(3); Meders III, 280 Ga. at 869(3). Pursuant to Part IV.A, there was no ineffective assistance in regard to this issue. Although Petitioner attempts to rely on new counsel not discovering the note until the remand hearing as providing cause, he ignores the

---

[17] As to this claim, the Supreme Court of Georgia said, in full:

> In two related enumerations petitioner argues that the habeas court erred by failing to address his claim that the State engaged in misconduct by introducing into evidence at trial food stamps possibly taken during the armed robbery and a summons issued against petitioner for trafficking in cocaine. These claims are barred by procedural default because they were not preserved by objection at trial. See OCGA § 9-14-48(d). See also Meders, supra, 260 Ga. at 54(3), 389 S.E.2d 320. Petitioner has failed to show cause to overcome the bar to these defaulted claims. While ineffective assistance of trial counsel can serve as cause under the cause and prejudice test applied to procedurally-defaulted claims, Turpin v. Todd, supra, 268 Ga. at 826, 493 S.E.2d 900, petitioner asserted his trial counsel's alleged ineffective assistance for failing to object to the State's use of these items and this Court thereafter rejected that claim on appeal. See Meders, supra, 261 Ga. at 807(2), 411 S.E.2d 491. We find no reversible error in the habeas court's denial of relief based on the alleged misconduct by the State in introducing this evidence.

Meders III, 280 Ga. at 869(3); see also Meders I, 260 Ga. at 54(3) ("Absent any objection by the defendant the court did not err by admitting the contents of the defendant's wallet in evidence.").

AO 72A
(Rev. 8/82)

fact that the file was open to trial counsel. Therefore, there is no cause to overcome the procedural default.

2. Prejudice

Petitioner argues that prejudice exists from the jury being misled about the degree to which the food stamps connected Meders to the robbery. Dkt. No. 48, at 72-73. It is improper for the prosecution to "knowingly [make] false statements or introduce[] or allow[] trial testimony that it knew or should have known was false." Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1333 (11th Cir. 2009). As to the closing argument, a new trial is warranted only if argument was both improper and prejudicial to a substantial right of the defendant. United States v. Rodriguez, 765 F.2d 1546, 1559 (11th Cir. 1985). The only purpose of closing argument "is to help the jury in evaluating the evidence," and improper suggestions, insinuations, and assertions calculated to mislead the jury are forbidden. Id. at 1559-60. In assessing the prejudice from improper argument, the Court is mindful of curative instructions and the strength of the government's case. Id. at 1560.

The Court finds nothing improper about admitting the food stamps as evidence and the prosecutor's closing arguments. The food stamps—which plausibly came from the crime scene—were patently relevant to the trial, and the prosecutor's arguments were reasonably inferred from the evidence. Although there was

no direct proof that the food stamps found on Meders were the same stolen from the store, the food stamps were found along with bait money. Dkt. No. 12-46, Ex. 15, at 1125; Mansfield, 679 F.3d at 1311-12. Other testimony also connected the food stamps to the robbery. Dkt. No. 12-34, Ex. 12, at 700 (quoting Creel's testimony that Meders asked him and Arnold whether they wanted some of the money and food stamps). This circumstantial evidence supported the prosecutor's arguments, which were not false, improper, or prejudicial to a substantial right. Again, the evidence against Meders was substantial, and his failure to bring this unmeritorious claim was not prejudicial. Therefore, Petitioner cannot show both cause and prejudice to overcome the procedural default.

E. Claim 5: Erroneous Admission of Cocaine Citation

Claim 5 asserts that admitting an unadjudicated summons for cocaine trafficking violated the Fifth and Fourteenth Amendments because it was inadmissible at trial. Dkt. No. 35 ¶¶ 73-77. Although Petitioner admits that the claim was found procedurally defaulted because trial counsel did not object to the citation's admission into evidence, he contends that he can show sufficient cause and prejudice. Dkt. No. 48, at 73-75; see also Dkt. No. 49, at 128, 131-32.

Petitioner's argument on prejudice is coincident with his claim's merits. See Dkt. No. 48, at 74 ("The merits discussion

AO 72A
(Rev. 8/82)

of this claim demonstrates that Meders was prejudiced."). His claim asserts that introducing the unadjudicated charge "undermined the fairness of Petitioner's trial." In support, Petitioner relies on the state habeas court's conclusion to that effect. Id. (citing Dkt. No. 12-204, Ex. 65, at 32). The state habeas court's analysis relied exclusively on state law and reasoned that, at the very least, trial counsel should have objected to the admission of such evidence. See Dkt. No. 12-204, Ex. 65, at 32-34. The failure to object "constituted grave error where" it was used to bolster testimony of motive, which may have been effectively impeached on a separate factual basis for an IAC claim. Id. at 34.

As an initial matter, the sole Supreme Court case cited in support of this claim is Donnelly v. DeChristoforo, 416 U.S. 637 (1974). Petitioner makes no attempt to apply that case to his circumstance except concluding that "the state violated Petitioner's due process rights by introducing the [cocaine] charge." Dkt. No. 35 ¶ 74. That case, however, does not apply to Petitioner's claim unless the Court credits the broad allegation that Petitioner has been deprived of his Fifth and Fourteenth Amendments rights.

To the degree that Petitioner's claim is one for a violation of clearly established law, the Court nevertheless

concludes that Petitioner has shown no prejudice to overcome procedural default.  See supra Part IV.A.3.c.iii.

### F. Claim 6: False Vouching for Witnesses

Claim 6 asserts that the prosecutor impermissibly and falsely vouched for witnesses, in violation of the Fifth and Fourteenth Amendments.  Dkt. No. 35 ¶¶ 78-97.  The statements at issue involve the prosecutor's argument (A) that key witnesses "all told the same story all the way down the line from day one," although there were inconsistencies in their stories, and (B) that no evidence existed to corroborate Meders's testimony about truck shootings, although the prosecutor possessed police reports about the truck shootings.  Id.  Both parties relied on their briefing of Claim 2 in arguing Claim 6, which involves an inquiry into whether Petitioner can overcome a procedural default.  Dkt. Nos. 48, at 75; 49, at 132.  As discussed supra Part IV.B, Petitioner's claim is procedurally defaulted, and there is no cause or prejudice to overcome the default.

### G. Claim 7: Improper Closing Argument at Sentencing

Claim 7 asserts that Petitioner was denied his right to a fair trial and reliable sentencing determination because the prosecutor played to the passions and fears of the jury, grossly misstated the evidence, expressed his personal opinion in an inflammatory manner, misstated the law of proof beyond a reasonable doubt, directed the jury to ignore proper areas of

AO 72A
(Rev. 8/82)

mitigation, denigrated Meders's procedural rights, and diminished the jury's moral responsibility by arguing that the jury's guilt-phase determinations had established certain aggravating factors.[18]  Dkt. Nos. 35 ¶¶ 98-109; 48, at 75.  The parties agree that the claim is properly before the Court and reviewed under § 2254(d).  Dkt. Nos. 48, at 75-76; 49, at 136.

### 1. Supreme Court of Georgia's Determination

As to this claim, the Supreme Court of Georgia on direct review found the following:

> The defendant did not object at trial to the prosecutor's closing argument and, having reviewed the complaints he now makes on appeal, we conclude the prosecutor's arguments did not result in the death sentence being imposed under the influence of passion, prejudice, or other arbitrary factor.  Kinsman v. State, 259 Ga. 89(11), 376 S.E.2d 845 (1989).

Meders I, 260 Ga. at 54(4).

### 2. Legal Standard

A two-pronged test governs claims for prosecutorial-misconduct based on a prosecutor's remarks: "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant."  Spencer, 609 F.3d at 1182 (quoting United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991)).

