# In the United States District Court for the Southern District of Georgia Brunswick Division

JIMMY FLETCHER MEDERS,

    Petitioner,

vs.

BRUCE CHATMAN, Warden, Georgia
Diagnostic Prison,

    Respondent.

CV 207-90

## ORDER

Presently before the Court is Petitioner's Motion for Certificate of Appealability (COA) and Amended Motion for COA (together "Motion for COA"). Dkt. Nos. 77, 81. Upon due consideration, Petitioner's motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

In October of 1987, Petitioner Jimmy Meders spent the afternoon drinking with his boss, Randy Harris, and two acquaintances, Bill Arnold and Greg Creel. The group left Harris behind while they continued to drink into the night and early morning of October 14, 1987. At approximately 2:30 in the morning, the trio stopped at a convenience store where Don

Anderson was working as a cashier. As Creel was heating a sausage biscuit in the microwave, Petitioner shot Anderson in the chest and head. Petitioner took $38.00 and some food stamps. The money and food stamps were found on Petitioner's person, and the murder weapon was stashed under Petitioner's waterbed. A jury of Petitioner's peers convicted him for Anderson's slaying and sentenced him to death. The Court denied his Petition for Writ of Habeas Corpus. Dkt. Nos. 35, 59. Petitioner now moves the Court for a COA. Dkt. Nos. 77, 81.

**I. Procedural Background**

In his Amended Petition for Writ of Habeas Corpus, dkt. no. 35, Meders asserted 18 claims for relief. The court ultimately denied Meders's motion for relief from his conviction and sentence. <u>See</u> Dkt. No. 59. He then filed a Rule 59(e) Motion to Alter and Amend the Judgment. Dkt. No. 62. Finding no manifest errors of law or fact, the Court denied Meders's Motion. Dkt. No. 75. Now he has filed a Motion for COA and an Amended Motion for COA "supplementing" the original Motion. Dkt. Nos. 77, 81.

Petitioner moves for a COA on Claim 1, Ineffective Assistance of Counsel (IAC) - guilt/innocence phase; Claim 1, IAC - sentencing phase; Claim 2, Prosecutorial Misconduct – Introduction of Perjured Testimony; Claim 3, Failure to Disclose Exculpatory Evidence; Claim 4, Improper Introduction of Food

2

Stamps; Claim 5, Erroneous Admission of Cocaine Citation; Claim 6, Prosecution's False Closing Argument; Claim 11, Failure to Conduct Competency Hearing; Claim 12, Failure to Appoint Trial Mental Health Expert; Claim 13, Improper Jury Instruction; Claim 14, Denial of Experts at Remand Proceeding; Claim 15, constitutionality of O.C.G.A. § 17-10-30; Claim 16, Flawed Proportionality Review; and Claim 18, Denial of Full and Fair Hearing on Remand.  The Court finds only one claim, IAC - guilt/innocence phase, Claim 1, merits a COA.

## II. Evidentiary Background

Meders's convictions were for the murder and robbery of a Jiffy Mart convenience store clerk, Don Anderson, which occurred during the early morning hours of October 14, 1987.  Although two other men, Bill Arnold and Greg Creel, admitted to being present at the time of the crime, only Meders was charged.  See Dkt. No. 12-204, Ex. 65, at 38.

Arnold and Creel became crucial witnesses for the state at trial.  Their testimony conflicts with Meders's version of events, and Meders's claims are heavily based on his trial counsel's failure to effectively cross-examine these witnesses with pertinent evidence, along with trial counsel's failure to exclude allegedly improper and prejudicial evidence.

A. Police Reports and Crucial Witness Testimony

1. Evidence at Trial

### a. Meders's Testimony

Meders testified at trial that he had spent the day and
evening of October 13 drinking and taking drugs with Arnold and
Creel. See Dkt. No. 12-45, Ex. 15, at 19-25. In a statement
given in November 1988, and in his testimony at trial, Meders
said that Arnold and Creel took him home during the evening and
then later returned to retrieve Meders's gun. Dkt. Nos. 12-40,
Ex. 13, at 23-24; 12-45, Ex. 15, at 34-35.