---

[18] Petitioner withdraws the portion of his claim alleging religious-themed improprieties.  Dkt. No. 48, at 75.

AO 72A
(Rev. 8/82)

Attempts to bolster a witness by vouching for his credibility are normally improper and error, and they are "indeed" improper if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness's credibility. Eyster, 948 F.2d at 1206. "In short, the government cannot argue the credibility of a witness based on the government's reputation or allude to evidence not formally before the jury." Id.

A death sentence is unconstitutional "only if the prosecutor's comments 'so infected the trial with unfairness as to make the result[] . . . a denial of due process.'" Spencer, 609 F.3d at 1182 (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). A denial of due process occurs where there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that, but for the offending remarks, the proceeding's outcome would have been different. Id. (quoting Eyster, 948 F.2d at 1206-07). Thus, there is not a due process violation for a mere undesirable, or even universally condemned, remark by the prosecutor. Id. (quoting Darden, 477 U.S. at 181). Habeas relief is not granted unless misconduct rendered the trial fundamentally unfair. Id.

Fundamental unfairness is measured based on the totality of the circumstances, with factors including:

> (1) whether the remarks were isolated, ambiguous,
> or unintentional; (2) whether there was a
> contemporaneous objection by defense counsel; (3)
> the trial court's instructions; . . . (4) the
> weight of aggravating and mitigating factors[;]
> . . . [5] the degree to which the challenged
> remarks have a tendency to mislead the jury and
> to prejudice the accused[;] and [6] the strength
> of the competent proof to establish the guilt of
> the accused.

Id. at 1182 (internal quotation marks and citation omitted).

### 3. Comments at Issue

The prosecution's closing argument at sentencing is the focus of the Court's analysis. Dkt. No. 12-51, Ex. 16, at 1308-1318. Each underlying fact is addressed separately and in the aggregate to determine whether the prosecutor's statements were improper.

### a. Life's Value

Petitioner asserts that the prosecutor misstated the law to the jury when he argued that "[t]o return a life sentence in this case, essentially says, ladies and gentlemen, that the life of Don Anderson had no value." Id. at 1314. The prosecutor continued, "I submit that to you, because what we are telling Mr. Meders is, that you can . . . exercise the most extreme punishment on another human being, the taking of a life, and don't have to worry about losing yours." Id. In the context, rather than making a legal argument, or stating any legal premise, the prosecutor's statement was a commonsensical moral

argument for the merit of capital punishment for murder offenses. The Court is aware of no authority that would deem the prosecutor's argument improper. To the degree that there was any impropriety, the comments were mitigated by the jury instructions, see Dkt. No. 21-52, Ex. 16, at 1325-30 (setting forth what must be found before an imposition of the death penalty), and did not render the sentencing fundamentally unfair.

### c. "Stupid" Actions

Petitioner argues that the prosecutor injected his opinion into closing argument by saying, "On that day [of the murder] it was, I will use the word, stupid, for what [Meders] did, to take that life." Dkt. No. 21-51, Ex. 16, at 1313. The point of this statement was that while there was no sound basis for killing Don Anderson, there was a reason to punish Meders with death. Although perhaps inarticulate, the Court is aware of no precedential authority that would deem the statement improper. At the very least, it did not prejudicially affect Meders's substantial rights.

### d. Jury's Responsibilities

Petitioner argues that the prosecutor diminished the jury's responsibilities by stating the following:

> I submit to you this, ladies and gentleman,
> that you have already in this case found the
> defendant beyond a reasonable doubt to have

AO 72A
(Rev. 8/82)

committed a statutory aggravating circumstance [as required by Georgia as a prerequisite to a death sentence].  In order to find [Meders] guilty of murder and armed robbery you had to find him guilty beyond a reasonable doubt of those two offenses, and so, you have already made that decision, and when you go back into that jury room and consider this case again from the sentencing standpoint, you can again come to the same conclusion.  The evidence has not changed.  Nothing has been added or taken away from it, and so at this stage finding that this crime of murder was committed during the commission of an armed robbery has been proven to your satisfaction.

The evidence has shown you, ladies and gentlemen, again, beyond a reasonable doubt that [Meders] did this for what?  For $38.00 and a stack of food stamps, about $17.00.  The taking of money, something of value for himself.  That statutory aggravating circumstance has also been found, and it will be necessary for you to write down the fact that you find one or the other, or both of those, to exist.

You have already seen that.  You have already concluded that, and when you go back to that jury room you can do that anew.  You can find again that those facts exist.

Dkt. No. 21-51, Ex. 16, at 1315-16.

The prosecutor's assertion was not legally incorrect and, in the context, not improper.  The jury found two aggravating circumstances pursuant to O.C.G.A. § 17-10-30 that supported the imposition of the death penalty: "(1) the offense of murder was committed while the defendant was engaged in the commission of armed robbery, and (2) the defendant committed the offense of murder for the purpose of receiving money or any other thing of monetary value."  Meders II, 261 Ga. at 807(3) (citing O.C.G.A.

§ 17-10-30(b)). In turn, "[a] person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon." O.C.G.A. § 16-8-41(a). The overlap between the underlying offenses and aggravating circumstances is clear.

The prosecutor never asserted that a mere finding of these aggravating circumstances was all the jury could consider; rather, he stated, at several points, that the jury had to consider mitigating circumstances and all of the evidence, along with the their own sympathies. Dkt. No. 21-51, Ex. 16, at 1311-12, 1316. Therefore, there was no impropriety. To the degree that there was any impropriety, it was corrected by the trial court's jury instructions. See Dkt. No. 21-52, Ex. 16, at 1325-30.

### e. Comments in Aggregate

Petitioner urges the Court to consider the aforementioned statements by the prosecutor collectively and in the context of other alleged improprieties.[19] Dkt. No. 48, at 77. As with the statements considered individually, the prosecutor's closing

---

[19] For example, Petitioner cites the prosecutor's argument that Meders committed the murder for $38.00 and $17.00 worth of food stamps, despite the prosecutor knowing that the food stamps seized from Meders could not be definitively connected to the ones at the murder scene. Dkt. No. 48, at 77 (citing Dkt. No. 21-51, Ex. 16, at 1316).

AO 72A
(Rev. 8/82)

argument did not work substantial injustice on Meders's sentencing. There was never any objection to them by trial counsel, nor was there a significant degree—in light of the jury instructions and the prosecutor's statements as a whole—to which the remarks would have misled the jurors about their solemn role and what they may consider in fulfilling it. See, e.g., Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (finding error where the prosecutor suggested that responsibility for determining the appropriateness of the defendant's death rests elsewhere than with the jury). At the very least, the Supreme Court of Georgia's determination on this claim was reasonable under § 2254(d) and is afforded deference. Therefore, Claim 7 is without merit.

H. Claim 8: Constitutionality of Glynn County Jury System

Claim 8 attacks Glynn County, Georgia's jury selection procedure at the time of Meders's trial as violating Petitioner's right to equal protection and his Sixth Amendment right to a fair jury trial. Dkt. Nos. 35 ¶¶ 110-120; 48, at 90-93. Although Petitioner admits that the claim is procedurally defaulted, he argues that he can show cause and prejudice to overcome the default. Dkt. No. 48, at 91 (citing Dkt. No. 12-204, Ex. 65, at 9).

The procedure at issue consisted of a "computer system [that] automatically forced the racial representation of each

jury venire to match the racial representation of the master list." Id. at 92 (citing Dkt. Nos. 12-12, Ex. 7, at 36-37; 12-13, Ex. 7, at 76-77). This was done by not utilizing a purely random sample from the master list, but instead by forcing a jury list's racial makeup[20] to mimic the racial makeup of the community. Dkt. Nos. 12-12, Ex. 7, at 38; 12-13, Ex. 7, 72-73. Thus, if the proportion of white jurors already selected for the venire reflected their proportion in the community, no other white jurors would be added.