Meders testified that Arnold and Creel encouraged him to
shoot a young man, Keith Bowen, with whom Arnold and Creel were
feuding. Dkt. No. 12-45, Ex. 15, at 35. Meders claims that he
refused and that Arnold then used Meders's gun to shoot at
Bowen's parked truck. Id. at 35-36. Further, according to
Meders, Arnold used Meders's gun to shoot at a pick-up truck
owned by another person with whom Arnold and Creel had an
ongoing feud, Robert Brown. Dkt. Nos. 12-40, Ex. 13, at 23-24;
12-45, Ex. 15, at 36-37.

### b. Creel's and Arnolds's Testimony

Creel and Arnold denied Meders's narrative. Creel admitted
that he had been drinking with Meders during the day of the
shooting, but denied taking him home and denied knowing Meders
had the murder weapon. Dkt. No. 12-34, Ex. 12, at 9, 27.
Arnold offered similar trial testimony, denying taking Meders

home and denying knowledge of the gun. Dkt. No. 12-35, Ex. 12, at 5, 21-22.

At trial, Meders was represented by Glynn County Public Defender John W. Davis. E.g., dkt. no. 12-2, Ex. 1, at 35. Davis was an experienced member of the State Bar of Georgia. Dkt. No. 12-204, Ex. 65, at 23-24. Prior to his defense work, he had served as a solicitor general, superior court judge, and United States congressman. Id. at 24. At trial, Davis cross-examined Creel about his alleged involvement in the drive-by shootings:

> Q. [Davis] Now, as a matter of fact, did not Jimmy Meders pull that gun out while you were riding around, after you had got him from his house, and didn't you shoot at a couple of trucks?
>
> A. [Creel] No, sir.

Dkt. No. 12-34, Ex. 12, at 28. Arnold's testimony was the same. See Dkt. No. 12-35, Ex. 12, at 21 ("Q. [Davis] Do, don't you, do you remember shooting at a truck? A. [Arnold] No, sir, we didn't.").

### c. Detective Boyet's Testimony

The lead detective in the case, Detective Jack Boyet, was asked preemptively by the prosecutor at trial if he found any evidence to corroborate testimony that Creel, Arnold, or another key witness, Randy Harris, possessed the gun at some point or that Arnold shot the victim. Boyet testified there was none.

Dkt. No. 12-40, Ex. 13, at 26.  Davis followed up on this point

with Boyet on cross-examination:

> Q. [Davis] And you stated that [Arnold and Creel]
> denied shooting at a truck?
>
> A. [Boyet] Yes, sir.
>
> Q. And did you have any reason to, to doubt that
> they were telling you the truth?
>
> A. **The only thing I had to indicate that they did
> do it was, is Jimmy Meders saying that they did.**
>
> Q. So you have no other reason?
>
> A. **There, there is no other evidence to indicate
> that they did.**  There, there are no witnesses
> that saw it other than the, the three who were
> allegedly in the [vehicle] and I have no proof
> that they did do it.

Dkt. No. 12-204, Ex. 65, at 41 (citing Dkt. No. 12-40, Ex. 13,

at 34) (emphasis supplied in habeas order).[1]

### d. Harris's Testimony

Randy Harris was Arnold's first cousin.  Dkt. No. 12-35,

Ex. 12, at 16.  Harris's testimony was also crucial for the

state's case in regard to motive and an alleged confession by

Meders.  Harris testified that Meders confessed to the crime

shortly after it occurred, claiming Meders said he had just shot

someone in the head for $38.00.[2]  Dkt. No. 12-33, Ex. 12, at 24.