### 1. Cause

As to cause, to the degree that an IAC claim on this claim is actually exhausted, Petitioner's reliance on IAC is without merit. See supra Part IV.A. Petitioner has not shown ineffectiveness in regard to counsel's failure to raise this issue.

### 2. Prejudice

As to prejudice, Petitioner has failed to show an inherent prejudice based on the underlying violation. A challenge based on discriminatory selection of state court juries may be made under the Fourteenth Amendment's Equal Protection Clause or the Sixth Amendment, "which vouchsafes the right to be tried by a jury chosen from a group reflecting a fair cross-section of the

---

[20] People were categorized as white, African American, or "other," with "other people" treated as if they were African American in forcing a racial balance. See Dkt. No. 12-13, Ex. 7, at 75.

community." Bowen v. Kemp, 769 F.2d 672, 683 (11th Cir. 1985).

Challenges under these provisions employ a virtually identical

standard for a claimant to make a prima facie case. Id. As to

a Fourteenth Amendment challenge, there are three prongs:

> The first step is to establish that the group is
> one that is a recognizable, distinct class. Next
> the degree of underrepresentation must be proved,
> by comparing the proportion of the group in the
> total population to the proportion called to
> serve as jurors, over a significant period of
> time. Finally, a selection procedure that is
> susceptible [to] abuse or is not racially neutral
> supports the presumption of discrimination raised
> by the statistical showing.

Id. at 684 (ellipses omitted) (quoting Castaneda v. Partida, 430

U.S. 482, 494 (1977)). As to a Sixth Amendment jury composition

claim:

> The defendant must show (1) that the group
> alleged to be excluded is a "distinctive" group
> in the community; (2) that the representation of
> this group in venires from which juries are
> selected is not fair and reasonable in relation
> to the number of such persons in the community;
> and (3) that this underrepresentation is due to
> systematic exclusion of the group in the jury-
> selection process.

Id. (brackets omitted) (quoting Duren v. Missouri, 439 U.S. 357,

364 (1979)).

Although the groups affected, whites and African Americans,

certainly are recognizable, distinct classes, the effect on the

jury does not create a constitutional violation. More

specifically, there has been no showing that whites or African

Americans were significantly underrepresented in the jury pool, or that the representation of a given group was not fair and reasonable in relation to the number of such persons in the community. Indeed, the process was meant to ensure a fair representation of the community in jury venires, despite its conscious consideration of race. Therefore, Petitioner has shown neither cause nor prejudice to overcome the procedural default.

I. Claim 9: Failure to Reveal Deals with Witnesses

Claim 9 asserts that the prosecutor failed to disclose deals with Arnold and Creel for them to testify in return for not being prosecuted, and an additional deal not to prosecute Harris for assaulting Meders's brother in return for Harris's testimony. Dkt. No. 35 ¶¶ 121-131. The parties agree that the claim is properly before the Court and reviewed under § 2254(d). Dkt. Nos. 48, at 78 (citing Dkt. No. 12-204, Ex. 65, at 18-19); 49, at 136.

The state habeas court reviewed Petitioner's claim—as it relates to Arnold and Creel—on the merits. Dkt. No. 12-204, Ex. 65, at 18-19. The state habeas court denied the claim because Petitioner had failed to establish the existence of any agreement.[21] Id. at 19. Petitioner's argument, which was based

---

[21] The state habeas court's findings were based in part on the prosecutor's testimony that he was not aware of any pending criminal charges at the time of the trial. Dkt. No. 12-204, Ex. 65, at 19.

on charges against Creel and Arnold not being disposed of until two years after the trial, was insufficient by relying on mere implication and inference.  Id.

Claim 9 is brought pursuant to Giglio v. United States, 405 U.S. 150 (1972).  Dkt. Nos. 35 ¶ 122; 56, at 98.  "The thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony." Depree v. Thomas, 946 F.2d 784, 797 (11th Cir. 1991) (quoting Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir. 1983)).  Thus, if there is "an agreement between a witness and the government that might motivate the witness to testify," then Giglio requires the government to disclose the agreement.  Tarver v. Hopper, 169 F.3d 710, 716 (11th Cir. 1999).  However, not all factors motivating a witness's cooperation need to be disclosed:

> The Giglio rule does not address nor require the disclosure of all factors which may motivate a witness to cooperate.  The simple belief by a defense attorney that his client may be in a better position to negotiate a reduced penalty should he testify against a codefendant is not an agreement within the purview of Giglio.

Id. at 717 (brackets omitted) (quoting Alderman, 22 F.3d at 1555).  Therefore, not everything said by a prosecutor to a witness requires disclosure.  Id.  Yet, an agreement is not a term of art, and mere "advice," in an appropriate context, about future prosecution of a witness may be discoverable.  Id.

AO 72A
(Rev. 8/82)

Claim 9 fails because Petitioner has proffered no evidence of an agreement between the prosecutor and Arnold, Creel, or Harris. See id. (affirming a lower court's dismissal of a habeas claim because there was no agreement or understanding between the prosecutor and witness); United States v. Curtis, 380 F.3d 1311, 1315-16 (11th Cir. 2004) (declining to address whether the substance of conversations should have been disclosed given that there was no explicit deal between a witness and the government); Depree, 946 F.2d at 797-98 (affirming a lower court's dismissal of a Giglio claim because there was no showing of a promise for favorable treatment). Petitioner's speculation, based on Creel and Arnold not being prosecuted for the murder, is insufficient to establish a Giglio violation.

Further, consideration of Detective Boyet's note about a confidential informant's tip implicating Creel and Arnold does not affect the Court's analysis. Rather than prove a Giglio violation, the note only shows that law enforcement discussed prosecuting Creel and Arnold, but declined to do so because of insufficient proof. See Dkt. Nos. 35, at 8-11 (discussing the discovery of the note and how it supports some of Petitioner's claims, while never stating that the note evidenced an agreement between the prosecutor and witness); 42-6, Ex. 135, at 7-15 (discussing how the memorandum at issue had been produced

several times prior to when Petitioner's counsel discovered it, could not support a <u>Brady</u> violation, and would not have been admitted at trial as hearsay).

Petitioner has failed to show that the state court's determination on his claim was unreasonable. Therefore, Claim 9 is without merit.

J. Claim 10: Improper Admission of Statements

Claim 10 asserts that the trial court improperly admitted statements made by Petitioner while he was in custody because there was no showing that he knowingly and voluntarily waived his right to remain silent or right to counsel. Dkt. No. 35 ¶¶ 132-140. The parties contest whether the Court should review the claim under § 2254(d) or <u>de novo</u>. <u>Compare</u> Dkt. No. 49, at 144 (concluding that the Supreme Court of Georgia's determination was not unreasonable) <u>with</u> Dkt. No. 56, at 99 (arguing that the claim should be reviewed <u>de novo</u> because it was never adjudicated on a full and fair record).

1. Proper Standard of Review

The Supreme Court of Georgia's discussion of Petitioner's claim was limited, and in full, said, "There was no error in the admission of the defendant's pre-trial statements. See, e.g., <u>Parks v. State</u>, 254 Ga. 403(1), 330 S.E.2d 686 (1985)." <u>Meders</u> <u>I</u>, 260 Ga. at 55(7). Petitioner argues that this ruling was made without any evidence about Meders's mental competence or

AO 72A
(Rev. 8/82)

capacity to understand the Miranda[22] warnings because (A) the trial court denied funding for an independent psychiatrist and (B) the state-appointed psychiatrist was not asked to opine about the question of voluntariness. Dkt. No. 48, at 79 (citing Dkt. Nos. 12-98, Ex. 32, at 32-34; 47-17, Ex. 17). Nevertheless, even assuming that de novo review applies, Claim 10 is without merit.