---

[1] A week before trial, Creel and Arnold also admitted to the prosecutor, John
Johnson, and Boyet that they knew Bowen and that they were feuding with
Brown.  Dkt. Nos. 12-82, Ex. 30, at 29-30; 12-138, Ex. 52, at 8, 10-11.
[2] When specifically questioned at the outset of the investigation, Harris was
unable to say where the clerk had been shot and, in fact, asked an

According to Harris, Meders made the confession as Meders dumped the spent bullets from the murder weapon onto a bed where Harris had been sleeping with an underage woman, Sondra Ruggles.[3] <u>Id.</u> at 23-24.

Meders claimed that Harris was providing false information against him because Harris suspected that Meders was having an affair with Harris's wife.  <u>See</u> Dkt. No. 12-154, Ex. 55, at 2.

### e. Prosecutor's Alleged Vouching

Petitioner claims that the trial prosecutor falsely vouched for the veracity of the state's key witnesses.  The prosecutor, John Johnson, argued that Creel, Arnold, and Harris had given consistent and truthful descriptions to the police from the very start of the investigation and that Meders had concocted his defense while awaiting trial.  Verbatim, Johnson argued:

> You look at [the witnesses'] personal credibility
> . . . and you also look at how their testimony
> here in Court reflects what they said on October
> 14th, 1987, because that is an important part of
> credibility.  Have they stuck with their story,
> have they told the same thing all the way down
> the line, and if you just decided credibility
> based on that, if, if that is all you look at,
> then Randy Harris, Bill Arnold, Greg Creel, the
> police officers all told the same story all the
> way down the line from day one.

Dkt. No. 12-48, Ex. 15, at 11-12.

---

investigator about the location of the gunshot wound.  Dkt. No. 12-134, Ex. 52, at 9.
[3] Petitioner asserts that the Supreme Court of Georgia relied on Harris's testimony in its factual summary, as did the remand court.  Dkt. No. 48 at 17 (citing <u>Meders v. State</u> (<u>Meders I</u>), 260 Ga. 49, 50 (1990); Dkt. No. 12-108, Ex. 33, at 3).

### f. Jury Question

During their deliberations, the jury submitted a question labeled "Jury Question 5":

> Was there any reports [sic.] filed on the incident of the truck, on Ga Hwy 303, reported between the day, after or between then and now, being shot at??

Dkt. No. 12-53, Ex. 17, at 13-14. No police reports were introduced into evidence about the two truck shootings and the jury was told simply to rely on the evidence introduced during trial. Dkt. No. 12-50, Ex. 16, at 20. The truck owners did not testify at trial.

### 2. Evidence at Remand

#### a. Police Reports

On remand, police reports of the Brown and Bowen vehicle shootings were found in the lead detective's file on the Jiffy Mart killing. Dkt. No. 12-82, Ex. 30, at 23-25. Detective Boyet testified at remand that he recognized the significance of the Bowen and Brown reports and copied them for his file at the outset of his investigation of the murder. See id. At 24-25. The report of the shooting of Robert Brown's pickup truck showed that the shooting had occurred near Highway 303 "about an hour before the murder," and it mentioned Greg Creel by name as a suspect.[4] Dkt. No. 12-204, Ex. 65, at 39. The officer who

---

[4] The victim suspected that Creel or another individual was involved in the shooting. The other police reports did not identify Creel as a suspect.

investigated the Brown truck shooting also saw its potential relationship to the Jiffy Mart murder, "comment[ing] at the time he took the report that the slug found was similar to the one found at the scene of the murder." Id.

The prosecutor had the reports of the shootings in his case file at the time of trial. Id. at 41. When the jury submitted Question 5, Johnson realized that the jury was concerned about a report of a truck shooting on Highway 303, but did not believe he had any duty to advise the court of the existence of the police incident reports in his file and, therefore, stood mute. See Dkt. No. 12-205, Ex. 65, at 3.

b. Contradictory Statements

At the remand hearing, Meders pointed to statements made by Creel and Arnold that he claims contradicted their trial testimony, although his trial counsel failed to present them to the jury. For example, on October 15, 1987, the day after the shooting, Creel said:

> And I think we come back when we got the car.
> No, we carried that idiot home. Well, Bill
> carried him home. Anyway, [Jimmy] ended up going
> home. . . . And then Bill said let's go get him.
> So, we went and got him.