### 2. Merits of Petitioner's Claim

#### a. Legal Standard

Petitioner's argument is premised primarily on the voluntariness of his confession. See Dkt. No. 48, at 80-81. A statement is voluntarily made only if it is "the product of an essentially free and unconstrained choice by its maker." Culombe v. Connecticut, 367 U.S. 568, 602 (1961). The Court must suppress statements that result from coercion by law enforcement. Colorado v. Connelly, 479 U.S. 157, 163, 167 (1986). In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). It warrants consideration of the accused's characteristics and the interrogation's details, including:

> [1] the accused's lack of education, or his low intelligence, [2] the lack of any advice to the accused of his constitutional rights, [3] the

---

[22] Miranda v. Arizona, 384 U.S. 436 (1966).

AO 72A
(Rev. 8/82)

length of detention, [4] the repeated and prolonged nature of the questioning, and [5] the use of physical punishment such as the deprivation of food or sleep.

Id. (quoting Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996)) (brackets and internal quotation marks omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). These factors weigh into "whether a statement was made freely or whether the defendant's 'will has been overborne and his capacity for self-determination has been critically impaired.'" United States v. Lynn, 547 F. Supp. 2d 1307, 1310 (S.D. Ga. 2008) (quoting Devier v. Zant, 3 F.3d 1445, 1455-56 (11th Cir. 1993) (per curiam)). As a prerequisite to admitting an individual's custodial statement, the government bears the burden of showing that a defendant voluntarily, knowingly, and intelligently waived his rights. J.D.B. v. North Carolina, 131 S. Ct. 2394, 2401 (2011) (quoting Miranda v. Arizona, 384 U.S. 436, 444, 475-76 (1966)).

b. Underlying Facts

The first interview at issue occurred on October 14, 1987, after law enforcement officers arrived at Meders's residence to locate and interview him. Dkt. No. 12-39, Ex. 13, at 845-47. The officers asked Meders to go to the police station for an interview about the murder, which Meders agreed to, although he initially requested to have the interview occur at his

residence. _Id._ at 848-49. Meders was read his _Miranda_ rights
before being taken to the police station. _Id._ at 850. Meders
admitted that the officers did not physically intimidate him,
but he said that he had a subjective impression that he would be
arrested if he did not agree to go to the station. _Id._ at 863.

At the police station, an officer reiterated the purpose of
the interview and asked whether Meders remembered and understood
the prior-read _Miranda_ rights. _Id._ at 852. There was nothing
indicative of Meders failing to understand those rights or
involuntarily speaking to law enforcement. _Id._ at 853-54.
Meders knew that he was not under arrest, although while at the
police station, he was not allowed beyond the interrogation
room. _Id._ at 865. Meders was given two sodas, although he had
nothing to eat at the station. _Id._ After a few hours, Meders
asked to talk to his lawyer, at which point the interview ended.
_Id._ at 854-55, 865.

On November 14, 1988, at approximately 11:35 a.m., a second
interview was conducted with Meders. _Id._ at 855. The interview
was in response to Meders's request to meet and occurred in a
small "lawyers booth" at the detention center. _Id._ at 856-57.
Meders's attorney did not know about the request or interview.
_Id._ at 857. When Meders was asked whether he understood his
rights and that anything could be used against him in court,
Meders said he understood. _Id._ There was no indication that

Meders was acting involuntarily. Id. at 858-59. Meders wanted to plead guilty to the armed robbery charge. Id. at 858. Meders admits that he was advised of his rights and voluntarily spoke to the officer. Id. at 866. However, the interview occurred two days after Meders had a nervous breakdown and tried to kill himself. Id.

At the state habeas proceeding, Dr. Dickinson testified that Meders functioned "in the dull normal range of intelligence" and may have had brain damage. Dkt. No. 12-140, Ex. 53, at 314-15. Further, Meders was taking an anti-depressant at the time of the second statement. Id. at 302-03. As to the attempted suicide, Dr. Dickinson merely testified that people with suicidal tendencies might make less intelligent decisions and "have a tendency to give things away." Id. at 305. The anti-depressant may have also caused Meders to act impulsively because initiating a treatment with the drug can fill patients with energy. Id. at 306-07.

### c. Application

There was no error in the admission of Petitioner's pre-trial statements. Although Meders was evaluated as being less intelligent than an average person, he was within a normal range of intelligence. He was repeatedly advised of his Miranda rights at the first interview. He was reminded again of his rights at the 1988 interview, including the right to have his

AO 72A
(Rev. 8/82)

counsel present, and warned that his statements could be used against him. Further, the first interview was conducted for only a few hours under accommodating—not coercive—conditions. During the second interview, Petitioner apparently made the statements quickly and during a relatively short period of time. See Lumpkins v. Sec'y Dep't of Corr., 449 F. App'x 879, 885 (11th Cir. 2011) (per curiam) (finding that an interview over the course of 17 hours did not render statements as involuntarily made). There was no deprivation of any sort, nor any other objective facts suggesting that Petitioner involuntarily spoke with law enforcement.

The crux of Petitioner's argument appears to focus on Petitioner's mental state at the time of the second interview. Petitioner had attempted suicide two days prior and was taking anti-depressants. Dr. Dickinson testified that suicidal individuals tend to "not care" and "give it away," while the anti-depressant may have "energized" Meders and caused him to act impulsively. Nevertheless, these facts, taken as true, do not suggest that Meders did not act freely or that his capacity for self-determination was critically impaired. Importantly, the statements were never accompanied by coercive police activity. See United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (citing Connelly, 479 U.S. at 169-70) (finding that a confession was not involuntarily made due to a mental disability

AO 72A
(Rev. 8/82)

given that there was no coercion by an official actor).

Therefore, even reviewing this claim de novo, it fails.  To the

degree that § 2254(d) controls the Court's standard of review,

the state court's determination was reasonable and entitled to

deference.  Therefore, Claim 10 is without merit.

K. Claim 11: Failure to Conduct Competency Hearing

Claim 11 asserts an error based on the trial court's

failure to conduct a competency hearing.  Dkt. No. 35 ¶¶ 141-47.

The parties disagree whether the claim should be reviewed de

novo or under § 2254(d).  Compare Dkt. No. 48, at 82 (arguing

that there was never an adjudication on the merits because

Meders I's factual record was "woefully inadequate") with Dkt.

No. 49, at 149 (arguing that the Supreme Court of Georgia's

determination deserves deference).

This claim is a procedural competency claim known as a

Pate[23] claim.  Battle v. United States, 419 F.3d 1292, 1298 (11th

Cir. 2005) (per curiam).  "This incompetency claim invokes the

Due Process Clause of the Fourteenth Amendment, which for some

time has been interpreted as prohibiting states from trying and

convicting a mentally incompetent defendant."  James v.

Singletary, 957 F.2d 1562, 1569 (11th Cir. 1992).  To present a

Pate claim, the petitioner "must first establish that the trial

court should sua sponte have held a competency hearing."  Id. at

---

[23] Pate v. Robinson, 383 U.S. 375 (1966).

1571. Such a hearing should be held "when the information known to the trial court at the time of the trial or plea hearing is sufficient to raise a bona fide doubt regarding the defendant's competence." Tiller v. Esposito, 911 F.2d 575, 576 (11th Cir. 1990). Three factors inform this inquiry: "(1) evidence of the defendant's irrational behavior; (2) the defendant's demeanor at trial; and (3) prior medical opinion regarding the defendant's competence to stand trial." Id. If this first step reveals a constitutional violation, the state is nevertheless afforded an opportunity to demonstrate harmless error—that is, the state may attempt to establish a petitioner's competency at the time of trial.[24] James, 957 F.2d at 1571; see also Jones v. Swenson, 469 F.2d 535, 538-39 n.1 (8th Cir. 1972) (affirming a lower court for not holding a competency hearing despite ordering a psychiatric examination).