Dkt. No. 12-156, Ex. 55, at 2.

Further, in a taped statement made prior to trial, Arnold told police officers:

> Ok, well I picked [Meders] up at his house and we
> was all riding around, we'd been riding around
> drinking all day, and he'd went home, so we went
> by and picked him up, then we just went riding
> around drinking, you know. . . . [I]t was day,
> daylight see, we'd been riding around all day
> long and Jimmy went home for a while and then we
> rode around and picked him up.

Id. at 25.

### B. Evidence Related to Food Stamps and Drug Citation

#### 1. Food Stamps

During trial, trial counsel did not object to the
introduction of food stamps purportedly taken during the robbery
that were found on Meders at the time of his arrest. Meders now
emphasizes that he was a lawful recipient of food stamps and
that the stamps found on him could not be tied to the crime.
Dkt. No. 12-204, Ex. 65, at 35-36. Indeed, the prosecutor's
file contained a note to this effect from Detective Boyet. See
id. at 35 ("Unable to trace any food coupons to store."),
Despite this, Johnson argued to the jury that Meders's
possession of the food stamps was evidence of his guilt, Dkt.
No. 12-48, Ex. 15, at 33, and reason to sentence Meders to
death, Dkt. No. 12-51, Ex. 16, at 35-36.

#### 2. Citation for Possession of Cocaine

As found by the state habeas court, "[t]he State introduced
at trial a charging document in which Mr. Meders was charged
with the sale of cocaine." Dkt. No. 12-204, Ex. 65, at 33. The

cocaine charge supported Harris's testimony about Meders's motive for the killing—that is, to pay off a drug debt. Dkt. Nos. 12-33, Ex. 12, at 26; 12-204, Ex. 65, at 33. Meders denied that he was indebted to a drug dealer. Dkt. Nos. 12-46, Ex. 15, at 11; 12-204, Ex. 65, at 33. The Supreme Court of Georgia refused to consider on direct appeal the introduction of the uncharged misconduct described in the cocaine citation (or any other contents of Petitioner's wallet) because Davis failed to object to its admission. Meders I, 260 Ga. at 54(3).

## III. Legal Standard

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a COA is issued. Rule 11 of the Rules Governing Section 2254 cases provides that the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The decision to issue a COA requires "an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). A COA may issue only if the applicant makes a showing of a denial of a constitutional right. In order to obtain a COA, a petitioner must show "that jurists of reason could disagree with the court's resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." Id. at

327. "Where a plain procedural bar is present and the district

court is correct to invoke it to dispose of the case, a

reasonable jurist could not conclude either that the district

court erred in dismissing the petition or that the petitioner

should be allowed to proceed further." Slack v. McDaniel, 529

U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d

1196, 1199 (11th Cir. 2000). "This threshold inquiry does not

require full consideration of the factual or legal bases adduced

in support of the claims." Miller-El, 537 U.S. at 336.

## IV. Discussion

### A. Claim 1: Ineffective Assistance of Trial Counsel – Guilt and Innocence Phase

Meders first moves for a COA on the issue of IAC during the

guilt/innocence phase of the trial. Dkt. No. 77 at 4-8.

#### 1. Federal District Court Habeas Order

In support of his Habeas Petition, Meders asserted an IAC

claim based on six alleged failings at the trial's guilt phase:

> (1) failing to use police incident reports found
> in the prosecutor's open file and failing to
> develop testimony of the shootings near Highway
> 303 that corroborated Meders's trial testimony
> and impeached the testimony of the State's key
> witnesses; (2) failing to respond to the trial
> judge when the deliberating jury sent out a note
> asking about the existence of such reports; (3)
> failing to utilize prior inconsistent recorded
> statements of the State's three eyewitnesses
> found in the prosecutor's open file; (4) failing
> to object to the admission of an unadjudicated

citation for cocaine sales; (5) failing to object
                    to the admission and use of food stamps based
                    upon a note in the prosecutor's open file that
                    the food stamps could not be linked to the
                    robbery; and (6) trial counsel's failure to make
                    an opening statement.