Claim 11 is without merit because the information available to the trial court did not create a bona fide doubt about Meders's competence. After Petitioner had attempted suicide in his prison cell, the trial court held a pre-trial hearing to address a motion for a psychiatric examination. Dkt. No. 12-11,

---

[24] To assess competency, courts use a two-pronged standard: "The test must be whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 480-81 (11th Cir. 2012) (brackets omitted) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).

Ex. 6, at 19. Meders testified that he had a "nervous breakdown" because of the conditions of his confinement.[25] Id. The prison's Mental Health Office evaluated Meders and prescribed him medication for "depression, anxiety and nerves." Id. at 20. Meders questioned his own mental stability because he was "going through a lot of [hard] times . . . with [his] personal life." Id. at 20-21. Indicative of this mental instability, Meders tried to hang himself (but was thwarted by guards), "went about six days without eating," was jittery, and claimed to sleep only two or three hours per day. Id. at 21-23. Due to his medication, Meders also saw "little spots." Id. at 25. However, Meders admitted to understanding the state judge's responsibility in the case and "the difference between right and wrong." Id. at 24. When asked whether he was incompetent, Meders said, "No, sir, not really." Id. at 25.

A state official conducted a psychiatric examination after the pre-trial hearing. The psychologist opined to the following:

- Meders could understand his rights in regard to the evaluation and signed a disclosure form;

- Meders was "alert and cooperative" during the exam;

---

[25] Specifically, Meders complained about being put in a holding cell and getting "surveillance every fifteen to twenty minutes." Dkt. No. 12-11, Ex. 6, at 19.

- Meders denied having any mental health problems, although he was prescribed medication for his nerves;

- Meders did not exhibit any "hallucinatory or delusional activity, and further denied the existence of both homicidal and suicidal ideations";

- Meders functioned "within the average range of intellectual capability" and could read and write effectively;

- Meders had "relatively intact" thought processes and "appropriate memory for both recent and remote events";

- Meders lacked symptoms indicative of "a major psychiatric disorder of either mood or thought";

- Meders had a history of substance abuse;

- Meders's suicide attempt was likely the result of an "adjustment reaction to incarceration probably compounded by a feeling of depression and hopelessness";

- Meders "adequately understands the function[] of the court and legal system," "fully appreciates his own involvement within th[e] situation," and "demonstrates adequate cognitive and verbal capabilities" to effectively assist his attorney;

- Meders appreciates the difference between right and wrong generally and as it pertained to the criminal proceeding; and

AO 72A
(Rev. 8/82)

- "Meders is competent to stand trial . . . and is able to assist his attorney in preparation of his defense."

Dkt. No. 39-20, Ex. 111, at 5175-77.

The foregoing facts support the lack of need for a competency hearing. The psychologist's opinion was definitive in its assessment of Meders's mental competence. The only evidence that supported a sua sponte conducting of a competency hearing was Meders's attempted suicide. However, the Supreme Court of the United States has never held that a defendant's suicide attempt—standing alone—requires a competency hearing. See Drope v. Missouri, 420 U.S. 162, 180 (1975) ("[W]hen considered together with the information available prior to trial and the testimony of petitioner's wife at trial, the information concerning petitioner's suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question." (emphasis added)); Flynt v. Sec'y, Dep't of Corr., No. 6:11-cv-1803-Orl-37GJK, 2012 WL 4369315, at *6 n.4 (M.D. Fla. Sept. 24, 2012) ("In Drope . . . the United States Supreme Court suggested that, while a suicide attempt is an indication of possible mental instability, it alone does not necessarily create a reasonable doubt about a defendant's competency to stand trial."). Rather, the three pertinent factors in the applicable standard show that the great weight of the evidence—including Petitioner's adequate mental

capability, his cooperative and alert behavior, his self-admitted understanding of the proceedings, and the psychologist's opinion of competence—weigh in favor of a conclusion that there was not a bona fide doubt about Meders's competence. Therefore, even reviewing this claim de novo, it fails. To the degree that § 2254(d) controls the Court's standard of review, the state court's determination was reasonable and entitled to deference.[26] Therefore, Claim 11 is without merit.

L. Claim 12: Failure to Appoint Trial Mental-Health Expert

Claim 12 asserts that the trial court's refusal to appoint a mental health expert to assist Meders at trial violated his constitutional rights in light of his mental background and history of substance abuse, which were relevant to competency and mitigation of sentence. Dkt. No. 35 ¶¶ 148-53. The parties

_____

[26] In full, Meders I addressed Petitioner's claim as follows:

> Meders concedes he did not file a plea of incompetence to stand trial. See OCGA § 17-7-130. However, relying on such cases as Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815 (1966); Holloway v. State, 257 Ga. 620, 361 S.E.2d 794 (1987); and Baker v. State, 250 Ga. 187, 297 S.E.2d 9 (1982); he contends the trial court should have conducted a hearing sua sponte to determine his competence to stand trial. We do not agree.
> The defendant's testimony and the court-ordered evaluation show that he understood "the nature and object of the proceedings against him and was capable of assisting his attorney with his defense." Brown v. State, 250 Ga. 66, 70, 295 S.E.2d 727 (1982). The trial court did not err by failing to conduct further investigation on this issue sua sponte.

Meders I, 260 Ga. at 51(1a).

disagree whether the claim should be reviewed _de novo_ or under § 2254(d). _Compare_ Dkt. No. 48, at 84 (arguing that there was never an adjudication on the merits because _Meders I_'s factual record was "woefully inadequate") _with_ Dkt. No. 49, at 151 (arguing that the Supreme Court of Georgia's determination[27] deserves deference). Under either standard, this claim fails.

The constitutional basis for Petitioner's claim originates from _Ake v. Oklahoma_, 470 U.S. 68 (1985). If a defendant

---

[27] As to this claim, the Supreme Court of Georgia said the following:

> Meders also contends the trial court's refusal to grant funds for an independent psychiatrist was error. He relies on _Ake v. Oklahoma_, 470 U.S. 68, 105 S. Ct. 1087, 84 L.Ed.2d 53 (1985) to support his contention that he was entitled to an independent psychiatrist. This reliance is misplaced. Ake's pre-trial behavior was so bizarre the trial court ordered an evaluation _sua sponte_. The examining psychiatrist reported that Ake was delusional and was probably a paranoid schizophrenic. After further evaluation, it was determined that Ake was not competent to stand trial. However, after several weeks of treatment and medication, Ake stabilized enough that he was able to stand trial. Notwithstanding Ake's severe mental problems, the State of Oklahoma denied him psychiatric assistance on the issue of sanity at the time of the crime. The U.S. Supreme Court reversed his conviction, holding that Ake had demonstrated "his sanity at the time of the offense [would] be a significant factor at trial," and was entitled to independent psychiatric assistance.
>
> In this case, by contrast, neither the defendant nor his attorneys reported any difficulty communicating with each other. The defendant himself testified that he was not incompetent, and although he was depressed at the prospect of being executed, nothing about his behavior could be characterized as bizarre. Unlike Ake, Meders was evaluated on the issue of sanity and the examiner found him to have been sane at the time of the crime as well as competent to stand trial. Nothing before the court reasonably indicated that Meders' sanity would be a significant factor at trial. Hence, the trial court did not err by refusing to provide funds for an independent psychiatrist. _Thomas v. Jones_, 891 F.2d 1500(C) (11th Cir. 1989).