Dkt. No. 48 at 46.  In its Habeas Order, the Court found

allegations (2) and (6) were unexhausted and therefore did not

address them.  Dkt. No. 59 at 43.

                    a.  Strickland Standard

     Meders's claim is brought under Strickland v. Washington,

466 U.S. 668 (1984).  To obtain habeas relief under Strickland,

a petitioner must show (1) counsel's performance was deficient

and (2) that deficiency prejudiced his defense.  Id. at 687.

Counsel's performance is deficient when it falls "below an

objective standard of reasonableness," Chandler v. United

States, 218 F.3d 1305, 1312 (11th Cir. 2000) (en banc), which

means that it is "outside the wide range of professionally

competent assistance," Strickland, 466 U.S. at 690.  Further,

"the issue is not what is possible or what is prudent or

appropriate, but only what is constitutionally compelled."

Chandler, 218 F.3d at 1313 (internal quotation marks omitted)

(quoting Burger v. Kemp, 483 U.S. 776, 794 (1987)).

     When deciding a habeas petition, Courts conduct a highly

deferential review of counsel's performance and "'indulge the

strong presumption' that counsel's performance was reasonable

                                13

and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (brackets omitted) (quoting Strickland, 466 U.S. at 689-90). To establish prejudice, there must be "a reasonable probability that, but for counsel's [deficient performance], the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002) (per curiam). A petitioner must "affirmatively prove prejudice." Strickland, 466 U.S. at 693.

### 1. Deficiency of Trial Counsel

Given that the state habeas court did not decide whether trial counsel's performance was deficient, this Court addressed the issue de novo. Dkt. No. 59 at 46. The Court found trial counsel's performance deficient as to allegations 1, 3, and 4, but not allegation 5 with regard to the admission of food stamps.[5] Id.

### 2. Prejudice to Meders

---

[5] As to the food stamps, the Court found no basis in finding that they would have been excluded had an objection been made. Dkt. No. 59 at 48.

In support of his habeas petition, Meders argued the state habeas court erred in finding insufficient prejudice under Strickland.[6] He argued that prejudice exists because there was a reasonable probability of a different verdict had the police reports and inconsistent statements been introduced and had there been an objection to the allegedly improper evidence. Dkt. No. 48 at 54. This Court concluded, however, that the state court's determination of no prejudice was reasonable under § 2254(d). Dkt. No. 59 at 49.

b. Remand Court's Analysis

In support of his habeas petition, Meders argued that the remand court unreasonably applied Strickland because it did not consider the police reports and impeaching statements, while it did consider the food stamps and cocaine citation. Dkt. No. 48 at 59. He also criticized the remand order's "shear paucity" of discussion and "truncated" prejudice inquiry and concluded that the Court should not countenance the remand court's conclusory finding of no prejudice based on the purportedly "overwhelming" evidence. Id.

In denying that Meders was prejudiced by any deficient performance, the remand court said that there was "overwhelming

---

[6] As explained in detail in procedural history of the Court's habeas Order, dkt. no. 59 at 7-9, the first state habeas court found sufficient prejudice under Strickland; the second state habeas court ("remand" court) found insufficient prejudice.

evidence supporting the conviction of the defendant and tending to undermine his own credibility." Dkt. No. 12-108, Ex. 33, at 9. Therefore, after purportedly "carefully considering the defendant's contentions and the record," the remand court found "that the defendant has not carried his burden of showing that there exists a reasonable probability that but for trial counsel's alleged deficiencies the result of the trial would have been different." Id. Although the court did not specify in that paragraph what specific evidence it was relying on, the remand court had provided a "backdrop to consideration of the 'prejudice' prong" under Strickland. Id. at 2. The evidence included:

- that the gun from which the fatal bullets were fired was owned by Meders and found under his mattress two days after the shooting;

- that all of the convenience store's bait money was found on Meders or at his house;

- that Meders had told Harris that Meders "blew a man's head off for $38.00";

- that Meders was the only one denying knowledge the next day of the shooting or being at the store;

- that Meders waited until a year after the shooting to come
  up with the narrative of events offered by him at trial;
  and

- that Meders failed to include the murder weapon in a
  disclosure of the firearms he owned.

Id. at 2-3.  Meders criticized the remand court's analysis based
on these facts as unduly giving them too much credence in light
of new evidence, while simultaneously not sufficiently crediting
the non-proffered evidence at issue and the fact that the jury
specifically asked about whether there were reports of any
drive-by shooting.

c.  Reasonableness of Remand Ruling

After carefully considering the merits of Petitioner's
federal habeas claim, this Court found

> there is at least a possibility that fair-minded
> jurists could disagree about whether the state court's
> decision conflicts with precedents of the Supreme
> Court of the United States.  As an initial matter, the
> Court recognizes the inference of prejudice based on
> Jury Question 5 and the critical battle for
> credibility during the trial.  In essence, although
> there was agreement by all witnesses to certain facts,
> some facts were disputed and could only be resolved by
> assessing the witnesses' credibility.  For example, at
> trial, Creel denied knowing that Meders had a gun on
> the night of the murder, but admitted within days
> after the murder to seeing a firearm beforehand.
> Similarly, although both Creel and Arnold denied
> picking Meders up from his house, they earlier had
> admitted to picking him up.  And, although the police

reports did not clearly implicate Creel and Arnold in
the shootings, their existence as proof of shootings
hours before the murder would have cast some doubt on
Creel's and Arnold's testimony that they were not
involved, although the police reports themselves
included speculative information and details
incongruous with Meders's narrative.  See Dkt. No. 12-
87, Ex. 31, at 8 (noting that two individuals were
seen in the shooting vehicle, not three).  All these
factual nuances were not determinative of Meders's
guilt, but these minute battles could have informed
the jury's decision on the ultimate dispute between
the witnesses actually present to the murder: whether
Arnold or Meders shot the store clerk.  It seems
possible that the jury discussed the witnesses'
credibility and whether parts of Meders's story could
be substantiated.

Dkt. No. 59, at 53-54.  Nevertheless, the Court concluded that
the "state court's determination was not an unreasonable
application of Strickland" because "[t]he record reveals the
significantly incriminating nature of the evidence."  Id. at 54;
see also id. at 54-57.  Upon Meders's motion for COA, the Court
now concludes that "reasonable jurists could debate whether (or,
for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented were
adequate to deserve encouragement to proceed further."[7]  Slack,
529 U.S. at 484-85.

---

[7] The Court's finding is limited as described herein and does not
apply to Meders's arguments regarding the remand hearing's
fairness.  See Dkt. No. 48 at 54-56 (arguing that the Supreme
Court of Georgia, by remanding the case to assess IAC claims,
forced him to litigate the issue with restrictive funding and
without the benefit of the Georgia Open Records Act).