_Meders I_, 260 Ga. at 51-52(1b) (alterations in original).

AO 72A
(Rev. 8/82)

demonstrates that his sanity at the time of the offense will be a significant factor at trial, constitutional due process "requires that 'the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.'" United States v. Hernandez, 743 F.3d 812, 815 (11th Cir. 2014) (per curiam) (quoting Ake, 470 U.S. at 83-84). This right to access a competent mental health expert extends to a criminal case's sentencing phase. Blanco v. Sec'y, Fla. Dep't of Corr., 688 F.3d 1211, 1223 (11th Cir. 2012).

Courts use the following analysis to address Ake claims:

> We first examine the information before the trial court when it is alleged to have deprived the defendant of due process. We then determine whether that information should have led the trial court to conclude that the defendant would probably not receive a fair trial. Specifically, we must assess the reasonableness of the trial [court]'s action at the time [it] took it and we are to evaluate the actions of the trial [court] based on the evidence presented to [it].

Id. at 1227 (alterations in original) (quoting Clisby v. Jones, 960 F.2d 925, 929-30 (11th Cir. 1992) (en banc)). "[I]t must be the trial judge, not the mental health expert, who denies the defendant due process by taking some action that renders the proceeding fundamentally unfair." Id. at 1228. Thus, except in the most unusual circumstances, a petitioner must "show that he

AO 72A
(Rev. 8/82)

requested from the trial court something in the way of mental health expert assistance that the trial court refused to give him." Provenzano v. Singletary, 148 F.3d 1327, 1333-34 (11th Cir. 1998).

Petitioner argues that he made a sufficient preliminary showing for the appointment of a private psychiatrist at a hearing on March 1, 1989. Dkt. No. 12-67, Ex. 22, at 15. This was based on evidence of a "nervous breakdown" while incarcerated, a suicide attempt, and being prescribed psychoactive medication. Id. Yet, the trial court opted for a state psychologist to evaluate Meders, despite trial counsel's argument that state officials are often less qualified than, and cost the same as, private experts. Id. at 16. Now, Petitioner asserts that an independent psychiatric expert would have assisted (A) with respect to Meders's competence, (B) as to the guilt phase, with whether Meders's intoxication and mental capacity would refute proof of intent, (C) with refuting the prosecutor's claim of future dangerousness and providing mitigating evidence at sentencing, and (D) with assessing the voluntariness of Meders's pre-trial statements. Id. at 17-18.

Petitioner's argument is without merit, as the Supreme Court of Georgia reasonably applied Ake's holding. As noted supra Parts IV.J and IV.K, the evidence of mental incompetency was limited and appeared to arise most markedly during a

AO 72A
(Rev. 8/82)

strenuous period of Meders's detention. Further, the Court
finds no basis in Petitioner's assertion that a privately
employed psychologist was necessary to vet potential mental-
health arguments. Indeed, trial counsel had an opportunity to
have the psychologist look into anything that the psychologist
did not already know about. See Dkt. No. 12-32, Ex. 12, at 625.
Tinted by the minimal role that Petitioner's mental health
played during the trial, these considerations compel the
conclusion that there was no error in the trial court's denial
of Meders's request to appoint a mental health expert. See,
e.g., Moore v. Kemp, 809 F.2d 702, 712 (11th Cir. 1987) (stating
that to make a due process claim for not providing expert
assistance, there must be "a reasonable probability both that an
expert would be of assistance to the defense and that denial of
expert assistance would result in a fundamentally unfair trial"
(footnote omitted)). Therefore, this claim is without merit.

M. Claim 13: Improper Jury Instruction

Claim 13 asserts that the trial court charged the jury with
an improper jury instruction under the Fifth and Fourteenth
Amendments by erroneously instructing the jury to disregard the
entire testimony of witnesses who had been impeached at trial,
where Petitioner was purportedly the only witness whose
testimony was impeached. Dkt. Nos. 35 ¶¶ 154-158; 48, at 85-87.
The instruction at issue was as follows:

> [I]f you determine in your minds absolutely that
> a witness'[s] testimony has been impeached and
> thus discredited, then it is your duty to
> disregard that testimony entirely unless such
> testimony is corroborated by circumstances or by
> other impeached evidence.

Dkt. No. 12-49, Ex. 16, at 1228.  Although Petitioner admits

that this claim was found to be procedurally defaulted, he

argues that there is cause and prejudice to overcome the

default.  Dkt. No. 48, at 85-86 (citing Dkt. No. 12-204, Ex. 65,

at 13-14; Meders III, 280 Ga. at 871(7)).

As to Petitioner's argument that the asserted error

prejudiced Meders by "effectively discount[ing] the credibility

of Meders's testimony at trial, where the jury's verdict hung on

determinations of credibility," Petitioner has failed to show

prejudice.  Petitioner's claim is based on an application of

Middleton v. McNeil, 541 U.S. 433 (2004).  As stated in

Middleton, "[i]n a criminal trial, the State must prove every

element of the offense, and a jury instruction violates due

process if it fails to give effect to that requirement."  Id. at

437.  If an ailing instruction "infected the entire trial," then

a resulting conviction violates due process.  Id. (quoting

Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  "If the charge as

a whole is ambiguous, the question is whether there is a

reasonable likelihood that the jury has applied the challenged

instruction in a way that violates the Constitution."  Id.

AO 72A
(Rev. 8/82)

(quoting Estelle, 502 U.S. at 72) (internal quotation marks omitted). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id.

After reviewing the jury instruction in the context of the entire charge, the Court declines to find sufficient prejudice to Petitioner that overcomes the procedural default on Claim 13. The Supreme Court of Georgia has found a similar charge to be erroneous, albeit nonprejudicial. See Adams v. State, 255 Ga. 356, 358 (1986) (finding the instruction contrary to the law but no prejudice to the defendant). Furthermore, elsewhere the trial court defined "[t]o impeach a witness" as "establishing that such witness is unworthy of belief." Dkt. No. 12-49, Ex. 16, at 1227; see also id. at 1228 (stating that a witness is impeached when found to be unworthy of belief). Therefore, under the instructions, Meders, or any other witness, would have been "impeached" only if the jury found that the witness's testimony was unworthy of belief.

In the context of a thorough five-page charge about the jury's prerogative in deciding credibility, the Court declines to find that there was such an ambiguity creating a reasonable likelihood that the jury discredited Petitioner's testimony only because he was cross-examined and that the burden shifted to Petitioner to prove his innocence. Although Petitioner claims

that the prejudice is stronger given that he was purportedly the only witness impeached, his argument is attenuated. The trial court made no instruction directly implicating Meders's testimony and creating an inference that only his testimony should be discredited. Because Petitioner cannot show prejudice, Claim 13 remains procedurally defaulted.

### N. Claim 14: Denial of Experts at Remand Proceeding

Claim 14 asserts that Meders was entitled to funds to retain experts[28] at the remand hearing and that denial of access to such funds violated Meders's right to counsel. Dkt. No. 35 ¶¶ 159-66. The parties agree that this claim should be reviewed under § 2254(d). Dkt. Nos. 48, at 88; 49, at 153.

Petitioner's claim is similar to Claim 12 except for applying at a different stage of the litigation—that is, on remand rather than at trial. Nevertheless, the parties do not dispute that Ake provides the appropriate standard for Meders's claim. See Dkt. No. 49, at 39. Therefore, Claim 14 involves the same inquiry as Claim 12, although it is based on the evidence available at the later stage of litigation.

---

[28] The sought funds would have assisted Meders in retaining a forensic psychologist, a political scientist informed on unconstitutional methods of jury selection, and a criminal defense attorney. Dkt. No. 35 ¶¶ 162-64.

AO 72A
(Rev. 8/82)

To the degree that Dr. Dickinson's affidavit should have been considered,[29] it does not lead to a different result from Claim 12. In his Motion to Provide Funds for Expert Assistance during the remand hearing, Meders argued that Dr. Dickinson's services were "required to assist counsel in determining and documenting the existence of any mitigating circumstances that would have mitigated in favor of a verdict of not guilty or a conviction less than death but were not sought by trial counsel and were not presented to the jury because of trial counsel's ineffective assistance." Dkt. No. 47-13, Ex. 13, at 5. Specifically, the assistance would be necessary given the known facts that Meders suffered a head injury requiring stitches when he was four, did not graduate from high school, had problems with substance abuse, had a "nervous breakdown" during detention, and claimed not to understand some pretrial proceedings or to be able to distinguish right from wrong. Id. at 5-6.

This evidence underlying the proposed funds was largely cumulative of the evidence presented to the court before trial. As an initial matter, it is unclear whether expert assistance was appropriate based on the underlying IAC theories proposed by Meders. Indeed, the motion for funds itself appears to be the

---

[29] At the remand hearing, Meders offered Dr. Dickinson's affidavit as an offer of proof for what he would have testified to had he been retained. Dkt. No. 12-84, Ex. 30, at 245.

most manifest raising of a sentencing IAC claim. To the degree

that a psychological expert would be pertinent to the remand's

issues, this evidence was insufficient to create a reasonable

probability that an expert would be of assistance to the

defense, as discussed supra Part IV.L. Instead, it appeared to

be cumulative of that before the trial court. Dr. Dickinson's

affidavit primarily attacks the public psychologist's evaluation

and second guesses the conclusions. Dkt. No. 12-95, Ex. 31.

This is insufficient to change the Court's analysis and warrant

a finding that Meders was deprived of due process at the remand

hearing. See, e.g., Christenson v. State, 261 Ga. 80, 83(2)

(1991) (finding that there was no need for psychiatric

assistance where the state did not present evidence on the issue

at sentencing and there was no showing that the defendant

suffered from any serious mental disorder); Bowden v. Kemp, 767

F.2d 761, 763-65 (11th Cir. 1985) (finding no error without any

indication that sanity would play a significant role).

Therefore, Claim 14 is without merit.

O. Claim 15: Constitutionality of O.C.G.A. § 17-10-30

Claim 15 challenges Georgia's capital sentencing

provisions, as enacted in O.C.G.A. § 17-10-30, as being

unconstitutional for unreasonably failing to define mitigating

circumstances and for allowing aggravating circumstances to be

applied arbitrarily or automatically for defendants convicted of

AO 72A
(Rev. 8/82)

certain offenses. Dkt. No. 35 ¶¶ 167-171. This claim was asserted in the state habeas action and denied as procedurally defaulted. Dkt. No. 12-204, Ex. 65, at 14. The state court expressly and solely relied on state law that is firmly established and regularly followed. See id. at 13-14 (citing Black v. Hardin, 255 Ga. 239 (1985); Valenzuela v. Newsome, 253 Ga. 793 (1985); O.C.G.A. § 9-14-48(d)).

To overcome this procedural default, Petitioner argues that he has shown cause through trial counsel's ineffective assistance, and prejudice by the lack of meaningful guidance and "double counting" of qualifying a person for the death penalty based on the aggravating factors existing from the mere conviction for an underlying offense. Dkt. No. 48, at 94-96. Petitioner's arguments are without merit.

Petitioner has failed to show prejudice. Although Petitioner disputes whether certain specified aggravating factors sufficiently capture the egregiousness (or lack thereof) of the underlying murder and whether consideration of multiple factors constitutes impermissible double counting, Georgia's death penalty scheme and O.C.G.A. § 17-10-30's list of aggravating factors have consistently passed constitutional scrutiny. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 302-03 (1987) (validating Georgia's death penalty scheme and discussing a safeguard in requiring "at least one statutory aggravating

AO 72A
(Rev. 8/82)

circumstance beyond a reasonable doubt" (emphasis added));

Gissendaner v. State, 272 Ga. 704, 716-18 (2000) (assessing

aggravating factors and upholding the constitutionality of

Georgia's death penalty statute), cert. denied, 531 U.S. 1196

(2001). In the face of this authority, the Court declines to

countenance Petitioner's attempt to bootstrap the underlying

claim and attempt to use conclusory assertions of arbitrariness

to find prejudice sufficient to overcome the procedural default.

P. Claim 16: Flawed Proportionality Review

Claim 16 asserts that the Supreme Court of Georgia's

application of proportionality review is unconstitutionally

flawed for using a string citation of cases, which are allegedly

similar to this one, to support its conclusion that Petitioner's

sentence is neither excessive nor disproportionate to those

imposed in similar cases. Dkt. No. 48, at 96. Although the

state habeas court found that this claim was procedurally

defaulted, Petitioner argues that this is clear error given that

he asserted the claim in his state habeas action—a claim that

was unripe until the proportionality review was complete in

Meders II. Id. at 96 (citing Dkt. No. 12-204, Ex. 65, at 15-

16). Although Respondent, in his Answer, asserted that the

claim was procedurally defaulted, he does not reassert this in

his brief, but rather argues the claim on its merits. See Dkt.

No. 49, at 161-168. The Court agrees that there was no

AO 72A
(Rev. 8/82)

meaningful opportunity to bring his claim prior to initiating the state habeas action and therefore reviews de novo Claim 16 on the merits. See Cone v. Bell, 556 U.S. 449, 472 (2009) (reviewing de novo a Brady claim rather than using the AEDPA's deferential standard because the claim was not adjudicated on the merits in a state proceeding).

### 1. Parties' Arguments

Petitioner's claim, under the Fifth and Fourteenth Amendments, asserts that the Supreme Court of Georgia's proportionality review was "utterly perfunctory" rather than meaningful, and therefore constitutionally infirm. In support, he relies on Justice Stevens's statement (in response to a denial of a petition for writ of certiorari) that Georgia's proportionality review procedure may be inadequate for using a string citation of cases without any factual analysis in conducting a proportionality review. Dkt. No. 48, at 97 (quoting Walker v. Georgia, 129 S. Ct. 453 (2008) (Stevens, J.)).

In response, Respondent argues that Petitioner is not entitled to an additional proportionality review and that the Supreme Court of Georgia's decision was not contrary to, or an unreasonable application of, Supreme Court of the United States precedent. Dkt. No. 48, at 97-98.

## 2. Merits Determination

The Court construes Petitioner's challenge as pertaining to process rather than the substance of Georgia's proportionality review. Indeed, it would be improper for the Court to conduct a de novo review of the proportionality determination. See Mills v. Singletary, 161 F.3d 1273, 1282 (11th Cir. 1998) (per curiam) ("[The Eleventh Circuit has] instructed district courts to refuse such requests [for proportionality review] when deciding habeas corpus petitions."). Therefore, only a review of whether the process is constitutionally adequate remains.

The Court does not find Georgia's application of proportionality review constitutionally infirm. The Supreme Court of Georgia's proportionality review is self-imposed. O.C.G.A. § 17-10-35(c)(3). Although this requirement has been pertinent in addressing whether Georgia's capital punishment scheme passes constitutional muster, Gregg v. Georgia, 428 U.S. 153, 198 (1976), such review is not constitutionally indispensable, Pulley v. Harris, 465 U.S. 37, 44-46 (1984). Moreover, the Supreme Court of the United States has affirmed the manner in which the Supreme Court of Georgia has conducted its proportionality review. See McCleskey, 481 U.S. at 306 (noting that the Supreme Court of Georgia supported its conclusion that a death sentence for armed robbery was not disproportionate to other sentences "with an appendix containing

AO 72A
(Rev. 8/82)

citations to 13 cases involving generally similar murders"). "Having elected to provide the additional protection of proportionality review, there can be no question that the way in which the Georgia Supreme Court administered that review in this case raised no constitutional issue." Walker v. Georgia, 555 U.S. 979 (2008) (Thomas, J., concurring). Therefore, Claim 16 is without merit.

Q. Claim 17: Cruel and Unusual Administration of Penalty

Claim 17 asserts that Georgia's administration of the death penalty is conducted in a cruel and unusual manner. Dkt. Nos. 35 ¶¶ 181-185; 48, at 98-100. Although the state habeas court found the claim to be procedurally defaulted, Petitioner contends that the as-applied challenge was unripe until a final affirmance in state court of his sentence or a clear articulation of how his execution would be conducted. Dkt. No. 48, at 98-99. Substantively, his argument boils down to (A) listing plausible mitigating factors as establishing that the death penalty in this case is excessive, (B) there being an unacceptable risk of extreme stress and unreasonable pain, and (C) "society's evolving standards" making lethal injection unconstitutional. Id. at 99-100.

Assuming that Claim 17 can overcome the procedural default, it would nevertheless be without merit. The Court construes Petitioner's first argument as asking for an additional

proportionality review—an impermissible endeavor by a federal district court addressing a habeas petition. See supra Part IV.P.2. Second, Petitioner's challenge to the manner of execution is not cognizable in a habeas action, but instead must be brought in a suit pursuant to 42 U.S.C. § 1983. See Tompkins v. Sec'y, Dep't of Corr., 557 F.3d 1257, 1261 (11th Cir. 2009) (per curiam) (citing Hill v. McDonough, 547 U.S. 573, 579-83 (2006)); McNabb v. Comm'r Ala. Dep't of Corr., 727 F.3d 1334, 1344 (11th Cir. 2013). Third, Petitioner's invocation of evolving standards of decency runs contrary to clearly established precedent. See Gregg, 428 U.S. at 187 (rejecting a contention that the death penalty may never be imposed); Baze v. Rees, 553 U.S. 35, 62-63 (2008) (countenancing Kentucky's lethal injection procedures). Therefore, Claim 17 is without merit to the degree it is not procedurally defaulted.

R. Claim 18: Denial of Full and Fair Hearing on Remand

Claim 18 asserts that Meders was deprived of his right to a full and fair hearing on remand by the remand court's refusal to continue the hearing to obtain the testimony of Meders's recently hospitalized trial counsel, to provide funds for experts, and to allow fair access to discovery prior to the hearing. Dkt. No. 35 ¶¶ 186-93. Although the parties agree that the portion of this claim related to expert funds should be reviewed under § 2254(d), Petitioner argues that the portion

related to a denial of a continuance was never adjudicated on the merits and therefore deserves de novo review.   Dkt. Nos. 48, at 88-89; 49, at 153.

### 1. Standard of Review

Petitioner states that he contested the denial of his continuance in his appeal from the remand court.   Dkt. No. 48, at 88 (citing Dkt. No. 12-109, Ex. 34, at 8).   Indeed, on appeal to the Meders II court, Petitioner stated that the remand court's rulings denied him access to former trial counsel, but he proffered no argument on this point.   Dkt. No. 12-109, Ex. 34, at 8.   In addition, however, Meders says that he raised the issue in opposition to the state's appeal of the state habeas court's grant of relief.   Dkt. No. 48, at 88 (citing Dkt. No. 12-212, Ex. 70, at 7-11).   Specifically, trial counsel's absence, combined with misrepresentations allegedly made by the prosecutor at the remand hearing, provided cause to overcome a procedural default on an IAC claim brought in the state habeas proceeding.[30]   Dkt. No. 12-212, Ex. 70, at 7-8.   Thereafter, in response to what Petitioner believes were fair presentations of his claim, the Supreme Court of Georgia's rulings in Meders II[31]

_____

[30] In effect, Petitioner is arguing that he fairly presented the claim to a state court by using it as a basis to overcome a procedural default on a separate claim.
[31] In full, as to what is now asserted in Claim 18, the Meders II court said the following:

> Meders argues the trial court should have appointed
> to assist him at the remand hearing a mental health expert,

AO 72A
(Rev. 8/82)

and Meders III[32] did not address the remand court's denial of a

continuance.

---

a jury composition expert, and a criminal defense attorney
to testify as an expert witness on the issue of
ineffectiveness.
  Meders was represented by two attorneys in the remand
proceedings.  He was not entitled to the appointment of a
third attorney to testify as an expert witness about how
properly to try a death penalty case.  Nor was expert
assistance necessary to determine whether or not the jury
lists fairly represented the population of Glynn County.
See Spivey v. State, 253 Ga. 187(7a), 319 S.E.2d 420
(1984).  Finally, it was not an abuse of discretion to deny
Meders' motion for independent psychological assistance.
See Christenson v. State, 261 Ga. 80(2), 402 S.E.2d 41
(1991).

Meders II, 261 Ga. at 806-07(1).

[32] In full, as to whether trial counsel's absence contributed to a finding of
cause to overcome procedural default on Petitioner's IAC claim, the Meders
III court said the following:

The first "cause" found by the habeas court to have impeded
counsel's efforts to raise the procedurally-defaulted
claims was the fact "petitioner was unable to cross examine
his trial counsel" at the remand hearing held on the
ineffectiveness issue due to trial counsel's illness and
inability to attend court.  This finding overlooks the
legal remedy that was readily available to petitioner in
this situation, namely, a court order to obtain counsel's
sworn testimony for use at the remand hearing.  See OCGA §
24-10-130 (depositions to preserve testimony in criminal
proceedings).  See also Dickens v. State, 280 Ga. 320,
322(2) fn. 2, 627 S.E.2d 587 (2006) (use of affidavits at
motion for new trial hearings challenging effectiveness of
counsel).  Moreover, even assuming petitioner had shown
cause for not presenting his trial counsel's testimony at
the remand hearing, trial counsel's death prior to the
habeas proceedings precluded petitioner from demonstrating
that any of his habeas claims were truly new or that he
suffered prejudice by his prior inability to raise
additional claims at the remand hearing.  In other words,
"nothing" (in the form of the absence of testimony) cannot
be used in this case to prove "something" (i.e., the
matters petitioner was required to show on habeas to avoid
procedural default).  Thus, the habeas court erred by
holding that trial counsel's absence from the remand
hearing served as "cause" for failure to raise ineffective
assistance on direct appeal.

Meders III, 280 Ga. at 866-67(1).

## 2. Merits

Petitioner's claim is without merit. To the degree Claim 18 relies on the denial of funds for psychological expert assistance, Claim 14's analysis controls. See supra Part IV.N. As to the other experts, the Supreme Court of Georgia's determination was reasonable under § 2254(d). On remand, Meders had—and continues to have—the benefit of excellent counsel, and the Court sees no basis in finding that constitutional due process mandated expert assistance on the issues of effective assistance of counsel and whether the jury fairly represented the community. As to the denial of the continuance, the Court declines to speculate on the effect that granting the continuance would have had on the course of litigation. Perhaps Davis would have been available afterward, but as likely would not have been. Nor can the Court guess about whether his testimony would have assisted Meders's claims or been prejudicial to them. Therefore, even reviewing the issue de novo, Claim 18 is without merit.

AO 72A
(Rev. 8/82)

## V. Conclusion

For the aforementioned reasons, Petitioner's Amended Petition for Writ of Habeas Corpus is **DENIED**. The Clerk of Court shall close the case.

**SO ORDERED**, this 14TH day of August, 2014.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)