2. COA Analysis

In support of his Motion for a COA on this issue,
Meders points to Georgia Superior Court Judge Bishop's
ruling on Meders's first state habeas action to show that
"reasonable jurists could debate whether (or, for that
matter, agree that) the petition should have been resolved
in a different manner, or that the issues presented were
adequate to deserve encouragement to proceed further." Id.
at 484-85. Judge Bishop found that Meders had been
prejudiced by trial counsel's deficient conduct:

> This court finds that absent these errors it
> is likely that the result of the proceeding would
> have been different and the jury would not have
> voted to convict, or in the alternative, voted to
> recommend the death penalty. … The prejudice
> suffered by the petitioner as a result of the
> ineffective assistance of trial counsel in (a)
> failure to introduce corroborative evidence; (b)
> failure to impeach Creel and Arnold with their
> prior statements; (c) failure to impeach Creel
> and Arnold with their prior convictions; (e)
> failure to object to irrelevant evidence –
> collectively served to undermine the exercise of
> the jury's discretion in determining the proper
> sentence to be imposed upon the petitioner and
> thereby violated the petitioner's right to the
> due process of law as guaranteed by the state and
> federal constitutions.

Dkt. No 77 at 6 (quoting dkt. no. 12-204 at 28; dkt.
no. 12-205 at 46-47). As Meders points out:

> Judge Bishop specifically commented on two items
> that impacted significantly on the prejudice to
> Mr. Meders. First, Judge Bishop discussed at
> length trial counsel's failure to introduce the

police incident reports concerning the pick-up
truck shootings prior to the murder, and Jury
Question 5 ("Was there any reports filed on the
incident of the truck, on Ga Hwy 303, reported
between the day, after or between then or a and
now, being shot at?), and concluded: "Jury
Question 5 established the importance of Mr.
Meders' testimony about the shooting at the pick-
up truck near Highway 303." Doc. 12-204 at 38-39.
Second, in regard to the same evidence, Judge
Bishop relied on the fact that when Detective
Boyet was asked at trial if he had any reason to
doubt Arnold and Creel's denial that they shot at
the truck, he responded, "The only thing I had to
indicate that they did do it, is Jimmy Meders
saying that they did." As Judge Bishop concluded,
this testimony came in the context of the fact
that at the time of trial, "the police incident
reports about the shooting of the pick-up truck
near Highway 303 and the shooting of the Bowen
truck were in Prosecutor Johnson's file that he
kept in this matter." Doc. 12-204 at 41.

Dkt. No. 77 at 6-7. The Court finds that Meders has
made a substantial showing of the denial of a
constitutional right, that is, effective assistance of
counsel during the guilt/innocence phase of trial,
including a showing that reasonable jurists could
debate whether the habeas petition as to that claim
should have been resolved in a different manner or
that the issues presented are adequate to deserve
encouragement to proceed further. Slack, 529 U.S. at
484-85. Meders's Motion for COA on the IAC guilt-
innocence phase claim is **GRANTED**.

B. <u>Meders's Motion for COA as to Remaining Claims</u>

The Court finds no merit to Meders's motion for a COA as to the remaining claims, Claim 1, Ineffective Assistance of Counsel – sentencing phase; Claim 2, Prosecutorial Misconduct – Introduction of Perjured Testimony; Claim 3, Failure to Disclose Exculpatory Evidence; Claim 4, Improper Introduction of Food Stamps; Claim 5, Erroneous Admission of Cocaine Citation; Claim 6, Prosecutions False Closing Argument; Claim 11, Failure to Conduct Competency Hearing; Claim 12, Failure to Appoint Trial Mental Health Expert; Claim 13, Improper Jury Instruction; Claim 14, Denial of Experts at Remand Proceeding; Claim 15, constitutionality of O.C.G.A. § 17-10-30; Claim 16, Flawed Proportionality Review; and Claim 18, Denial of Full and Fair Hearing on Remand. Because the Court has discussed these claims at length in the Order denying habeas relief, dkt. no. 59, and the Order on Meders's motion to alter and amend the judgment, dkt. no. 75, no further discussion is necessary. Meders's motion for a COA as to the these claims is **DENIED**.


**V. Conclusion**

For the aforementioned reasons, Petitioner's Motion for a Certificate of Appealability, dkt. nos. 77 & 81, is **GRANTED** as to Claim 1, IAC during the guilt/innocence phase of the trial,

and **DENIED** as to his remaining claims.

**SO ORDERED**, this 30th day of September, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA